# Exhibit 1

1    JAMES McMANIS (40958)
     CHRISTINE PEEK (234573)
2    BRANDON ROSE (269196)
     JENNIFER MURAKAMI (273603)
3    McMANIS FAULKNER
     A Professional Corporation
4    50 West San Fernando Street, 10th Floor
     San Jose, California 95113
5    Telephone:    (408) 279-8700
     Facsimile:     (408) 279-3244
6    Email:        cpeek@mcmanislaw.com

7    Attorneys for Petitioners and Plaintiffs,
     TIMOTHY WHITE,
8    ROBERT L. BETTINGER, and
     MARGARET SCHOENINGER

9

10            SUPERIOR COURT OF THE STATE OF CALIFORNIA

11                FOR THE COUNTY OF ALAMEDA

12    TIMOTHY WHITE, an individual; ROBERT      Case No. 1 2 6 2 5 8 9 1
     L. BETTINGER, an individual; and
13    MARGARET SCHOENINGER, an individual,

14

15            Petitioners and plaintiffs,

16        vs.

     **PETITION FOR WRIT OF MANDAMUS**
     **(CODE CIV. PROC., § 1085), OR IN THE**
     **ALTERNATIVE, FOR WRIT OF**
17    THE UNIVERSITY OF CALIFORNIA; THE      **ADMINISTRATIVE MANDAMUS (CODE**
     REGENTS OF THE UNIVERSITY OF         **CIV. PROC., § 1094.5); COMPLAINT FOR**
     CALIFORNIA; MARK G. YUDOF, in his     **DECLARATORY AND INJUNCTIVE**
18    individual and official capacity as President of   **RELIEF (CODE CIV. PROC., §§ 526a,**
     the University; MARYE ANNE FOX, in her    **1060)**
19    individual and official capacity as Chancellor of
     the University of California, San Diego; GARY
20    MATTHEWS, in his individual and official
     capacity as Vice Chancellor of the University of
21    California, San Diego; and DOES 1-50,
     inclusive,

22

23            Respondents and defendants.

24

25

26

27

28

                                  1

ENDORSED
FILED
ALAMEDA COUNTY

APR 1 6 2012

CLERK OF THE SUPERIOR COURT
By Tasha Perry, Deputy

1   1.      Petitioners and Plaintiffs, TIMOTHY WHITE ("WHITE"), ROBERT L .

2   BETTINGER ("BETTINGER"), and MARGARET SCHOENINGER ("SCHOENINGER"),

3   (collectively "Petitioners" or "Plaintiffs"), allege as follows:

4                                        **PARTIES**

5   2.      Plaintiff WHITE is an individual who lives in Berkeley, California. He is a real

6   property owner in and resident of the County of Alameda and the State of California, and pays

7   federal, state, and local taxes. WHITE is a professor of Integrative Biology at the University of

8   California, Berkeley. He holds Bachelor of Science degrees in both Biology and Anthropology

9   from the University of California, Riverside, and a Master of Arts and Ph.D. in Biological

10  Anthropology from the University of Michigan, Ann Arbor. He is renowned for his work in the

11  study of ancient humans. For example, in the 1990's, WHITE led an expedition in Ethiopia that

12  resulted in the discovery of a 4.4 million-year-old skeleton, dubbed "Ardi," which predated Lucy

13  by 1.2 million years.

14  3. ·    Plaintiff BETTINGER is an individual who lives in Davis, California. He is a

15  real property owner in and resident of the County of Solano and the State of California, and pays

16  federal, state, and local taxes. BETTINGER is a professor of Anthropology at the University of

17  California, Davis. He holds a Bachelor of Arts and a Ph.D. in Anthropology from the University

18  of California, Riverside. BETTINGER's scholarship and fieldwork have focused on hunter-

19  gatherers and the population expansions of hunter-gatherers.

20  4.      Plaintiff SCHOENINGER is an individual who lives in Encinitas, California. She

21  is a real property owner in and resident of the County of San Diego and the State of California,

22  and pays federal, state, and local taxes. SCHOENINGER is a professor of Anthropology at the

23  University of California, San Diego. She holds a Bachelor of Arts in Anthropology from the

24  University of Florida, a Master of Arts in Anthropology from the University of Cincinnati, and a

25  Ph.D. in Anthropology from the University of Michigan. SCHOENINGER's research centers on

26  the subsistence strategies of early humans.

27  5.      Defendant UNIVERSITY OF CALIFORNIA ("UNIVERSITY") is a public trust

28  established by article IX of the California Constitution.

PETITION FOR WRIT OF MANDAMUS; COMPLAINT, Case No.

1    4.    Defendant THE REGENTS OF THE UNIVERSITY OF CALIFORNIA
2  ("REGENTS") is a public corporation that administers the UNIVERSITY. (Cal. Const., art. IX,
3  § 9, subd. (a).)

4    5.    Defendant MARK YUDOF ("YUDOF") is an individual, who serves as President
5  of the UNIVERSITY. The President is the chief executive officer of the UNIVERSITY, and
6  governs through authority delegated by the REGENTS. The President is responsible directly to
7  the REGENTS. Moreover, the President "shall serve as the guardian of the public trust, ensuring
8  legal and ethical compliance, managing system risk, and providing information regarding
9  University activities." (*See* Regents Policy 1500, Statement Of Expectations Of The President
10  Of The University (March 2011) ("Regents Policy"), *available at*
11  http://www.universityofcalifornia.edu/regents/policies/1500.html.) YUDOF is sued here in his
12  individual and official capacities.

13    6.    Defendant MARYE ANNE FOX ("FOX") is an individual employed by
14  employed by the UNIVERSITY as the Chancellor of its San Diego campus ("UCSD"). The
15  campus Chancellor is the chief campus officer and executive head of all campus activities. FOX
16  is sued here in her individual and official capacities.

17    7.    Defendant GARY MATTHEWS ("MATTHEWS") is an individual employed by
18  the UNIVERSITY as Vice Chancellor, Resource Management and Planning, at UCSD. He is
19  sued here in his individual and official capacities.

20    8.    Plaintiffs do not know the true names and capacities of Defendants DOES 1
21  through 50, inclusive, and therefore sue these Defendants by such fictitious names. Plaintiffs
22  may amend this Writ Petition and Complaint to allege their true names and capacities when
23  ascertained. Plaintiffs are informed and believe that each of the fictitiously named Defendants is
24  responsible in some manner for the occurrences herein alleged, and that the illegal acts as herein
25  alleged were proximately caused by their conduct.

26    9.    At all times referenced herein, Defendants, including those named as DOES 1
27  through 50, were the agents, servants, and employees of their co-defendants, and in doing the
28  things alleged were acting in the scope of their authority as such agents, servants and employees,

3

1 under the direction and supervision and with the permission and consent of their co-defendants.

2                                     **GENERAL ALLEGATIONS**

3       10.     In 1976, Professor Gail Kennedy of UCLA led an archaeological field excavation

4 project on University property in San Diego (the "site"). The Chancellor's official residence,

5 University House, is also located on the site. Professor Kennedy's team discovered a rare double

6 burial. The bones have great scientific significance due to the age of the two skeletons ("La Jolla

7 Skeletons"), which are estimated to date back 8977 to 9603 years ago. The La Jolla Skeletons

8 are extremely old by North American osteological standards. They are similar to, though likely

9 older than, another skeleton found in Kennewick in 1996, which was the subject of federal

10 litigation that resolved in 2004. (*See Bonnichsen v. United States* (9th Cir. 2004) 367 F.3d 864.)

11 Because of their extreme age and relatively good condition, the La Jolla Skeletons represent a

12 unique opportunity for all people to understand human origins in North America.

13      11.     The SAN DIEGO ARCHAEOLOGICAL CENTER ("SDAC") presently has

14 physical custody of the La Jolla Skeletons, and holds them on behalf of the UNIVERSITY. The

15 SDAC is a California nonprofit corporation located in Escondido, California. By taking custody

16 of the La Jolla Skeletons on behalf of the UNIVERSITY, the SDAC is acting as the

17 UNIVERSITY's agent with respect to the La Jolla Skeletons.

18      12.     In 1990, Congress passed the Native American Graves Protection and

19 Repatriation Act ("NAGPRA"). NAGPRA imposes various requirements on, inter alia, state

20 government agencies and institutions of higher learning that receive federal funds, and that hold

21 "Native American" human remains or cultural items. NAGPRA defines "Native American" as

22 follows:

23      'Native American' means of, or relating to, a tribe, people, or culture that is
        indigenous to the United States.

24

25 (25 U.S.C. § 3001(9).) The Ninth Circuit has held that human remains must bear some

26 relationship to a presently existing tribe, people, or culture to be considered "Native American"

27 within the meaning of NAGPRA. (*See Bonnichsen v. United States, supra,* 367 F.3d at 875-76.)

28 NAGPRA does not apply to remains that are not "Native American" or "Native Hawaiian." For

                                                    4

PETITION FOR WRIT OF MANDAMUS; COMPLAINT, Case No.

1  remains or cultural items that are "Native American," NAGPRA may require that they be

2  "repatriated" or returned to a tribe, depending on whether or not certain conditions are met.

3  NAGPRA's statutory scheme does not require repatriation of "culturally unidentifiable" human

4  remains, however.

5      13.    NAGPRA requires those entities subject to it to compile an inventory of "Native

6  American" human remains and cultural objects in their possession, and to submit the inventory

7  to the DOI. (25 U.S.C. § 3003.)

8      14.    The UNIVERSITY has created a system-wide University Advisory Group on

9  Cultural Repatriation and Human Remains and Cultural Items ("Advisory Group"). (*See*

10  University of California Policies and Procedures On Curation and Repatriation of Human

11  Remains and Cultural Items ("Human Remains Policies").) The Human Remains Policies are

12  attached as Exhibit A. If a tribe requests repatriation, the Advisory Group must review all

13  campus determinations and report its findings and recommendations to the President or the

14  President's designee. The President or the President's designee has final authority to approve or

15  disapprove determinations regarding disposition of remains and cultural items.

16      15.    Under the Human Remains Policies, each campus with a collection of Native

17  American remains or cultural items must designate a liaison to work with native communities

18  considering or requesting repatriation from the UNIVERSITY. Defendant MATTHEWS is the

19  liaison for the San Diego campus.

20      16.    The Kumeyaay Nation ("Kumeyaay"), a coalition of 12 Native American tribes,

21  claims to have occupied the site on which the La Jolla Skeletons were found. Although the

22  Kumeyaay have asserted that the La Jolla Skeletons are culturally affiliated with their coalition

23  of tribes, there is insufficient evidence to support the conclusion that the Kumeyaay are

24  descended from the people who were buried at the site, approximately 10,000 years ago. In

25  addition, there is insufficient evidence to conclude that any Kumeyaay tribe actually occupied

26  the site at the time the La Jolla Skeletons were buried there. The evidence does not support a

27  finding that there is any link between the La Jolla Skeletons and any Kumeyaay tribe, or any

28  currently existing Native American tribe, for the following reasons, among other reasons:

5

a.   The burial pattern of the La Jolla Skeletons differs from that of the Kumeyaay as reported in early ethnographies. Before the Spanish explorers made contact with North America, the Kumeyaay cremated, rather than buried, their dead.

b.   Preliminary carbon and nitrogen stable isotope analysis of human bone collagen from the La Jolla Skeletons is consistent with a year-round diet of open-ocean and some nearshore marine fish or marine mammals. This contrasts with the diet of the Kumeyaay, who lived on wild plants, supplemented with more small than large game, and in some places, fish. Seasonal dependence on marine foods would produce lower values of the isotope signals than those recovered from the La Jolla Skeletons.

c.   The skeletal morphology of the La Jolla Skeletons does not show any link to the Kumeyaay, or any other Native American tribe. The La Jolla Skeletons have long, narrow cranial vaults and short, relatively narrow faces compared with extant Native Americans. A detailed 2007 morphological study by Professor Douglas Owsley concluded the La Jolla Skeletons were not Native American.

d.   Because there has been no genetic testing of the La Jolla Skeletons (because the UNIVERSITY has not allowed any testing), there is no genetic or DNA evidence linking the Kumeyaay or any other Native American tribe to the La Jolla Skeletons.

17.   On or about October 22, 2008, the UNIVERSITY submitted a "Notice of Inventory Completion" and inventory to the United States Department Of The Interior ("DOI"), which included the La Jolla Skeletons and various other items said to be associated with the remains. The DOI includes, as a bureau, the National Park Service ("NPS"). In turn, the NPS includes the Native American Graves Protection and Repatriation Review Committee ("NAGPRA Review Committee").

18.   The inventory was based on a 2008 report written by the local UC San Diego NAGPRA Review Committee. The 2008 report was silent on whether the La Jolla Skeletons were "Native American" within the meaning of NAGPRA, and made no attempt to determine whether or not the La Jolla Skeletons were subject to NAGPRA. The 2008 report did conclude,

6

1  however, that there was insufficient evidence to conclude the remains were culturally affiliated

2  with the Kumeyaay.

3        19.    Because there is insufficient evidence to conclude the La Jolla Skeletons are

4  "Native American" within the meaning of NAGPRA, Defendants' decision to include them on

5  the October 22, 2008 inventory was legally erroneous.  NAGPRA and its accompanying

6  regulations do not apply to the La Jolla Skeletons at all, because the La Jolla Skeletons do not

7  fall within the class of human remains that NAGPRA covers.  Therefore, the La Jolla Skeletons

8  should not have been included on any federal inventory.

9        20.    On or about February 23, 2009, MATTHEWS submitted to the DOI, through its

10  NAGPRA Review Committee, a Request by a Museum or Federal Agency that the Review

11  Committee Act on an Agreement Concerning the Disposition of Human Remains and Associated

12  Funerary Objects Determined to be Unidentifiable ("2009 Repatriation Request").

13  MATTHEWS requested that the DOI approve an agreement between FOX and the Kumeyaay

14  Cultural Repatriation Committee ("KCRC") to transfer custody of the La Jolla Skeletons to the

15  KCRC.  The KCRC is a coalition of 12 different Kumeyaay tribes of San Diego County.  The

16  2009 Repatriation Request was later withdrawn.

17        21.    In 2010, the DOI and its Secretary Ken Salazar ("Salazar") purported to

18  promulgate a new federal regulation governing the disposition of "culturally unidentifiable"

19  human remains that meet NAGPRA's definition of "Native American."  For all "culturally

20  unidentifiable" "Native American" human remains, Salazar and the DOI purported to impose the

21  following requirements, among other requirements:

22        a.    Requirements that the federal agency or museum in possession of the

23        remains consult with tribal representatives concerning culturally unidentifiable remains

24        and associated funerary objects;

25        b.    Requirements that federal agencies and museums offer to transfer control

26        of such remains to "(i) [t]he Indian tribe . . . from whose tribal land, at the time of the

27        excavation or removal, the human remains were removed; or (ii) [t]he Indian tribe or

28        tribes that are recognized as aboriginal to the area from which the human remains were

7

removed," unless the agency or museum can prove a right of possession;

      c.      Authorization for federal agencies and museums to transfer control to other tribes or Native Hawaiian organizations, in the event no tribe described above agrees to accept the remains; and

      d.      Notification requirements.

22.      On or about June 4, 2010, YUDOF wrote to FOX, stating that he planned to give "significant deference" to the Chancellors of the respective UC campuses regarding decisions about the disposition of remains. YUDOF instructed FOX that the UCSD campus had the responsibility to conduct consultations and analysis required under NAGPRA, and to make initial determinations and recommendations regarding cultural affiliation. YUDOF further instructed FOX that once UCSD completed its assessment, it should determine whether it needed to amend the previous NAGPRA inventory or prepare a new draft Notice of Inventory Completion.

23.      The La Posta Band of Diegueno Mission Indians of the La Posta Reservation ("La Posta Band of Mission Indians") is a federally recognized tribe of Kumeyaay people.

24.      On or about August 2, 2010, Steve Banegas, a spokesperson for the KCRC, wrote to the UCSD campus and requested that the La Jolla Skeletons be repatriated to the La Posta Band of Mission Indians, along with certain other objects previously excavated from the site.

25.      On or about October 21, 2010, MATTHEWS circulated a new Draft Notice of Inventory Completion ("Draft Notice") for review by the Advisory Group. The new notice was deficient for many reasons. It referred to "associated funerary items," even though the published paper describing the burials stated that no cultural items were found in association with the La Jolla Skeletons. It asserted that stone and shell recovered from the site was "reasonably believed to have been placed with or near" the La Jolla Skeletons, "at the time of death or later as part of the death rite or ceremony," without any factual support, and in apparent contradiction to Gail Kennedy's account of the excavation. The Draft Notice referred to the La Jolla Skeletons as "Native American," despite a detailed 2007 morphological study by Professor Owsley concluding they were not Native American. Finally, the Draft Notice stated that a detailed

8

1   assessment of the La Jolla Skeletons had been made by UC professional staff, when in fact, the

2   only staff who had seen the La Jolla Skeletons included Gail Kennedy (who did not refer to them

3   as Native American), Philip Walker (now deceased, who concluded they were not Native

4   American), and plaintiff SCHOENINGER. SCHOENINGER never made any determination that

5   the remains were "Native American" within the meaning of NAGPRA, nor was she asked to do

6   so. In its responses to comments published along with the final version of 43 C.F.R. § 10.11, the

7   DOI included language indicating that museums must make a "threshold determination" that

8   culturally unidentifiable remains are "Native American" before including them on a federal

9   inventory. (*See* 75 Fed.Reg. 12387 (response to Comment 55).)

10       26.    On or about March 2, 2011, the Advisory Group considered MATTHEWS' Draft

11   Notice and submitted a summary and report. The Advisory Group recommended that UCSD

12   should not forward the Draft Notice without further consultation with tribes other than the

13   Kumeyaay. The Advisory Group also recommended that the San Diego campus reanalyze

14   whether the supposed "associated funerary objects" are, in fact, funerary objects, and if not, to

15   revise the Draft Notice accordingly. The Advisory Group did not reach a consensus on any other

16   recommendations.

17       27.    On or about May 11, 2011, YUDOF wrote to FOX, stating that he intended to

18   defer to the campus's determination on the issue of whether or not the remains were "Native

19   American" under NAGPRA, and to authorize the campus to proceed under the NAGPRA

20   process. YUDOF authorized UCSD to dispose of the La Jolla Skeletons under NAGPRA,

21   subject to the following directions and recommendations:

22       a.    UCSD was required to reanalyze, including through expert analysis,

23       whether the materials listed on the Draft Notice were funerary objects, and if not, to

24       revise the Draft Notice.

25       b.    YUDOF advised UCSD to revise its Notice of Inventory Completion to

26       acknowledge an alleged "division among experts" on the issue of whether the La Jolla

27       Skeletons are "Native American" within the meaning of NAGPRA.

28       c.    YUDOF instructed UCSD to consult more broadly with other tribes in the

9

1  region. Following this consultation, if UCSD determined that additional tribes were
2  aboriginal to the site, YUDOFF instructed UCSD to revise its Notice of Inventory
3  Completion accordingly. If there were no competing claims, however, YUDOF
4  authorized FOX to dispose of the La Jolla Skeletons to the La Posta Band of Mission
5  Indians in accordance with NAGPRA, 30 days after publication in the Federal Register.

6  28.  The La Jolla Skeletons are in good enough condition that it may be possible to
7  retrieve DNA samples and perform DNA sequencing. Not only would this provide a wealth of
8  information of interest to the general public, such sequences also could be used to assess whether
9  or not the remains share any genetic affiliation with modern Native American groups.

10  29.  FOX and UCSD have authority to grant requests to study the La Jolla Skeletons,
11  but have refused to allow any research to be conducted.

12  30.  On or about August 16, 2010, BETTINGER requested permission to study the La
13  Jolla Skeletons. He proposed to perform (1) macro-morphological work; (2) stable isotope
14  analyses to determine diet and place of origin; and (3) ancient DNA work to establish genetic
15  affinity. These studies are essential to understanding the colonization of California and Western
16  North America, and of the New World generally. These studies are also central to
17  BETTINGER's long-standing research on hunter gatherers and hunter gatherer expansions. Dr.
18  Art Ellis, UCSD Vice Chancellor for Research, replied that UCSD was finalizing procedures for
19  dealing with such requests and that while he (Ellis) was shortly leaving UCSD, he had forwarded
20  BETTINGER's request to Associate Vice Chancellor George Tynan, whom BETTINGER could
21  look forward to hearing from. BETTINGER never heard back from Tynan. If the repatriation
22  does not go forward, BETTINGER and other experts in the field of ancient DNA and stable
23  isotope analysis plan to pursue these studies. Because they are so well preserved, and because
24  there are two of them, the La Jolla Skeletons present a unique opportunity to study patterns at a
25  population level rather than an individual level, enabling scientists to apply the results of the
26  studies in a wide variety of other contexts. No other set of New World remains holds such a high
27  degree of research potential.

28  31.  In or about April, 2009, WHITE asked to study the La Jolla Skeletons. He

10

1  engaged in communications with various UNIVERSITY representatives regarding his request

2  from 2009 to 2011 without ever receiving a final response to his request. For WHITE, the La

3  Jolla Skeletons represent part of a worldwide sample of early humanity, which is critical to the

4  understanding of the species, *Homo sapiens*. If the La Jolla Skeletons are not repatriated,

5  WHITE still plans to study them.

6      32.  In 2009, SCHOENINGER spoke informally to the Senior Vice Chancellor for

7  Academic Affairs, Paul Drake, and the then Vice Chancellor for Research at UCSD, Art Ellis,

8  about studying the La Jolla Skeletons. She gave a presentation to the Academic Senate Council

9  regarding the research value of the skeletons in 2009. The Academic Senate Council told

10  SCHOENINGER she could not study the La Jolla Skeletons or involve herself further in any

11  requests to study them, because she allegedly had a "conflict of interest." SCHOENINGER

12  wants to preserve the opportunity to study the La Jolla Skeletons in the future, especially in the

13  event that studies by BETTINGER or WHITE implicate new research questions in her area of

14  focus.

15      33.  On or about December 5, 2011, defendants published, or caused to be published,

16  in the Federal Register, a Notice of Inventory Completion: The University of California, San

17  Diego, San Diego, CA ("Repatriation Notice"). The Repatriation Notice is attached as Exhibit

18  B. The Repatriation Notice stated that if no one else came forward and claimed the La Jolla

19  Skeletons by January 4, 2012, the La Jolla Skeletons would be repatriated to the La Posta Band

20  of Mission Indians after that date. The Repatriation Notice also made the following purported

21  findings, among other findings:

22      a.  The La Jolla Skeletons are "Native American," pursuant to 25 U.S.C. §

23      3001(9).

24      b.  Pursuant to 25 U.S.C. § 3001(2), a relationship of shared group identity

25      cannot be reasonably traced between the La Jolla Skeletons and any present-day Indian

26      tribe.

27      c.  Pursuant to 25 U.S.C. § 3001(3)(A), approximately 25 objects found at the

28      site are "reasonably believed to have been placed with or near" the La Jolla Skeletons, "at

11

1   the time of death or later as part of the death rite or ceremony."

2           d.     Pursuant to 43 C.F.R. § 10.11(c)(1), and based upon request from the

3   Kumeyaay Cultural Repatriation Committee, on behalf of the 12 associated Kumeyaay

4   tribes, disposition of the La Jolla Skeletons is to the La Posta Band of Diegueno Mission

5   Indians of the La Posta Indian Reservation, California.

6        34.     On or about January 25, 2012, the parties entered into a Tolling Agreement, by

7   which respondents and defendants agreed that, "any and all statutes of limitation applicable to

8   any claims whatsoever that plaintiffs may have against defendants relating to the La Jolla

9   Skeletons that have not already expired shall be tolled to and including April 16, 2012."

10  **PETITION FOR WRIT OF MANDAMUS (Code Civ. Proc. § 1085),**

11  **OR IN THE ALTERNATIVE, FOR WRIT OF ADMINISTRATIVE MANDAMUS**
    **(Code Civ. Proc. § 1094.5)**

12  **[All Petitioners Against All Respondents]**

13       35.     Petitioners hereby incorporate by reference paragraphs 1 through 33, inclusive.

14

15       36.     NAGPRA only applies to the La Jolla Skeletons if they meet the legal definition

16  of "Native American" under NAGPRA. Title 43, part 10.11, subdivision (a) of the Code of

17  Federal Regulations also specifically states that it applies "to human remains previously

18  determined to be Native American under § 10.9, but for which no lineal descendant or culturally

19  affiliated Indian tribe or Native Hawaiian organization has been identified."

20       37.     Under NAGPRA and its accompanying regulations, Respondents have a clear,

21  present, mandatory and ministerial duty to make a formal determination whether or not the La

22  Jolla Skeletons are "Native American" within the meaning of NAGPRA, before repatriating

23  them under the alleged authority of 43 C.F.R. § 10.11.

24       38.     Under article I, sections 7 and 15 of the California Constitution, and the

25  Fourteenth Amendment to the United States Constitution, Respondents have a clear, present,

26  mandatory and ministerial duty to comply with the minimum requirements of due process,

27  including a clear, present, mandatory and ministerial duty to avoid imposition of arbitrary

28  adjudicative procedures.

39. In addition, Respondents have a clear, present, mandatory and ministerial duty to administer the UNIVERSITY as a public trust, pursuant to the state constitutional mandate. "[D]ecisions are to be made solely to promote the best interests of the University as a public trust, rather than the interests of a particular constituency, and that Board members will disclose personal, familial, business relationships, or other potential conflicts of interest as appropriate." (*See* Regents Policy 1100, Statement Of Expectations Of The Members Of The Board Of Regents (Jan. 2010), *available at* http://www.universityofcalifornia.edu/regents/policies/ 1100.html.) The public has an interest in preserving scientifically and historically significant items, as does the UNIVERSITY.

40. Petitioners are beneficially interested in the issuance of a writ of mandamus, because they have a clear, present, substantial and vested right in Respondents' performance of their duty to determine whether or not NAGPRA and its accompanying regulations actually apply to the La Jolla Skeletons, before Respondents dispose of them to the Kumeyaay. A disposition without such a formal determination would arbitrarily and illegally destroy the La Jolla Skeletons' incalculable scientific value to Petitioners, and to the public at large, and would violate NAGPRA.

41. In addition, Petitioners are beneficially interested as citizens and taxpayers in Respondents' performance of their duties under the law. Respondents' threatened act of repatriation not only would deprive Petitioners' of any opportunity to research the La Jolla Skeletons, it would also arbitrarily and illegally deprive all members of the public of the opportunity to understand the origins of humanity in North America.

42. The above-described actions of Respondents, including but not limited to, Respondents' inclusion of the La Jolla Skeletons on the October 22, 2008 Notice of Inventory Completion and the Repatriation Notice, were arbitrary and capricious, in excess of Respondents' jurisdiction, a prejudicial abuse of their discretion, and/or there was not a fair trial, for, inter alia, the following reasons:

a. Respondents failed to make a formal and adequate finding or determination whether or not the La Jolla Skeletons are "Native American" under

13

1  NAGPRA. On information and belief, Respondents failed to consider any evidence or

2  conduct a hearing on this issue. In failing to make this decision using procedures that

3  meet minimum constitutional standards, and in making their purported "findings" without

4  considering any evidence or providing Petitioners a full and fair opportunity to present

5  evidence, Respondents acted in an arbitrary and capricious manner, in violation of

6  Petitioners' fundamental due process rights, and in violation of Respondents' duty to

7  administer the University as a public trust;

8      b.     For the same reasons, Respondents' decision to include the La Jolla

9  Skeletons on the October 22, 2008 Notice of Inventory Completion and the Repatriation

10  Notice was not supported by an adequate finding or determination that the La Jolla

11  Skeletons are "Native American" under NAGPRA;

12      c.     To the extent Respondents made a formal finding or determination that the

13  La Jolla Skeletons were "Native American" under NAGPRA, their determination was

14  arbitrary and capricious, not supported by the weight of the evidence, and/or was not

15  supported by substantial evidence in light of the whole record. Respondents' decision

16  was further flawed in that Respondents apparently based their decision on the geographic

17  relationship of the Kumeyaay to the UCSD site, even though the "aboriginal territories"

18  occupied and defined for historic Indian tribes are not in any way linked to the prehistoric

19  territories that their lineal ancestors may have occupied;

20      d.     Petitioners were not allowed to present evidence in opposition to

21  Respondents' summary conclusion that the La Jolla Skeletons were "Native American"

22  within the meaning of NAGPRA;

23      e.     On information and belief, Respondents did not reanalyze whether the

24  materials listed on the Draft Notice were funerary objects, as required by YUDOF's May

25  11, 2011 letter;

26      f.     On information and belief, Respondents' purported finding that the 25

27  objects were "reasonably believed" to have been placed at the site at or near the time of

28  death or later as part of the "death rite or ceremony" is not supported by any evidence in

14

1    the record, and/or Petitioners were not allowed to present evidence in opposition to

2    Respondents' summary conclusion. Respondents' purported finding is arbitrary and

3    capricious ;

4         g.    The Human Remains Policies Respondents followed in drafting and

5    submitting the Notice of Inventory Completion and Repatriation Notice are fatally

6    flawed, because they provide no guidelines for determining whether remains are "Native

7    American" within the meaning of NAGPRA. Furthermore, they provide no standards

8    governing what evidence is admissible on the question of whether the remains are

9    "Native American" within the meaning of NAGPRA, or what weight the evidence is to

10   be given. The lack of standards renders it impossible for Petitioners to challenge the

11   evidence presented or Respondents' summary conclusion. The Human Remains Policies

12   do not provide notice of what evidence may be relied upon in the evaluation of whether

13   remains are or are not "Native American." The lack of procedures and standards renders

14   the Human Remains Policies unconstitutionally vague and violates due process.

15       43.   By including the La Jolla Skeletons on the October 22, 2008 Notice of Inventory

16   Completion and Repatriation Notice, Respondents acted in an arbitrary and capricious manner

17   and in violation of Petitioners' and the public's right to a fair determination of whether or not the

18   La Jolla Skeletons are "Native American" within the meaning of NAGPRA.

19       44.   Petitioners have no plain, speedy, and adequate remedy in the ordinary course of

20   law other than the relief sought by this petition.

21       45.   Petitioners have exhausted all administrative procedures required of them by law.

22       46.   If the relief sought by this petition is not granted, Petitioners and the general

23   public will suffer irreparable injury and harm, in that the ability to study the La Jolla Skeletons

24   will be lost forever. Petitioners are informed and believe that Respondents will repatriate the

25   remains to the La Posta Band of Mission Indians as soon as possible after January 4, 2012,

26   unless Respondents are restrained by this Court. Petitioners are informed and believe that the La

27   Posta Band of Mission Indians will fail to maintain the skeletons in a manner that preserves their

28   scientific value, and therefore the skeletons' scientific value will be destroyed, unless

15

1 | Respondents are restrained by this Court.

2 |      WHEREFORE, Petitioners pray for judgment against Respondents as set forth below.

3 | ## COMPLAINT

4 | ## FIRST CAUSE OF ACTION – DECLARATORY AND INJUNCTIVE RELIEF -
5 | ## VIOLATION OF NAGPRA (Code Civ. Proc. §§ 526a, 1060)

6 | ### [All Plaintiffs Against All Defendants]

     47.    Plaintiffs hereby incorporate by reference paragraphs 1 through 45, inclusive.

7 |      48.    NAGPRA only applies to the La Jolla Skeletons if they meet the legal definition

8 | of "Native American" under NAGPRA. Title 43, part 10.11, subdivision (a) of the Code of

9 | Federal Regulations also specifically states that it applies "to human remains previously

10 | determined to be Native American under § 10.9, but for which no lineal descendant or culturally

11 | affiliated Indian tribe or Native Hawaiian organization has been identified." Defendants' actions

12 | in approving the transfer of the La Jolla Skeletons to the La Posta Band of Mission Indians are

13 | illegal, invalid, null and void, because Defendants failed to make a finding or determination, or

14 | failed to make an adequate finding or determination, that the remains are "Native American"

15 | within the meaning of NAGPRA. Defendants' actions are also illegal, invalid, null and void to

16 | the extent Defendants concluded the remains were "Native American," because their conclusion

17 | is not supported by the evidence.

18 |      49.    Defendants have expended public funds in support of their illegal efforts to

19 | repatriate the La Jolla Skeletons, without determining whether they are "Native American"

20 | within the meaning of NAGPRA, and/or without considering all of the evidence concerning

21 | whether or not the La Jolla Skeletons are "Native American" within the meaning of NAGPRA.

22 |      50.    An actual, present controversy exists between Plaintiffs and Defendants, because

23 | Plaintiffs contend and Defendants deny that that Defendants' actions in approving the transfer of

24 | the La Jolla Skeletons to the La Posta Band of Mission Indians are illegal, invalid, null and void.

25 |      51.    Plaintiffs desire a judicial determination that Defendants' actions in approving the

26 | transfer of the La Jolla Skeletons to the La Posta Band of Mission Indians are illegal, invalid,

27 | null and void. A judicial declaration is necessary and appropriate at this time, so that Plaintiffs

28 |

PETITION FOR WRIT OF MANDAMUS; COMPLAINT, Case No.

1  may ascertain their rights, the rights of the general public, and Defendants' duties under the law.

2    52.    Unless Defendants are enjoined, Plaintiffs and the general public will suffer

3  irreparable injury and harm, in that the ability to study the La Jolla Skeletons will be lost forever.

4  Plaintiffs are informed and believe that Defendants will repatriate the remains to the La Posta

5  Band of Mission Indians as soon as possible after January 4, 2012, unless Defendants are

6  restrained by this Court. Plaintiffs are informed and believe that the La Posta Band of Mission

7  Indians will fail to maintain the skeletons in a manner that preserves their scientific value, and

8  therefore the skeletons' scientific value will be destroyed, unless Defendants are restrained by

9  this Court.

10    53.    Plaintiffs and the general public have no plain, adequate, or speedy remedy at law

11  and are entitled to injunctive relief against Defendants. Plaintiffs and the general public have no

12  administrative remedy because Defendants' procedures for approving the transfer of the La Jolla

13  Skeletons, and the short timeframe for repatriation after Defendants published their Repatriation

14  Notice, preclude any administrative relief.

15  ## SECOND CAUSE OF ACTION – DECLARATORY AND INJUNCTIVE RELIEF - BREACH OF PUBLIC TRUST

16

17  ### [All Petitioners Against Defendants REGENTS, YUDOF, FOX and MATTHEWS]

    54.    Plaintiffs hereby incorporate by reference paragraphs 1 through 52, inclusive.

18    55.    The UNIVERSITY is a public trust established by article nine of the California

19  Constitution.

20

    56.    The La Jolla Skeletons are part of the public trust that is the UNIVERSITY. In

21  addition, the UNIVERSITY maintains its collections of human remains and cultural items – to

22  which the La Jolla Skeletons belong – as a public trust.

23

    57.    Defendants REGENTS and YUDOF are trustees of the UNIVERSITY. FOX is

24  an agent of YUDOF when she is performing YUDOF's duties as trustee of the UNIVERSITY.

25  MATTHEWS is an agent of YUDOF when acting as an agent of FOX when she is performing

26  YUDOF's duties as trustee of the UNIVERSITY. Plaintiffs are informed and believe that

27  YUDOF and the REGENTS neglected to take reasonable steps to compel FOX and

28

1  MATTHEWS to correct what defendants knew or should have known were violations of
2  NAGPRA.

3      58.    Plaintiffs and the general public are beneficiaries of the public trust, of which the
4  La Jolla Skeletons are a part.

5      59.    Defendants have a duty to administer the UNIVERSITY as a public trust,
6  pursuant to the state constitutional mandate. (*See* Regents Policy 1100 (REGENTS are to serve
7  as trustees for the people of the State of California and as stewards for the University of
8  California, "acting to govern the University in fulfillment of its educational, research, and public
9  service missions in the best interests of the people of California"); *see also* Regents Policy 1500
10  ("The President is expected to direct the management and administration of the University of
11  California system consistent with the Bylaws and Standing Orders, administering the University
12  in fulfillment of its educational, research, and public service missions in the best interests of the
13  people of California").) Defendants have a duty to fulfill the UNIVERSITY's educational,
14  research, and public service missions in the best interests of the people of California.

15      60.    Defendants breached their duty to Plaintiffs and to the public to administer the
16  public trust for the public interest by (1) arbitrarily and capriciously including the La Jolla
17  Skeletons on the October 22, 2008 Notice of Inventory Completion and Repatriation Notice,
18  even though defendants lacked a reasonable or good faith belief that the remains are "Native
19  American" within the meaning of NAGPRA; (2) approving the transfer of the La Jolla Skeletons
20  to the La Posta Band of Mission Indians, even though defendants lacked a reasonable or good
21  faith belief that the remains are "Native American" within the meaning of NAGPRA, or that they
22  had any relationship to the tribe known as the La Posta Band of Mission Indians; (3) failing to
23  conduct a good faith inquiry and make a formal determination whether or not the remains are
24  "Native American" within the meaning of NAGPRA; and (4) misrepresenting that "25 objects"
25  were "reasonably believed" to have been placed at the site at or near the time of death or later as
26  part of the "death rite or ceremony," contrary to Gail Kennedy's account of the excavation.

27      61.    An actual, present controversy exists between Plaintiffs and Defendants, because
28  Plaintiffs contend and Defendants deny that that Defendants' actions alleged above constitute a

18

PETITION FOR WRIT OF MANDAMUS; COMPLAINT, Case No.

1 | breach of trust.

2 |     62.    Plaintiffs desire a judicial determination that Defendants' actions constitute a
3 | breach of trust. A judicial declaration is necessary and appropriate at this time, so that Plaintiffs
4 | may ascertain their rights and the rights of the general public, and Defendants' duties under the
5 | law.

6 |     63.    Plaintiffs seek to compel the trustees to perform their duties and to enjoin the
7 | trustees from committing future breaches. Plaintiffs are informed and believe that Defendants
8 | will repatriate the remains to the La Posta Band of Mission Indians as soon as possible after
9 | January 4, 2012, unless defendants are restrained by this Court. Plaintiffs are informed and
10 | believe that the La Posta Band of Mission Indians will fail to maintain the skeletons in a manner
11 | that preserves their scientific value, and therefore the skeletons' scientific value will be
12 | destroyed, contrary to the public interest, unless defendants are restrained by this Court.

13 |     64.    Plaintiffs and the general public have no plain, adequate, or speedy remedy at law
14 | and are entitled to injunctive relief against Defendants. Plaintiffs and the general public have no
15 | administrative remedy because Defendants' procedures for approving the transfer of the La Jolla
16 | Skeletons, and the short timeframe for repatriation after Defendants published their Repatriation
17 | Notice, preclude any administrative relief.

18 | **THIRD CAUSE OF ACTION – 42 U.S.C. § 1983 AND THE UNITED STATES**
19 | **CONSTITUTION – FIRST AMENDMENT**

20 | **[All Plaintiffs Against Defendants YUDOF, FOX, and MATTHEWS]**

    65.    Plaintiffs hereby incorporate by reference paragraphs 1 through 63, inclusive.

21 |
22 |     66.    Plaintiffs have a First Amendment right to receive information and ideas. The
23 | opportunity to use the La Jolla Skeletons for research purposes is the only means of accessing the
information and ideas contained within them.

24 |     67.    Defendants' actions alleged above have deprived, and will continue to deprive,
25 | Plaintiffs of their right to receive information under the First Amendment to the United States
26 | Constitution. Plaintiffs have been unable to study the remains, despite having made study
27 | requests. The government may not, "consistently with the spirit of the First Amendment,
28 |

19

PETITION FOR WRIT OF MANDAMUS; COMPLAINT, Case No.

1    contract the spectrum of available knowledge." (*See Griswold v. Connecticut* (1965) 381 U.S.
2    479, 482.)

3         68.    In committing the acts herein alleged, Defendants were acting under color of state
4    law.

5         69.    Plaintiffs desire a judicial determination that Defendants' actions violate
6    Plaintiffs' First Amendment right to receive information. A judicial declaration is necessary and
7    appropriate at this time, so that Plaintiffs may ascertain their rights and the rights of the general
8    public, and Defendants' duties under the law.

9         70.    An actual and immediate controversy has arisen and now exists between Plaintiffs
10   and Defendants related to their respective rights and duties. Plaintiffs contend, and Defendants
11   deny, that Defendants' actions have deprived, and will continue to deprive, Plaintiffs of their
12   right to receive information under the First Amendment to the United States Constitution.

13        71.    Plaintiffs and the general public have no plain, adequate, or speedy remedy at law
14   and are entitled to injunctive relief against Defendants. Unless Defendants are enjoined,
15   Plaintiffs and the general public will suffer irreparable injury and harm, in that the ability to
16   study the La Jolla Skeletons will be lost forever. Plaintiffs are informed and believe that
17   Defendants will repatriate the remains to the La Posta Band of Mission Indians as soon as
18   possible after January 4, 2012, unless Defendants are restrained by this Court. Plaintiffs are
19   informed and believe that the La Posta Band of Mission Indians will fail to maintain the
20   skeletons in a manner that preserves their scientific value, and therefore the skeletons' scientific
21   value will be destroyed, unless Defendants are restrained by this Court.

22   ///
23   ///
24   ///
25   ///
26   ///
27   ///
28   ///

20

1    <u>**PRAYER FOR RELIEF**</u>

2    Petitioners and Plaintiffs pray for judgment against Respondents and Defendants as

3    follows:

4    1.    On the petition for writ of traditional mandamus, or in the alternative, writ of

5    administrative mandamus:

6    (a)    For a peremptory writ directing Respondents to set aside the Notice of

7    Inventory Completion of October 22, 2008 and December 5, 2011, respectively; AND

8    (b)    For a peremptory writ directing Respondents to make a formal

9    determination whether or not the La Jolla Skeletons are "Native American" within the

10   meaning of NAGPRA; AND

11   (c)    For a peremptory writ directing Respondents to set aside and cease and

12   desist from any actions taken to implement the decision to transfer possession of the La

13   Jolla Skeletons to the La Posta Band of Mission Indians, unless and until Respondents

14   have made a formal determination that the remains are "Native American" within the

15   meaning of NAGPRA.

16   OR IN THE ALTERNATIVE:

17   (a)    For a peremptory writ directing Respondents to set aside the Notice of

18   Inventory Completion of October 22, 2008 and December 5, 2011, respectively; AND

19   (b)    For a peremptory writ prohibiting Respondents from transferring

20   possession of the La Jolla Skeletons to the La Posta Band of Mission Indians, on the

21   ground that they are not "Native American" within the meaning of NAGPRA.

22   2.    On the first cause of action for declaratory and injunctive relief:

23   (a)    A declaration, order and judgment that the La Jolla Skeletons are not

24   "Native American" within the meaning of NAGPRA; AND

25   (b)    A declaration, order and judgment that Defendants, in attempting to

26   transfer possession of the La Jolla Skeletons to the La Posta Band of Mission Indians,

27   acted arbitrarily and without jurisdiction or authority, and that Defendants' decision to

28   approve such transfer, and all subsequent actions to implement such transfer, are illegal,

21

invalid, null and void; AND

(c)     A preliminary and permanent injunction requiring Defendants to set aside and cease and desist from any and all actions implementing the decision to transfer possession of the La Jolla Skeletons to the La Posta Band of Mission Indians; AND

(d)     A permanent injunction prohibiting Defendants from taking any action in the future to approve or implement a transfer of possession of the La Jolla Skeletons to the La Posta Band of Mission Indians, or any other Native American tribe.

3.      On the second cause of action for breach of trust:

(a)     A declaration, order and judgment Defendants' actions constituted a breach of trust; AND

(b)     A preliminary and permanent injunction requiring Defendants to compel the Defendants to perform their duties as trustees of the UNIVERSITY and protect the UNIVERSITY's research assets from destruction; AND

(c)     A preliminary and permanent injunction requiring Defendants set aside and cease and desist from any and all actions implementing the decision to transfer possession of the La Jolla Skeletons to the La Posta Band of Mission Indians; AND

(d)     A permanent injunction prohibiting Defendants from taking any action in the future to approve or implement a transfer of possession of the La Jolla Skeletons to the La Posta Band of Mission Indians, or any other Native American tribe.

4.      On the third cause of action for violation of the First Amendment:

(a)     A declaration, order and judgment that Defendants' actions violate Plaintiffs' First Amendment right to receive information; AND

(b)     A preliminary and permanent injunction requiring Defendants set aside and cease and desist from any and all actions implementing the decision to transfer possession of the La Jolla Skeletons to the La Posta Band of Mission Indians; AND

(c)     A permanent injunction prohibiting Defendants from taking any action in the future to approve or implement a transfer of possession of the La Jolla Skeletons to the La Posta Band of Mission Indians, or any other Native American tribe.

22

5.   For Petitioners' and Plaintiffs' costs of suit;

6.   For Petitioners' and Plaintiffs' attorneys' fees; AND

7.   For any other and further relief that this Court may deem just and proper.

DATED: April 16, 2012                    McMANIS FAULKNER


                                         _Christine E. Peek_
                                         _____
                                         JAMES McMANIS
                                         CHRISTINE PEEK

                                         Attorneys for Petitioners and Plaintiffs,

                                         TIMOTHY WHITE,
                                         ROBERT L. BETTINGER, and
                                         MARGARET SCHOENINGER

23

PETITION FOR WRIT OF MANDAMUS; COMPLAINT, Case No.

1  **VERIFICATION TO PETITION FOR WRIT OF MANDAMUS**
   **(CODE CIV. PROC., § 1085), OR IN THE ALTERNATIVE,**
2  **FOR WRIT OF ADMINISTRATIVE MANDAMUS (CODE CIV. PROC., § 1094.5)**

3  I, Timothy White, Ph.D., declare:

4  I am one of the Petitioners and Plaintiffs in the instant action. I have read the Petition For

5  Writ Of Mandamus (Code Civ. Proc., § 1085), Or In The Alternative, For Writ Of

6  Administrative Mandamus (Code Civ. Proc., § 1094.5) against Respondents and know its

7  contents. The allegations of the Petition For Writ Of Mandamus (Code Civ. Proc., § 1085), Or

8  In The Alternative, For Writ Of Administrative Mandamus (Code Civ. Proc., § 1094.5) are true

9  of my own knowledge, except as to those matters which are alleged on information and belief,

10 and as to those matters, I believe them to be true.

11 I declare under penalty of perjury under the laws of the State of California that the

12 foregoing is true and correct.

13

14 Date: APRIL 9, 2012

                              Name:  Timothy White, Ph.D.
15

16

17

18

19

20

21

22

23

24

25

26

27

28

Verification to Petition for Writ of Mandate, Case No.

Exhibit A

University of California
May 1, 2001

## UNIVERSITY OF CALIFORNIA POLICY AND PROCEDURES ON CURATION AND REPATRIATION OF HUMAN REMAINS AND CULTURAL ITEMS

### I. GENERAL PRINCIPLES

It is the policy of the University of California to assure the respectful and dignified treatment of human remains and the consideration of living descendants of those deceased. The University recognizes that individuals and communities have cultural and religious concerns that must be considered in determining the treatment and disposition of human remains in its collections.

At the same time, the University's collections of human remains and cultural items serve valuable educational and research purposes important to the enhancement of knowledge in various disciplines. The University maintains these collections as a public trust and is responsible for preserving them according to the highest standards while fulfilling its mission to provide education and understanding about the past and present through continued teaching, research and public service.

The general principles of this policy, as stated above, apply to all human remains in the University's collections. The remainder of this policy pertains to Native American and Native Hawaiian human remains and "cultural items." "Cultural items," as used throughout this policy, refers to associated and unassociated funerary objects, sacred objects, and objects of cultural patrimony, as defined by the federal Native American Graves Protection and Repatriation Act ("NAGPRA;" P.L. 101-601). This policy is intended to ensure both adherence to the above statement of principles and compliance with NAGPRA.

### II. POLICY REGARDING NATIVE AMERICAN HUMAN REMAINS AND CULTURAL ITEMS

It is the policy of the University of California to respect Native American and Native Hawaiian concerns regarding the treatment and disposition of Native American and Native Hawaiian remains and cultural items that are part of the University's collections, and to repatriate such remains and cultural items to lineal descendants (as defined by NAGPRA), Indian tribes, and Native Hawaiian organizations under specified conditions, in accordance with federal and state law.

With respect to implementation of the requirements of NAGPRA, Indian tribes are defined as federally-recognized tribes (that is, as any tribe, band, nation or community of Indians "recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians") [43 CFR Part 10, Subpart A, §10.2 (b) (2)].

NAGPRA does not give standing to non-federally-recognized groups to seek repatriation of human remains or cultural items. However, in the event that the State of California develops a process for according official state recognition for repatriation purposes to Native American tribes, bands, nations, rancherias or other entities that is consistent with state and federal law including the California and United

May 1, 2001                                                                 Page 1 of 8

States constitutions, the University, in addition to repatriating to federally-recognized tribes under specified conditions, will also repatriate to such state-recognized tribes under specified conditions and to the extent permissible under law.

The University recognizes the right of all native peoples, including non-federally-recognized tribes, to make inquiries to its museums about possible cultural relationships to the human remains and cultural items in its collections, to visit the collections, and to study them under normal museum procedures. The University recognizes that the participation of such groups may lend a different and vital perspective to the present understanding of scholars and others studying the collections and also that such participation may allow Native Americans and Native Hawaiians to enrich their own cultural knowledge.

## III. UNIVERSITY ADVISORY GROUP ON CULTURAL AFFILIATION AND REPATRIATION OF HUMAN REMAINS AND CULTURAL ITEMS

A. **Composition.** The President or the President's designee shall establish a University Advisory Group on Cultural Affiliation and Repatriation of Human Remains and Cultural Items ("Advisory Group"), which shall be composed of one University faculty member delegated principal responsibility for compliance with this policy from each of those campuses that house collections covered by NAGPRA, and two Native American members to be selected by the President or designee from among nominees submitted by each campus. The Vice Provost for Research (or designee) will be the UC Office of the President liaison to the Advisory Group.

B. **Responsibilities.** The Advisory Group shall:

1. Review and advise the President or designee regarding campus implementation of and compliance with this policy and related applicable law and regulations;

2. Review campus decisions regarding potential cultural affiliation and repatriation of Native American or Native Hawaiian remains and cultural items, and report its findings and recommendations to the President or designee;

3. Make recommendations to the President or designee for revisions to this policy and any associated guidelines; and

4. Assist in the resolution of disputes that may arise in connection with this policy.

C. **Additional Input.** Campuses are encouraged to solicit input on significant policy matters, as appropriate, from members of Native American and Native Hawaiian groups and from additional University faculty members drawn from a variety of disciplines in which the study, treatment, curation, and repatriation of human remains is relevant. Campuses are encouraged to forward input received from such consultations to the Office of the President via their Advisory Group representative.

The following procedures and criteria shall be utilized to implement this policy:

May 1, 2001

## IV. REVIEW OF COLLECTIONS: INVENTORIES AND SUMMARIES

A.   **Inventories of Native American and Native Hawaiian human remains and associated funerary objects.**

In accordance with NAGPRA, each campus with Native American or Native Hawaiian human remains and associated funerary objects shall complete inventories of all such remains and associated funerary objects in its collections by reviewing existing documentation. Campus inventories shall draw on the best available academic expertise and involve consultation with tribal authorities representing Native American and Native Hawaiian groups. The inventories shall include descriptions of human remains and associated funerary objects and shall, to the extent possible, identify the geographical and cultural affiliation of those human remains and associated cultural items, as required by NAGPRA.

Final campus inventories and notices of inventory completion shall be transmitted to the Advisory Group and to the President or designee upon completion. Upon approval, the President or designee shall direct the campus to make them available to federal agencies and to lineal descendants, Native American tribes and Native Hawaiian organizations, as required by law.

Upon request by lineal descendants or appropriate tribal authorities, the campus shall provide additional available documentation to supplement the information provided in the campus inventories. Existing information is sufficient to fulfill this requirement; no additional scientific studies need be undertaken to provide such information.

B.   **Summaries of unassociated funerary objects, sacred objects, and objects of cultural patrimony.**

In accordance with NAGPRA, each campus shall complete a written summary of Native American and Native Hawaiian unassociated funerary objects, sacred objects, and objects of cultural patrimony held in its collections. These summaries provide a basis for further consultations with Native American and Native Hawaiian tribal authorities to determine cultural affiliation. Final campus summaries shall be submitted to federal agencies, lineal descendants, Native American tribes and Native Hawaiian organizations, as required by law.

Upon request by lineal descendants or appropriate tribal authorities, the campus shall provide access to records, catalogues, relevant studies, or other pertinent data for the purpose of determining the geographic origin, cultural affiliation and basic facts surrounding the acquisition and accession of objects covered in the summary.

C.   **Updates to inventories and summaries.**

In the course of the review of their collections and of continuing NAGPRA implementation efforts, campuses may determine that their inventories or summaries require additions or revisions. Such revisions to campus inventories shall be transmitted to the Advisory Group and to the President or designee upon completion. Upon approval, the President or designee shall direct the campus to make them available to federal agencies and to the appropriate lineal descendants, Native American tribes and Native Hawaiian organizations.

## V. DETERMINATION OF CULTURAL AFFILIATION

To the extent possible, campus inventories and summaries shall identify the cultural affiliation of human remains, funerary objects, sacred objects, and objects of cultural patrimony, as defined by federal law. "Cultural affiliation" refers to a relationship of shared group identity that can be reasonably traced historically or prehistorically between a present-day Native Hawaiian organization or federally-recognized Indian tribe and an identifiable earlier group.

Under NAGPRA, all of the following requirements must be met to determine cultural affiliation between a present-day Indian tribe or Native Hawaiian organization and human remains, funerary objects, sacred objects, or objects of cultural patrimony of an earlier group:

A.    Existence of an identifiable present-day Indian tribe or Native Hawaiian organization with standing under NAGPRA;

A.    Existence of an identifiable earlier group; and

B.    Existence of a shared group identity that can be reasonably traced between the present-day Indian tribe or Native Hawaiian organization and the earlier group. Evidence to support this requirement must establish that a present-day Indian tribe or Native Hawaiian organization has been identified from prehistoric or historic times to the present as descending from the earlier group.

Evidence to establish cultural affiliation may include biological, geographical, kinship, archaeological, anthropological, linguistic, folkloric, oral tradition, historical, or other relevant information or expert opinion. All campus determinations of cultural affiliation shall be reviewed by the Advisory Group, which shall make a recommendation to the President or designee regarding final determinations.

In accordance with NAGPRA, remains and cultural items that cannot be identified as affiliated with a particular lineal descendent or federally-recognized Indian tribe or Native Hawaiian organization are to be classified on inventories as culturally unidentifiable.

Tribal authorities shall be permitted reasonable access to examine items in the University's collections in order to evaluate the cultural affiliation of items listed in the inventory as culturally unidentifiable. They shall also be given reasonable opportunity, upon request, to present their views orally or in writing to campus officials responsible for NAGPRA implementation regarding the identification of any such human remains, funerary objects, sacred objects, or objects of cultural patrimony. The perspectives of such tribal authorities shall be considered in determining cultural affiliation.

## VI. REQUESTS FOR REPATRIATION

### A.    General

Campus review of repatriation requests shall reflect consideration of academic expertise and Native American or Native Hawaiian viewpoints, and shall provide for consultation with requesting

individuals or tribes, as required by NAGPRA.

All campus determinations of cultural affiliation and all campus determinations regarding repatriation requests made pursuant to this policy shall be reviewed by the Advisory Group, which shall report its findings and recommendations to the President or designee. The President or designee shall have final authority to approve or disapprove determinations regarding disposition of remains and cultural items in University collections. The University shall follow guidelines and procedures for implementing repatriation that are in accordance with accepted professional museum standards and federal and state law and regulations. Campuses may proceed with the deaccession and repatriation of materials in the University's collections, pursuant to this policy, after obtaining the written approval for such action from the President or designee.

**B.    Requests from Lineal Descendants and Federally-recognized Indian Tribes and Native Hawaiian Organizations.**

Upon the written request of a lineal descendant, Indian tribe or Native Hawaiian organization, the University will expeditiously repatriate human remains, funerary objects, sacred objects, and objects of cultural patrimony if lineal descent has been established or if cultural affiliation between the requesting tribe or organization and the requested remains or cultural items has been established in accordance with federal law and if all other requirements for repatriation of such human remains or cultural items as set forth in federal law are met.

**C.    Requests from California-recognized Indian tribes.**

In the case of a written request from an Indian tribe, band, nation, rancheria, reservation or other entity that is California-recognized but not federally-recognized, the University will expeditiously repatriate human remains, funerary objects, sacred objects, and objects of cultural patrimony if it is established that all requirements for repatriation under the federal law have been met except the requirement that the requesting tribe or group be federally-recognized.

In order for repatriation to a non-federally-recognized California-recognized tribe to take place, it must be determined that:

1.  "Cultural association" exists; i.e., affiliation between the requesting tribe and the requested remains or cultural items would have been established in accordance with federal law if the requesting tribe were federally-recognized. In order for this criterion to be met, it must be determined that the requesting tribe is an identifiable present-day tribe, and that there is evidence establishing that the requesting tribe has been identified from prehistoric or historic times to the present as descended from an identifiable earlier group from whom the requested human remains or cultural items originated; and

2.  The standards for repatriation of such human remains or cultural items as set forth in federal law are met.

In addition, in the case of human remains that meet the above criteria and that have been (or should

May 1, 2001                                                                      Page 5 of 8

have been) reported on the campus inventory as "culturally unidentifiable," the University will consult with the Secretary of the Interior ("Secretary"), and will proceed with repatriation only upon recommendation of the Secretary, as specified in federal law. The University also will consult with the Secretary prior to repatriating cultural items that have been (or that should have been) reported on the campus inventory as "culturally unidentifiable," and will proceed with repatriation only upon recommendation of the Secretary. Prior to any repatriation under this section, the University will seek to notify all other Native American or Native Hawaiian tribes or organizations that have been determined to have a potential interest in the requested remains or cultural items. Repatriation will not take place until there has been a reasonable opportunity for other potentially-interested groups to notify the University of any conflicting claims.

## VII. Liaisons, Conflicts, and Mediation

### A. Liaison.

Each campus with a collection of Native American or Native Hawaiian remains, funerary objects, sacred objects, or objects of cultural patrimony shall designate a liaison to work with native communities considering or requesting repatriation from the University's collections. The liaison shall be a person familiar with NAGPRA and the repatriation process, and shall cultivate a positive relationship with Native American communities. It will be the responsibility of the liaison to make University collections of Native remains and items accessible to all tribes, and to assist tribes in understanding and invoking the repatriation process. The liaison will assist tribes in planning for repatriation of culturally affiliated items. With respect to human remains and cultural items in campus collections that are categorized as "culturally unidentifiable," the liaison will facilitate examination of the items by tribal authorities.

### B. Resolution of Disputed Claims for Cultural Affiliation and Repatriation.

Tribal authorities who disagree with determinations regarding cultural affiliation (or cultural association) and repatriation are encouraged to work with campus museum officials at the campus where the remains or cultural items at issue are housed and with the campus liaison to resolve disputes. Tribal authorities shall be given reasonable opportunity, upon request, to present their views orally or in writing to campus authorities responsible for making determinations relating to cultural affiliation and repatriation.

Third-party mediation is encouraged to assist in efforts to reach agreement about disputed claims to items in the University's collections. Such mediation may include any means mutually agreed to by all parties to a repatriation discussion and approved by the Chancellor of the campus that houses the disputed items.

Repatriation disputes remaining unresolved following initial dialogue among the parties shall be reviewed and decided by the Chancellor, subject to review by the President or designee. The President or designee may seek a recommendation from the University Advisory Group, and shall have final authority regarding disposition of Native American remains and cultural items in University collections, in accordance with this policy and applicable laws and regulations.

C.    **Multiple Claims for Repatriation.**

Where there are multiple requests for repatriation, and where the University is unable to determine which requesting party is the most appropriate claimant, the University shall retain and preserve the human remains or cultural items until the requesting parties reach agreement on proper disposition or until the dispute is resolved by mediation, a court of competent jurisdiction, or other appropriate means. The parties may choose mediation by a third party, which may be the NAGPRA Review Committee established by federal law or other appropriate entity mutually agreeable to the disputants.

In cases involving multiple repatriation claims, the Native American claimants may determine for themselves the proper disposition of the remains or cultural items. Once the multiple claimants agree upon a proper disposition, and once the University is provided with assurance of protection against multiple liability (either under the provisions of NAGPRA or under an agreement among the claimants), the University will repatriate to the Native American tribe specified in such an agreement, provided that the tribe is one that has been determined by the University to be entitled to repatriation under this policy. If the conflict is not resolved by this means, then the matter may be resolved by a court of competent jurisdiction through a declaratory or interpleader action, or by other appropriate means.

## VIII. TEACHING AND RESEARCH USE OF REMAINS AND CULTURAL ITEMS IN UNIVERSITY COLLECTIONS

Campuses are granted the authority to make decisions about the use of Native American or Native Hawaiian human remains, associated and unassociated funerary objects, sacred objects, and objects of cultural patrimony in University collections for teaching and research purposes, subject to the following guidelines:

A.    Given the importance of the study of human osteology in archaeology, paleontology, and comparative morphology, and the importance of skeletal material in training students at the lower division, upper division and graduate level, campuses normally retain the discretion to use such items in teaching. Campuses are encouraged to take into consideration the views and concerns of Native American and Native Hawaiian representatives when making decisions regarding the teaching and research use of Native American and Native Hawaiian skeletal materials.

B.    Remains and cultural items covered by this policy shall normally remain accessible for research by qualified investigators, subject to approval by the curator of the relevant campus collection.

C.    Once a repatriation request has been granted and actual repatriation is pending, the remains and cultural items covered by the request shall not be used in teaching or research unless expressly permitted by the tribal authority that has been granted jurisdiction over the materials, subject to exceptions provided by federal law.

D.    In circumstances in which cultural affiliation (or cultural association) has been established and other repatriation requirements have been met but in which an affiliated (or associated) tribe has chosen not to request repatriation, an affiliated (or associated) tribe may request that the affiliated (or

associated) remains or cultural items  not be used for teaching or research.  The decision of the affiliated (or associated) tribe as to whether the remains and cultural items can be used in teaching or research shall normally be accepted as final by the University, subject to exceptions provided by federal law.

Questions concerning the implementation of any part of this policy may be directed to the Vice Provost for Research in the Office of the President.

Exhibit B



## Determinations Made by the Minnesota Indian Affairs Council

Officials of the MIAC have determined that:

• Based on non-destructive physical analysis and catalogue records, the human remains are Native American.

• Pursuant to 25 U.S.C. 3001(2), a relationship of shared group identity cannot be reasonably traced between the Native American human remains and any present-day Indian tribe.

• According to final judgments of the Indian Claims Commission, the land from which the Native American human remains and associated funerary objects were removed is the aboriginal land of The Tribes.

• Pursuant to 25 U.S.C. 3001(9), the human remains described in this notice represent the physical remains of two individuals of Native American ancestry.

• Pursuant to 25 U.S.C. 3001(3)(A), the one object described above is reasonably believed to have been placed with or near individual human remains at the time of death or later as part of the death rite or ceremony.

• Pursuant to 43 CFR 10.11(c)(1), the disposition of the human remains is to The Tribes.

## Additional Requestors and Disposition

Representatives of any Indian tribe that believes itself to be culturally affiliated with the human remains or any other Indian tribe that believes it satisfies the criteria in 43 CFR 10.11(c)(1) should contact James L. (Jim) Jones, Cultural Resource Director, Minnesota Indian Affairs Council, 3801 Bemidji Avenue NW., Suite 5, Bemidji, MN 56601, telephone (218) 755–3223, before January 4, 2012. Disposition of the human remains to The Tribes may proceed after that date if no additional requestors come forward.

The Minnesota Indian Affairs Council is responsible for notifying The Tribes that this notice has been published.

Dated: November 29, 2011.

**Sherry Hutt,**

*Manager, National NAGPRA Program.*

[FR Doc. 2011–31072 Filed 12–2–11; 8:45 am]

**BILLING CODE 4312–50–P**

## DEPARTMENT OF THE INTERIOR

### National Park Service

[2253–665]

### Notice of Inventory Completion: The University of California, San Diego, San Diego, CA

**AGENCY:** National Park Service, Interior.

**ACTION:** Notice.

**SUMMARY:** The Regents of the University of California on behalf of the University of California, San Diego, have completed an inventory of human remains and associated funerary objects, in consultation with the appropriate Indian tribes, and have determined that there is no cultural affiliation between the remains and any present-day Indian tribe. Representatives of any Indian tribe that believes itself to be culturally affiliated with the human remains may contact the University of California, San Diego. Disposition of the human remains and associated funerary objects to the Indian tribes stated below may occur if no additional requestors come forward.

**DATES:** Representatives of any Indian tribe that believes it has a cultural affiliation with the human remains should contact the University of California, San Diego at the address below by January 4, 2012.

**ADDRESSES:** Gary C. Matthews, Vice Chancellor Resource Management & Planning, University of California, San Diego, 9500 Gilman Drive #0057, La Jolla, CA 92093–0057, telephone (858) 534–5820.

**SUPPLEMENTARY INFORMATION:** Notice is hereby given in accordance with the Native American Graves Protection and Repatriation Act (NAGPRA), 25 U.S.C. 3003, of the completion of an inventory of human remains and associated funerary objects in the possession of the University of California, San Diego. The human remains and associated funerary objects were removed from the University of California, San Diego's University House site in San Diego County, CA.

This notice is published as part of the National Park Service's administrative responsibilities under NAGPRA, 25 U.S.C. 3003(d)(3) and 43 CFR 10.11(d). The determinations in this notice are the sole responsibility of the museum, institution, or Federal agency that has control of the Native American human remains. The National Park Service is not responsible for the determinations in this notice.

### Consultation

A detailed assessment of the human remains was made by University of California professional staff in consultation with representatives of the Barona Group of Capitan Grande Band of Mission Indians of the Barona Reservation, California; Campo Band of Diegueno Mission Indians of the Campo Indian Reservation, California; Ewiiaapaayp Band of Kumeyaay

Indians, California; Iipay Nation of Santa Ysabel, California (formerly the Santa Ysabel Band of Diegueno Mission Indians of the Santa Ysabel Reservation); Inaja Band of Diegueno Mission Indians of the Inaja and Cosmit Reservation, California; Jamul Indian Village of California; La Posta Band of Diegueno Mission Indians of the La Posta Indian Reservation, California; Manzanita Band of Diegueno Mission Indians of the Manzanita Reservation, California; Mesa Grande Band of Diegueno Mission Indians of the Mesa Grande Reservation, California; San Pasqual Band of Diegueno Mission Indians of California; Sycuan Band of the Kumeyaay Nation; and the Viejas (Baron Long) Group of Capitan Grande Band of Mission Indians of the Viejas Reservation, California (herein after referred to as "The Tribes").

### History and Description of the Remains

In 1976, human remains representing, at minimum, two individuals were removed from the University of California, San Diego's University House site, in San Diego, CA. The site is variously referred to as the Black, William House; SDM–W–12A (as recorded by the San Diego Museum of Man); CA–SDI–4669 (as recorded with the State of California); and NPS No.: 08000343. No known individuals were identified. The approximately 25 associated funerary objects consist of shell, stone, charcoal, and bone.

### Determinations Made by the University of California, San Diego

Officials of the University of California, San Diego have determined that:

• The calibrated dates for the human remains are believed to fall between 8,977 and 9,603 years B.P.

• The human remains are Native American.

• Pursuant to 25 U.S.C. 3001(2), a relationship of shared group identity cannot be reasonably traced between the Native American human remains and any present-day Indian tribe.

• Evidence indicates that the land from which the Native American human remains were removed is the aboriginal land of the Diegueno (Kumeyaay) Tribe. As noted in the Schedule of Indian Land Cessions, on or about January 7, 1852, the Diegueno (Kumeyaay) ceded to the United States an area that includes present-day San Diego County.

• The present-day descendants of the Diegueno (Kumeyaay) are The Tribes.

• Pursuant to 25 U.S.C. 3001(9), the human remains described in this notice represent the physical remains of two

individuals of Native American ancestry.

• Pursuant to 25 U.S.C. 3001(3)(A), the approximately 25 objects described above are reasonably believed to have been placed with or near individual human remains at the time of death or later as part of the death rite or ceremony.

• Pursuant to 43 CFR 10.11(c)(1), and based upon request from the Kumeyaay Cultural Repatriation Committee, on behalf of The Tribes, disposition of the human remains is to the La Posta Band of Diegueno Mission Indians of the La Posta Indian Reservation, California.

## Additional Requestors and Disposition

Representatives of any Indian tribe that believes itself to be culturally affiliated with the human remains or any other Indian tribe that believes it satisfies the criteria in 43 CFR 10.11(c)(1) should contact Gary C. Matthews, Vice Chancellor Resource Management & Planning, University of California, San Diego, 9500 Gilman Drive #0057, La Jolla, CA 92093–0057, telephone (858) 534–6820, before January 4, 2012. Disposition of the human remains to the La Posta Band of Diegueno Mission Indians of the La Posta Indian Reservation, California may proceed after that date if no additional requestors come forward.

The University of California, San Diego is responsible for notifying The Tribes that this notice has been published.

Dated: November 29, 2011.

**Sherry Hutt,**

*Manager, National NAGPRA Program.*

[FR Doc. 2011–31066 Filed 12–2–11; 8:45 am]

**BILLING CODE 4312–50–P**

---

## DEPARTMENT OF THE INTERIOR

### National Park Service

[2253–665]

### Notice of Inventory Completion: Minnesota Indian Affairs Council, Bemidji, MN

**AGENCY:** National Park Service, Interior.

**ACTION:** Notice.

**SUMMARY:** The Minnesota Indian Affairs Council has completed an inventory of human remains in consultation with the appropriate Indian tribes, and has determined that there is no cultural affiliation between the remains and any present-day Indian tribe. Representatives of any Indian tribe that believes itself to be culturally affiliated with the human remains may contact the Minnesota Indian Affairs Council.

Disposition of the human remains to the Indian tribes stated below may occur if no additional requestors come forward.

**DATES:** Representatives of any Indian tribe that believes it has a cultural affiliation with the human remains should contact the Minnesota Indian Affairs Council at the address below by January 4, 2012.

**ADDRESSES:** James L. (Jim) Jones, Cultural Resource Director, Minnesota Indian Affairs Council, 3801 Bemidji Avenue NW., Suite 5, Bemidji, MN 56601, telephone (218) 755–3223.

**SUPPLEMENTARY INFORMATION:** Notice is here given in accordance with the Native American Graves Protection and Repatriation Act (NAGPRA), 25 U.S.C. 3003, of the completion of an inventory of human remains in the possession of the Minnesota Indian Affairs Council (MIAC). The human remains were removed from Marshall County, MN.

This notice is published as part of the National Park Service's administrative responsibilities under NAGPRA, 25 U.S.C. 3003(d)(3) and 43 CFR 10.11(d). The determinations in this notice are the sole responsibility of the museum, institution, or Federal agency that has control of the Native American human remains. The National Park Service is not responsible for the determinations in this notice.

## Consultation

A detailed assessment of the human remains was made by the MIAC professional staff in consultation with representatives of the Lower Sioux Indian Community in the State of Minnesota; Prairie Island Indian Community in the State of Minnesota; Red Lake Band of Chippewa Indians, Minnesota; Sisseton-Wahpeton Oyate of the Lake Traverse Reservation, South Dakota; Turtle Mountain Band of Chippewa Indians of North Dakota (hereinafter referred to as "The Tribes").

## History and Description of the Remains

In 1998, human remains representing, at minimum, three individuals were recovered from site 21–MA–70, Wright Quarry, in Marshall County during gravel quarrying operations by the Marshall County Highway Department. In 1999, the human remains were transferred to the Minnesota Office of the State Archaeologist. In 2002, the human remains were transferred to the MIAC (H375). No known individuals were identified. No associated funerary objects are present.

Examination of the site context by professional staff of the Minnesota Office of the State Archaeologist suggests a pre-contact burial site.

Additionally, a number of pre-historic sites are recorded in the immediate vicinity. Cranial, dental and femora morphology identify the human remains as American Indian. These human remains have no archeological classification and cannot be associated with any present-day Indian tribe.

In 2009, human remains representing, at minimum, one individual were unearthed from an unknown site in Warren, MN, during new home construction. The human remains were transferred to the Marshall County Sheriff's Department, to the Minnesota Bureau of Criminal Apprehension Laboratory, and then to the Human Identification Laboratory at the University of North Dakota for identification. The human remains were then transferred to the MIAC (H443). No known individuals were identified. No associated funerary objects are present.

The burial context and morphology of the human remains suggest identification as pre-contact American Indian. These human remains have no archeological classification and cannot be associated with any present-day Indian tribe.

## Determinations Made by the Minnesota Indian Affairs Council

Officials of the MIAC have determined that:

• Based on non-destructive physical analysis and catalogue records, the human remains are Native American.

• Pursuant to 25 U.S.C. 3001(2), a relationship of shared group identity cannot be reasonably traced between the Native American human remains and any present-day Indian tribe.

• According to final judgments of the Indian Claims Commission, the land from which the Native American human remains were removed is the aboriginal land of The Tribes.

• Pursuant to 25 U.S.C. 3001(9), the human remains described in this notice represent the physical remains of four individuals of Native American ancestry.

• Pursuant to 43 CFR 10.11(c)(1), the disposition of the human remains is to The Tribes.

## Additional Requestors and Disposition

Representatives of any Indian tribe that believes itself to be culturally affiliated with the human remains or any other Indian tribe that believes it satisfies the criteria in 43 CFR 10.11(c)(1) should contact James L. (Jim) Jones, Cultural Resource Director, Minnesota Indian Affairs Council, 3801 Bemidji Avenue NW., Suite 5, Bemidji, MN 56601, telephone (218) 755–3223, before January 4, 2012. Disposition of

1  JAMES McMANIS (40958)
   CHRISTINE PEEK (234573)
2  BRANDON ROSE (269196)
   JENNIFER MURAKAMI (273603)
3  McMANIS FAULKNER
   A Professional Corporation
4  50 West San Fernando Street, 10th Floor
   San Jose, California 95113
5  Telephone:    (408) 279-8700
   Facsimile:    (408) 279-3244
6  Email:        cpeek@mcmanislaw.com

7  Attorneys for Petitioners and Plaintiffs,
   TIMOTHY WHITE,
8  ROBERT L. BETTINGER, and
   MARGARET SCHOENINGER
9

                    ENDORSED
                     FILED
              ALAMEDA COUNTY

              *illegible*

         CLERK OF THE SUPERIOR COURT
         By_____
                              Deputy

10              SUPERIOR COURT OF THE STATE OF CALIFORNIA

11                     FOR THE COUNTY OF ALAMEDA

12  TIMOTHY WHITE, an individual; ROBERT      Case No. RG 12-625891
    L. BETTINGER, an individual; and
13  MARGARET SCHOENINGER, an individual,      **NOTICE OF PLAINTIFFS' EX PARTE
                                              APPLICATION FOR TEMPORARY
14                                            RESTRAINING ORDER AND ORDER TO
              Petitioners and Plaintiffs,     SHOW CAUSE REGARDING
15                                            PRELIMINARY INJUNCTION**

16        vs.

17  THE UNIVERSITY OF CALIFORNIA; THE
    REGENTS OF THE UNIVERSITY OF
    CALIFORNIA; MARK G. YUDOF, in his         Date:  April 23, 2012
18  individual and official capacity as President of   Time:  9:00 a.m.
    the University; MARYE ANNE FOX, in her    Dept.:  31
19  individual and official capacity as Chancellor of   Judge: The Hon. Evelio Grillo
    the University of California, San Diego; GARY
20  MATTHEWS, in his individual and official
    capacity as Vice Chancellor of the University of   Trial Date:  None
21  California, San Diego; and DOES 1-50,
    inclusive,                                Reservation # 1281986
22

23            Respondents and Defendants.

24

25

26

27

28                                            1
─────────────────────────────────────────────────────────────────
NOTICE OF PLAINTIFFS' EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND
ORDER TO SHOW CAUSE REGARDING PRELIMINARY INJUNCTION, CASE NO. RG 12-625891

1       TO DEFENDANTS, THE UNIVERSITY OF CALIFORNIA, THE REGENTS OF THE

2 UNIVERSITY OF CALIFORNIA, MARK G. YUDOF, MARYE ANNE FOX, GARY

3 MATTHEWS, AND DOES 1-50, INCLUSIVE, AND THEIR ATTORNEYS OF RECORD:

4       Plaintiffs, Timothy White ("White"), Robert L. Bettinger ("Bettinger"), and Margaret

5 Schoeninger ("Schoeninger"), hereby apply for a Temporary Restraining Order prohibiting

6 defendants, the University of California ("University"), the Regents of the University of

7 California ("Regents"), Mark G. Yudof ("Yudof"), Marye Anne Fox ("Fox"), Gary Matthews

8 ("Matthews"), their agents, servants, assigns, and all those acting in concert with them, including

9 but not limited to, the San Diego Archaeological Center ("SDAC"), from changing in any

10 manner the current condition and location of the human remains ("La Jolla Skeletons") and

11 associated funerary objects described in defendants' Notice of Inventory Completion, published

12 in the Federal Register on or about December 5, 2011.

13       Plaintiffs also hereby apply for an Order to Show Cause why a Preliminary Injunction

14 should not be granted enjoining defendants, the University, Regents, Yudof, Fox, and Matthews,

15 their agents, servants, assigns, and all those acting in concert with them, including but not limited

16 to, the SDAC, from changing in any manner the current condition and location of the La Jolla

17 Skeletons during the pendency of this action.

18       This application is made on the grounds that defendants have caused a Notice of

19 Inventory Completion to be published in the Federal Register on or about December 5, 2011, in

20 which defendants stated their intent to dispose of the La Jolla Skeletons to the La Posta Band of

21 Mission Indians pursuant to the Native American Graves Protection and Repatriation Act

22 ("NAGPRA"), if no other claimants came forward by January 4, 2012. This date was later

23 extended by agreement of the parties to April 30, 2012. Plaintiffs have no other means by which

24 to protect their interest in maintaining the La Jolla Skeletons in the University's collection, so

25 that research performed on them may benefit the public as a whole. Plaintiffs are likely to

26 prevail in the action, and have no adequate remedy at law absent the relief requested. Without

27 such relief, plaintiffs will suffer irreparable injury before the matter may be heard. Unless

28

2

NOTICE OF PLAINTIFFS' EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND
ORDER TO SHOW CAUSE REGARDING PRELIMINARY INJUNCTION, CASE NO. RG 12-625891

1 | defendants are enjoined, plaintiffs and the general public will suffer irreparable injury and harm,
2 | in that the ability to study the La Jolla Skeletons will be lost forever.  Defendants may repatriate
3 | the La Jolla Skeletons to the La Posta Band of Mission Indians after April 30, 2012, unless
4 | defendants are restrained by this Court.

5 | This application is based on the Petition For Writ Of Mandamus (Code Civ. Proc., §
6 | 1085), Or In The Alternative, For Writ Of Administrative Mandamus (Code Civ. Proc., §
7 | 1094.5); Complaint For Declaratory And Injunctive Relief (Code Civ. Proc., §§ 526a, 1060),
8 | filed in this action, plaintiffs' Memorandum of Points and Authorities in Support of Temporary
9 | Restraining Order and For Order to Show Cause Regarding Preliminary Injunction, the
10 | Declarations of Robert Bettinger, Margaret Schoeninger, and Christine Peek, any other pleadings
11 | and documents filed in this action, and on such evidence as may be presented at the hearing on
12 | this matter.

13 | DATED:  April 18, 2012                          McMANIS FAULKNER

14 |

15 |                                                 _Christine E. Puk_
    |                                                 JAMES MCMANIS
16 |                                                 CHRISTINE PEEK

17 |                                                 Attorneys for Petitioners and Plaintiffs,

18 |                                                 TIMOTHY WHITE,
    |                                                 ROBERT L. BETTINGER, and
19 |                                                 MARGARET SCHOENINGER

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |                                          3
    | NOTICE OF PLAINTIFFS' EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND
    | ORDER TO SHOW CAUSE REGARDING PRELIMINARY INJUNCTION, CASE NO. RG 12-625891



ALAN
*10249514*

APR 1 8 2012

By _____

Exec. Off/Clerk

1  JAMES McMANIS (40958)
   CHRISTINE PEEK (234573)
2  BRANDON ROSE (269196)
   JENNIFER MURAKAMI (273603)
3  McMANIS FAULKNER
   A Professional Corporation
4  50 West San Fernando Street, 10th Floor
   San Jose, California 95113
5  Telephone:    (408) 279-8700
   Facsimile:    (408) 279-3244
6  Email:        cpeek@mcmanislaw.com

7  Attorneys for Petitioners and Plaintiffs,
   TIMOTHY WHITE,
8  ROBERT L. BETTINGER, and
   MARGARET SCHOENINGER
9

10            SUPERIOR COURT OF THE STATE OF CALIFORNIA

11                 FOR THE COUNTY OF ALAMEDA

12  TIMOTHY WHITE, an individual; ROBERT       Case No. RG 12-625891
    L. BETTINGER, an individual; and
13  MARGARET SCHOENINGER, an individual,       **MEMORANDUM OF POINTS AND**
                                               **AUTHORITIES IN SUPPORT OF**
14                                             **PLAINTIFFS' EX PARTE APPLICATION**
                    Petitioners and Plaintiffs, **FOR TEMPORARY RESTRAINING**
15                                             **ORDER AND ORDER TO SHOW CAUSE**
            vs.                                **REGARDING PRELIMINARY**
16                                             **INJUNCTION**
    THE UNIVERSITY OF CALIFORNIA; THE
17  REGENTS OF THE UNIVERSITY OF
    CALIFORNIA; MARK G. YUDOF, in his
18  individual and official capacity as President of
    the University; MARYE ANNE FOX, in her     Date:  April 23, 2012
19  individual and official capacity as Chancellor of Time:  9:00 a.m.
    the University of California, San Diego; GARY   Dept.: 31
20  MATTHEWS, in his individual and official    Judge: The Hon. Evelio Grillo
    capacity as Vice Chancellor of the University of
21  California, San Diego; and DOES 1-50,
    inclusive,                                  Trial Date:  None
22
                                               Reservation # 1281986
23            Respondents and Defendants.

24

25

26

27

28  MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' EX PARTE
    APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE REGARDING
    PRELIMINARY INJUNCTION, CASE NO. RG 12-625891

1

## TABLE OF CONTENTS

2  INTRODUCTION ................................................................................................................ 1

3  STATEMENT OF FACTS ................................................................................................. 2

4  LEGAL ARGUMENT ....................................................................................................... 9

5      I.      STANDARD FOR INJUNCTIVE RELIEF. ................................................. 9

6      II.     PLAINTIFFS AND THE GENERAL PUBLIC WILL SUFFER
7              IRREPARABLE INJURY IF AN INJUNCTION DOES NOT
8              ISSUE. ........................................................................................................... 9

       III.    PLAINTIFFS ARE LIKELY TO PREVAIL ON THE MERITS
9              OF THEIR WRIT PETITION AND THE CAUSES OF ACTION
10             IN THEIR COMPLAINT BECAUSE IT IS VIRTUALLY
               IMPOSSIBLE TO ESTABLISH THAT THE LA JOLLA
11             SKELETONS ARE "NATIVE AMERICAN" WITHIN THE
12             MEANING OF NAGPRA. ........................................................................... 11

13     IV.     A COURT ORDER PRESERVING THE LA JOLLA SKELETONS
               IN THEIR CURRENT CONDITION AND LOCATION IS
14             WARRANTED AND NECESSARY TO PROTECT THEIR
               RESEARCH VALUE ................................................................................... 14
15

16     V.      DEFENDANTS HAVE TWICE PREVIOUSLY AGREED TO
               KEEP THE LA JOLLA SKELETONS IN THE SAME LOCATION
17             AND CONDITION WHILE THE PARTIES ATTEMPT TO RESOLVE
               THEIR DISPUTE ......................................................................................... 15
18

CONCLUSION .................................................................................................................. 15

19

20

21

22

23

24

25

26

27

i

28

1

<u>TABLE OF AUTHORITIES</u>

2

**CASES**

3

*Bonnichsen v. United States* (9th Cir. 2004) 367 F.3d 864.......................................... 11, 12, 13, 14

4

*Bonnichsen v. United States* (D. Or. 2002) 217 F. Supp. 2d 1116, 1134.....................11, 12, 14

5

*Cohen v. Board of Supervisors* (1985) 40 Cal. 3d 277, 286............................................9, 11

6

*Continental Baking Co. v. Katz* (1968) 68 Cal.2d 512, 528 ............................................ 9

7

*Heckmann v. Ahmanson* (1985) 168 ........................................................................ 10

8

*Moorpark Homeowner's Association v. VRT Corp.* (1998) 63 Cal App. 4th 1396, 1402 ............... 9

9

*Shoemaker v. County of Los Angeles* (1995) 37 Cal.App.4th 618, 624........................................... 9

10

**STATUTES**

11

25 U.S.C. Section 3001 ............................................................................................ 3, 7

12

25 U.S.C. Sections 3003-3005 ................................................................................ 3

13

43 C.F.R. Section 10.11 ....................................................................................... 3, 7, 13

14

Code of Civil Procedure Section 6a.............................................................................1

15

Code of Civil Procedure Section 526(a)(3) ............................................................. 10

16

Code of Civil Procedure Section 526(a)(4)-(5) ....................................................... 10

17

Code of Civil Procedure Section 527(c)(1) ............................................................. 9

18

Code of Civil Procedure Section 1085........................................................................ 1

19

Code of Civil Procedure Section 1094.5...................................................................... 1

20

21

22

23

24

25

26

27

ii

28

1

**INTRODUCTION**

2      Plaintiffs, TIMOTHY WHITE ("White"), ROBERT L. BETTINGER ("Bettinger"), and

3  MARGARET SCHOENINGER ("Schoeninger"), require this Court's immediate assistance to

4  prevent irreparable injury that would result if defendants, the University of California

5  ("University"), the Regents of the University of California ("Regents"), Mark G. Yudof

6  ("Yudof"), Marye Anne Fox ("Fox"), and Gary Matthews ("Matthews"), are allowed to transfer

7  possession of two approximately 10,000 year-old skeletons (the "La Jolla Skeletons") to the La

8  Posta Band of Mission Indians, after April 30, 2012.

9      Plaintiffs are three University professors who wish to study the La Jolla Skeletons, so that

10  the origins of humanity in North America may be better understood by all people. In violation of

11  federal law and in breach of their duties to operate the University as a public trust, defendants

12  seek to transfer possession of the La Jolla Skeletons to the La Posta Band of Mission Indians,

13  thereby irrevocably destroying the invaluable research potential of these very old and very rare

14  human remains. Unless Defendants are enjoined, plaintiffs and the general public will suffer

15  irreparable injury and harm, in that the ability to study the La Jolla Skeletons will be lost forever.

16  Defendants may repatriate the La Jolla Skeletons to the La Posta Band of Mission Indians after

17  April 30, 2012, unless Defendants are restrained by this Court.

18      To prevent further damage to plaintiffs and the general public, plaintiffs have filed a

19  Petition For Writ Of Mandamus (Code Civ. Proc., § 1085), Or In The Alternative, For Writ Of

20  Administrative Mandamus (Code Civ. Proc., § 1094.5); Complaint For Declaratory And

21  Injunctive Relief (Code Civ. Proc., §§ 526a, 1060) ("Verified Writ Petition and Complaint").

22  Plaintiffs now seek a temporary restraining order and order to show cause regarding preliminary

23  injunction, restraining defendants, their agents, servants, assigns, and all those acting in concert

24  with them, including but not limited to, the San Diego Archaeological Center ("SDAC"), from

25  changing in any manner the current condition and location of the La Jolla Skeletons during the

26  pendency of this action. Plaintiffs have not previously applied to the Court for similar relief.

27      Plaintiffs are likely to succeed on the merits of their Verified Writ Petition and

28

1

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' EX PARTE
APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE REGARDING
PRELIMINARY INJUNCTION, CASE NO. RG 12-625891

1 Complaint, because the La Jolla Skeletons are not subject to the federal law at issue, and may not
2 be transferred to anyone pursuant to it. Furthermore, the substantial and irrevocable harm that
3 would occur if a temporary restraining order and preliminary injunction were denied is greater
4 than any purported harm to defendants if the temporary restraining order and preliminary
5 injunction were granted. A court order preserving the La Jolla Skeletons in their current
6 condition and location is necessary to protect their research value to plaintiffs and the public
7 while this action is pending.

8

## STATEMENT OF FACTS

9 In 1976, Professor Gail Kennedy of UCLA led an archaeological field excavation project
10 on University property in San Diego. (Verified Writ Petition and Complaint, ¶ 10, attached as
11 Exhibit A to the Declaration of Christine Peek in Support of Plaintiffs' Ex Parte Application for
12 Temporary Restraining Order and Order to Show Cause Regarding Preliminary Injunction
13 ("Peek Decl.").) Professor Kennedy's team discovered a rare double burial. (*Id.* at ¶ 10.) The
14 bones have great scientific significance due to the age of the two skeletons, which are estimated
15 to date back 8977 to 9603 years ago. (*Id.* at ¶ 10.) The La Jolla Skeletons are extremely old by
16 North American osteological standards. (*Id.* at ¶ 10.) They are similar to, though likely older
17 than, another skeleton found in Kennewick in 1996, which was the subject of federal litigation
18 that resolved in 2004. (*See id.* at ¶ 10; *see also Bonnichsen v. United States* (9th Cir. 2004) 367
19 F.3d 864.) Because of their extreme age and relatively good condition, the La Jolla Skeletons
20 represent a unique opportunity for all people to understand human origins in North America.
21 (Verified Writ Petition and Complaint, ¶ 10.)

22 In 1990, Congress passed the Native American Graves Protection and Repatriation Act
23 ("NAGPRA"). NAGPRA imposes various requirements on, inter alia, state government
24 agencies and institutions of higher learning that receive federal funds, and that hold "Native
25 American" human remains or cultural items. NAGPRA defines "Native American" as follows:

26 'Native American' means of, or relating to, a tribe, people, or culture that is
indigenous to the United States.
27

2
28 MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' EX PARTE
APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE REGARDING
PRELIMINARY INJUNCTION, CASE NO. RG 12-625891

1  (25 U.S.C. § 3001(9).) The Ninth Circuit has held that human remains must bear some
2  relationship to a presently existing tribe, people, or culture to be considered "Native American"
3  within the meaning of NAGPRA. (*See Bonnichsen v. United States, supra,* 367 F.3d at 875-76.)
4  NAGPRA does not apply to remains that are not "Native American" or "Native Hawaiian." (*See*
5  *id.* at 875; *see also* 25 U.S.C. § 3001(9)-(10).) For remains or cultural items that are "Native
6  American," NAGPRA may require that they be "repatriated" or returned to a tribe, depending on
7  whether or not certain conditions are met. (25 U.S.C. §§ 3003-3005.) NAGPRA's statutory
8  scheme does not require repatriation of "culturally unidentifiable" human remains, however.
9  (*See generally* 25 U.S.C. § 3001 et seq.)

10        NAGPRA requires those entities subject to it to compile an inventory of "Native
11  American" human remains and cultural objects in their possession, and submit the inventory to
12  the DOI. (25 U.S.C. § 3003.) In its responses to comments published along with the final
13  version of 43 C.F.R. § 10.11, the DOI included language indicating that museums must make a
14  "threshold determination" that culturally unidentifiable remains are "Native American" before
15  including them on a federal inventory. (*See* 75 Fed.Reg. 12387 (response to Comment 55),
16  attached as Exhibit B to Peek Decl.)

17        The University has created a system-wide University Advisory Group on Cultural
18  Repatriation and Human Remains and Cultural Items ("Advisory Group"). (Verified Writ
19  Petition and Complaint, ¶ 14; *see also* Declaration of Margaret Schoeninger in Support of
20  Plaintiffs' Ex Parte Application for Temporary Restraining Order and Order to Show Cause
21  Regarding Preliminary Injunction ("Schoeninger Decl."), ¶ 4.) If a tribe requests repatriation,
22  the Advisory Group must review all campus determinations and report its findings and
23  recommendations to the President or the President's designee. (Verified Writ Petition and
24  Complaint, ¶ 14; Schoeninger Decl., ¶ 4.) The President or the President's designee has final
25  authority to approve or disapprove determinations regarding disposition of remains and cultural
26  items. (Verified Writ Petition and Complaint, ¶ 14; Schoeninger Decl., ¶ 4.)

27        The Kumeyaay Nation ("Kumeyaay"), a coalition of 12 Native American tribes, claims to

3

28

1  have occupied the site on which the La Jolla Skeletons were found.  (Verified Writ Petition and

2  Complaint, ¶ 16.)  The La Posta Band of Mission Indians is a federally recognized tribe of

3  Kumeyaay people.  (*Id.* at ¶ 23.)  Although the Kumeyaay have asserted that the La Jolla

4  Skeletons are culturally affiliated with their coalition of tribes, there is insufficient evidence to

5  support the conclusion that the Kumeyaay are descended from the people who were buried at the

6  site, approximately 10,000 years ago.  (*Id.* at ¶ 16.)  In addition, there is insufficient evidence to

7  conclude that any Kumeyaay tribe actually occupied the site at the time the La Jolla Skeletons

8  were buried there.  (*Id.* at ¶ 16.)  The evidence does not support a finding that there is any link

9  between the La Jolla Skeletons and any Kumeyaay tribe, or any currently existing Native

10 American tribe, for the following reasons, among other reasons:

11
12 • The burial pattern of the La Jolla Skeletons differs from that of the Kumeyaay as reported in early ethnographies.  Before the Spanish explorers made contact with North America, the Kumeyaay cremated, rather than buried, their dead.

13
14
15
16 • Preliminary carbon and nitrogen stable isotope analysis of human bone collagen from the La Jolla Skeletons is consistent with a year-round diet of open-ocean and some nearshore marine fish or marine mammals.  This contrasts with the diet of the Kumeyaay, who lived on wild plants, supplemented with more small than large game, and in some places, fish.  Seasonal dependence on marine foods would produce lower values of the isotope signals than those recovered from the La Jolla Skeletons.

17
18
19
20 • The skeletal morphology of the La Jolla Skeletons does not show any link to the Kumeyaay, or any other Native American tribe.  The La Jolla Skeletons have long, narrow cranial vaults and short, relatively narrow faces compared with extant Native Americans.  A detailed 2007 morphological study by Professor Douglas Owsley concluded the La Jolla Skeletons were not Native American.

21
22 • Because there has been no genetic testing of the La Jolla Skeletons (because the University has not allowed any testing), there is no genetic or DNA evidence linking the Kumeyaay or any other Native American tribe to the La Jolla Skeletons.

23 (*Id.* at ¶ 16; *see also* Schoeninger Decl., ¶ 10.)

24    On or about October 22, 2008, the University submitted a "Notice of Inventory

25 Completion" and inventory to the United States Department Of The Interior ("DOI"), which

26 included the La Jolla Skeletons and various other items said to be associated with the remains.

27 (Verified Writ Petition and Complaint, ¶ 17; *see also* Schoeninger Decl., ¶ 6.)  The inventory

28

1  was based on a 2008 report written by the local UC San Diego NAGPRA Review Committee.

2  (Verified Writ Petition and Complaint, ¶ 18; Schoeninger Decl., ¶ 6.) The 2008 report was silent

3  on whether the La Jolla Skeletons were "Native American" within the meaning of NAGPRA,

4  and made no attempt to determine whether or not the La Jolla Skeletons were subject to

5  NAGPRA. (Verified Writ Petition and Complaint, ¶ 18; Schoeninger Decl., ¶ 6.) The 2008

6  report did conclude, however, that there was insufficient evidence to conclude the remains were

7  culturally affiliated with the Kumeyaay. (Verified Writ Petition and Complaint, ¶ 18;

8  Schoeninger Decl., ¶ 6.)

9      Because there is insufficient evidence to conclude the La Jolla Skeletons are "Native

10  American" within the meaning of NAGPRA, Defendants' decision to include them on the

11  October 22, 2008 inventory was legally erroneous. (Verified Writ Petition and Complaint, ¶ 19.)

12  NAGPRA and its accompanying regulations do not apply to the La Jolla Skeletons at all, because

13  the La Jolla Skeletons do not fall within the class of human remains that NAGPRA covers. (*Id.*

14  at ¶ 19.) Therefore, the La Jolla Skeletons should not have been included on any federal

15  inventory. (*Id.* at ¶ 19.)

16      In 2010, the DOI and its Secretary Ken Salazar ("Salazar") purported to promulgate a

17  new federal regulation governing the disposition of "culturally unidentifiable" human remains

18  that meet NAGPRA's definition of "Native American." (*Id.* at ¶ 21.) Soon thereafter, Steve

19  Banegas, a spokesperson for the Kumeyaay, wrote to the UCSD campus and requested that the

20  La Jolla Skeletons be repatriated to the La Posta Band of Mission Indians, along with certain

21  other objects previously excavated from the site. (*Id.* at ¶ 24.)

22      On or about October 21, 2010, Matthews circulated a new Draft Notice of Inventory

23  Completion ("Draft Notice") for review by the Advisory Group. (*Id.* at ¶ 25; *see also*

24  Schoeninger Decl., ¶ 7.) The new notice was deficient for many reasons. (*Id.* at ¶ 25.) It

25  referred to "associated funerary items," even though the published paper describing the burials

26  stated that no cultural items were found in association with the La Jolla Skeletons. (Verified

27  Writ Petition and Complaint, ¶ 25; Schoeninger Decl., ¶ 7.) It asserted that stone and shell

28  
5

1  recovered from the site was "reasonably believed to have been placed with or near" the La Jolla

2  Skeletons, "at the time of death or later as part of the death rite or ceremony," without any

3  factual support, and in apparent contradiction to Gail Kennedy's account of the excavation.

4  (Verified Writ Petition and Complaint, ¶ 25; Schoeninger Decl., ¶ 7.)  The Draft Notice referred

5  to the La Jolla Skeletons as "Native American," despite a detailed 2007 morphological study by

6  Professor Owsley concluding they were not Native American.  (Verified Writ Petition and

7  Complaint, ¶ 25; Schoeninger Decl., ¶ 7.)  Finally, the Draft Notice stated that a detailed

8  assessment of the La Jolla Skeletons had been made by UC professional staff, when in fact, the

9  only staff who had seen the La Jolla Skeletons included Gail Kennedy (who did not refer to them

10  as Native American), Philip Walker (now deceased, who concluded they were not Native

11  American), and plaintiff Schoeninger.  (Verified Writ Petition and Complaint, ¶ 25; Schoeninger

12  Decl., ¶ 7.)  Schoeninger never made any determination that the remains were "Native

13  American" within the meaning of NAGPRA, nor was she asked to do so.  (Verified Writ Petition

14  and Complaint, ¶ 25; Schoeninger Decl., ¶ 7.)

15       On or about March 2, 2011, the Advisory Group considered Matthews' Draft Notice and

16  submitted a summary and report.  (Verified Writ Petition and Complaint, ¶ 26.)  The Advisory

17  Group recommended that UCSD should not forward the Draft Notice without further

18  consultation with tribes other than the Kumeyaay.  (*Id.* at ¶ 26.)  The Advisory Group also

19  recommended that the San Diego campus reanalyze whether the supposed "associated funerary

20  objects" are, in fact, funerary objects, and if not, to revise the Draft Notice accordingly.  (*Id.* at ¶

21  26.)  The Advisory Group did not reach consensus on any other recommendations.  (*Id.* at ¶ 26.)

22       On or about May 11, 2011, YUDOF authorized UCSD to dispose of the La Jolla

23  Skeletons under NAGPRA, subject to the following directions and recommendations:

24       • UCSD was required to reanalyze, including through expert analysis, whether
           the materials listed on the Draft Notice were funerary objects, and if not, to
25           revise the Draft Notice.

26       • YUDOF advised UCSD to revise its Notice of Inventory Completion to
           acknowledge an alleged "division among experts" on the issue of whether the
27

28  
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' EX PARTE
APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE REGARDING
PRELIMINARY INJUNCTION, CASE NO. RG 12-625891

1   La Jolla Skeletons are "Native American" within the meaning of NAGPRA.

2   • YUDOF instructed UCSD to consult more broadly with other tribes in the
    region. Following this consultation, if UCSD determined that additional tribes
3   were aboriginal to the site, YUDOFF instructed UCSD to revise its Notice of
    Inventory Completion accordingly. If there were no competing claims,
4   however, YUDOF authorized FOX to dispose of the La Jolla Skeletons to the
    La Posta Band of Mission Indians in accordance with NAGPRA, 30 days after
5   publication in the Federal Register.

6   (Verified Writ Petition and Complaint, ¶ 27; *see also* Schoeninger Decl., ¶ 8.)

7   On or about December 5, 2011, defendants published, or caused to be published, in the

8   Federal Register, a Notice of Inventory Completion: The University of California, San Diego,

9   San Diego, CA ("Repatriation Notice"). (Verified Writ Petition and Complaint, ¶ 33; *see also*

10  Schoeninger Decl., ¶ 9.) The Repatriation Notice stated that if no one else came forward and

11  claimed the La Jolla Skeletons by January 4, 2012, the La Jolla Skeletons would be repatriated to

12  the La Posta Band of Mission Indians after that date. (Verified Writ Petition and Complaint, ¶

13  33; *see also* Schoeninger Decl., ¶ 9.) The Repatriation Notice also made the following purported

14  findings, among other findings:

15  • The La Jolla Skeletons are "Native American," pursuant to 25 U.S.C. §
    3001(9).
16
    • Pursuant to 25 U.S.C. § 3001(2), a relationship of shared group identity
17    cannot be reasonably traced between the La Jolla Skeletons and any present-
      day Indian tribe.
18
    • Pursuant to 25 U.S.C. § 3001(3)(A), approximately 25 objects found at the
19    site are "reasonably believed" to have been placed with or near the La Jolla
      Skeletons at the time of death or later as part of the "death rite or ceremony."
20
    • Pursuant to 43 C.F.R. § 10.11(c)(1), and based upon request from the
21    Kumeyaay Cultural Repatriation Committee, on behalf of the 12 associated
      Kumeyaay tribes, disposition of the La Jolla Skeletons is to the La Posta Band
22    of Diegueno Mission Indians of the La Posta Indian Reservation, California.

23  (Verified Writ Petition and Complaint, ¶ 33; *see also* Schoeninger Decl., ¶ 9.)

24  Before this action was filed, the parties entered into a formal Tolling Agreement, to

25  attempt to resolve the dispute over the La Jolla Skeletons without litigation. (Peek Decl., ¶¶ 12-

26  13.) The Tolling Agreement stated, "The parties agree that defendants will continue to retain the

27  La Jolla Skeletons in their current condition and location at the SDAC, to and including April 30,

7

28  MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' EX PARTE
    APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE REGARDING
    PRELIMINARY INJUNCTION, CASE NO. RG 12-625891

1   2012." (*Id.*, ¶ 12, Exh. K.) So far, the parties have been unable to resolve their dispute. (*Id.*, ¶

2   13.) In anticipation of filing this case, plaintiffs asked, and defendants agreed, to stipulate to

3   preserve the La Jolla Skeletons in their current location and condition. (*Id.*, ¶¶ 13-14, Exhs. L &

4   M.) Despite many attempts to draft a stipulation to preserve the La Jolla Skeletons in their

5   current condition and location, the parties could not agree on one. (*Id.*, ¶¶ 14-18.) With each

6   successive draft, the University had more demands. (*Id.*, ¶ 16.) Ultimately, plaintiffs could not

7   agree to the University's demands, which included a needless and unworkable exception for

8   "exigent circumstances," a term the University declined to define, and no requirement that the

9   University notify plaintiffs or obtain the Court's permission before moving the La Jolla

10  Skeletons from their current location. (*Id.*, ¶ 16, Exh. O; *see also id.*, ¶ 18.) Unable to resolve

11  the dispute over the La Jolla Skeletons or obtain a stipulation from defendants to preserve them,

12  plaintiffs filed this action on April 16, 2012.

13      The SDAC presently has physical custody of the La Jolla Skeletons, and holds them on

14  behalf of the University. (Verified Writ Petition and Complaint, ¶ 11; *see also* Schoeninger

15  Decl., ¶ 11.) The La Jolla Skeletons are in good enough condition that it may be possible to

16  retrieve DNA samples and perform DNA sequencing. (Verified Writ Petition and Complaint, ¶

17  28; *see also* Schoeninger Decl., ¶ 11; Declaration of Robert Bettinger in Support of Plaintiffs' Ex

18  Parte Application for Temporary Restraining Order and Order to Show Cause Regarding

19  Preliminary Injunction ("Bettinger Decl."), ¶ 4.) Not only would this provide a wealth of

20  information of interest to the general public, such sequences also could be used to assess whether

21  or not the remains share any genetic affiliation with modern Native American groups. (Verified

22  Writ Petition and Complaint, ¶ 28; *see also* Schoeninger Decl., ¶ 11; Bettinger Decl., ¶ 4.) Fox

23  and UCSD have authority to grant requests to study the La Jolla Skeletons, but have refused to

24  allow any research to be conducted. (Verified Writ Petition and Complaint, ¶ 29; Schoeninger

25  Decl., ¶¶ 11-12; Bettinger Decl., ¶ 4.) White, Bettinger, and Schoeninger have asked to study the

26  La Jolla Skeletons, but the University has not granted their requests. (Verified Writ Petition and

27  Complaint, ¶¶ 30-32; Schoeninger Decl., ¶ 12; Bettinger Decl., ¶ 4.)

28

1

**LEGAL ARGUMENT**

2

I.     **STANDARD FOR INJUNCTIVE RELIEF.**

3       A temporary restraining order on *ex parte* notice is appropriate if, from facts set forth in

4   an affidavit, declaration or verified complaint, the applicant will suffer irreparable injury before

5   the matter may be heard on regular notice.  (Code Civ. Proc., § 527(c)(1).)  The standards for

6   demonstrating irreparable injury for a temporary restraining order are the same as the

7   requirements for a preliminary injunction to issue.  A preliminary injunction is appropriate if: (i)

8   the plaintiff is likely to succeed on the merits, and (ii) the interim harm to the plaintiff if the

9   preliminary injunction were denied is greater than the harm to the defendant if the preliminary

10  injunction were granted.  (*Cohen v. Board of Supervisors* (1985) 40 Cal. 3d 277, 286.)  The

11  Court has discretion to grant a preliminary injunction. (*Shoemaker v. County of Los Angeles*

12  (1995) 37 Cal.App.4th 618, 624.)

13

II.    **PLAINTIFFS AND THE GENERAL PUBLIC WILL SUFFER
       IRREPARABLE INJURY IF AN INJUNCTION DOES NOT ISSUE.**

14

15      Plaintiffs respectfully request that this Court exercise its discretion to issue a temporary

16  restraining order, because plaintiffs and the general public will suffer irreparable injury if

17  defendants are not restrained from changing the current condition and location of the La Jolla

18  Skeletons, while this action is pending.  In balancing the hardships to each party, the court

19  considers "such things as the inadequacy of other remedies, the degree of irreparable harm, and

20  the necessity of preserving the status quo."  (*Moorpark Homeowner's Association v. VRT Corp.*

21  (1998) 63 Cal.App.4th 1396, 1402.)  The court must determine which party is more likely to be

22  injured by the exercise of its discretion, "and it must then be exercised in favor of that party."

23  (*Continental Baking Co. v. Katz* (1968) 68 Cal.2d 512, 528.)

24      Here, plaintiffs and the general public will suffer irreparable harm if defendants are not

25  prevented from disposing of the La Jolla Skeletons to the La Posta Band of Mission Indians.  The

26  purpose of plaintiffs' lawsuit is to determine the parties' rights and obligations with respect to

27  the preservation of the La Jolla Skeletons as part of the public trust, and most importantly, to

28

9

1 | prevent the University from disposing of the La Jolla Skeletons pursuant to an inapplicable
2 | federal law, and in violation of their duties to preserve the public trust. (*See generally* Verified
3 | Writ Petition and Complaint.) The parties' agreement to preserve the skeletons expires on April
4 | 30, 2012. (Peek Decl., ¶ 12, Exh. K.) If defendants carry out their stated intention to repatriate
5 | the skeletons, their actions will render ineffectual any judgment in plaintiffs' favor. The La Jolla
6 | Skeletons will lose their research value if repatriated. (*See* Schoeninger Decl., ¶¶ 13-14.)
7 | Because the Kumeyaay tribes are categorically opposed to further research and intend to bury the
8 | skeletons, (*see* Schoeninger Decl., ¶ 14), the tribes have no reason to preserve the skeletons'
9 | research value. A TRO and preliminary injunction are necessary to preserve the status quo and
10 | to avoid rendering any judgment ineffectual. (*See* Code Civ. Proc., § 526(a)(3); *see also*
11 | *Heckmann v. Ahmanson* (1985) 168 Cal.App.3d 119, 136-37 (preliminary injunction was proper
12 | where proceeds of transaction at issue would be dissipated by the time a final judgment could be
13 | obtained).)

14 | Furthermore, an injunction is proper if the actual or threatened injury cannot be
15 | compensated by an ordinary damage award. (Code Civ. Proc., § 526(a)(4)-(5).) Here, the loss of
16 | the opportunity for all people to better understand the origins of humanity in North America
17 | cannot easily be valued in monetary terms, if at all.

18 | In contrast, neither defendants nor the La Posta Band of Mission Indians would suffer
19 | any prejudice from maintaining the status quo. The La Jolla Skeletons have been under the
20 | University's control since their discovery in 1976, some 35 years ago. (*See* Schoeninger Decl., ¶
21 | 3.) Allowing them to remain in their current location and in their current condition would not
22 | subject defendants or the tribe to any detriment, but would merely preserve what has been the
23 | status quo for more than 30 years. On the other hand, if the skeletons were destroyed, or their
24 | research value diminished by poor handling, before the Court has determined whether they are
25 | even subject to repatriation under NAGPRA, there is no way to recover their lost research
26 | potential.

27 |

28 |

1  **III.    PLAINTIFFS ARE LIKELY TO PREVAIL ON THE MERITS OF THEIR
2          WRIT PETITION AND THE CAUSES OF ACTION IN THEIR
           COMPLAINT BECAUSE IT IS VIRTUALLY IMPOSSIBLE TO
3          ESTABLISH THAT THE LA JOLLA SKELETONS ARE "NATIVE
           AMERICAN" WITHIN THE MEANING OF NAGPRA.**

4          As noted above, a preliminary injunction is appropriate if the plaintiff is likely to succeed

5  on the merits of the underlying action. (*Cohen, supra*, 40 Cal. 3d at 286.) Here, due to the

6  skeletons' extreme age, it is virtually impossible for defendants or any tribal claimant to establish

7  they are "Native American" within the meaning of NAGPRA. (*See* Bettinger Decl., ¶ 3.)

8  Therefore, plaintiffs are likely to succeed on their claim that the La Jolla Skeletons are not

9  subject to NAGPRA.

10         For NAGPRA to apply, the remains must be "Native American" as defined by the statute:

11         NAGPRA mandates a two-part analysis. The first inquiry is whether human
           remains are Native American within the statute's meaning. If the remains *are not*
12         Native American, then NAGPRA does not apply. However, if the remains *are*
           Native American, then NAGPRA applies . . . .
13
(*Bonnichsen, supra*, 367 F.3d at 875 (italics in original).) Defendants have not established that
14
the La Jolla Skeletons are "Native American" under NAGPRA. Accordingly, defendants' efforts
15
to repatriate the La Jolla Skeletons to the La Posta Band of Mission Indians must be rejected.
16
           As the *Bonnichsen* court established, age alone is an insufficient basis to classify remains
17
as "Native American" under NAGPRA. In *Bonnichsen*, the Secretary of the Interior decided that
18
all pre-Columbian human remains found on federal land would automatically be deemed Native
19
American for purposes of NAGPRA, even if they had no cultural or biological connection to
20
present-day American Indians. (*See Bonnichsen v. United States* (D. Or. 2002) 217 F. Supp. 2d
21
1116, 1134-37, *aff'd* (9th Cir. 2004) 367 F.3d 864.) If defendants are making the same
22
assumption, they have applied the incorrect test.
23
           Both the district court and the Ninth Circuit in *Bonnichsen* concluded that an age-based
24
test for determining Native American status under NAGPRA was inappropriate. (*Bonnichsen,
25
supra*, 367 F.3d at 875-76; *Bonnichsen, supra*, 217 F. Supp. 2d at 1135-37.) First, it is
26
inconsistent with NAGPRA's use of the present tense, which expressly limits its application to
27
                                    11
28

1   remains and objects that have a relationship to present day Native Americans. (*Bonnichsen*,

2   *supra*, 367 F.3d at 875-76.) Second, it is inconsistent with Congress's purposes for enacting

3   NAGPRA:

> NAGPRA was intended to benefit modern American Indians by sparing them the
> indignity and resentment that would be aroused by the despoiling of their
> ancestors' graves and the study or display of their ancestors' remains. ...
> Congress's purposes would not be served by requiring the transfer to modern
> American Indians of human remains that bear no relationship to them. Yet, that
> would be the result under the Secretary's construction of the statute, which would
> give Native American status to any remains found within the United States
> regardless of age and regardless of lack of connection to existing indigenous
> tribes.

9   (*Id.* at 876 (emphasis added); *see also id.* at 876, fn. 17.)

10   NAGPRA only applies to those remains and objects that have a "special and significant

11   genetic or cultural relationship to some presently existing indigenous tribe, people or culture."

12   (*Id.* at 879; *see also id.* at 882.) The relationship or connection cannot be tenuous, unknown or

13   unproven. (*Id.* at 879.) In addition, it must be based upon substantial evidence. (*Id.* at 879-80.)

14   Applying these standards, the Ninth Circuit concluded that an approximately 9,000 year-old

15   skeleton (known as the "Kennewick Man") was not "Native American" and therefore was not

16   governed by NAGPRA. (*Id.* at 879-82.)

17   The holding in *Bonnichsen* compels the same result here. A vast span of time separates

18   both the Kennewick Man and the La Jolla Skeletons from any presently existing Indian tribes.

19   The Kennewick Man skeleton was radiocarbon dated to be 8410 +/- 60 years B.P. (years before

20   present). (*Bonnichsen, supra*, 217 F. Supp.2d at 1120 & fn. 6.) This is equivalent to sometime

21   between 8340 and 9200 calendar years. (*Id.* at 1120 & fn. 6.) This range represents "a time

22   predating all recorded history from any place in the world, a time before the oldest cities of our

23   world had been founded . . . ." (*Bonnichsen, supra*, 367 F.3d at 868.) This great span of time

24   makes it virtually impossible to establish any connection with modern Native Americans. (*See*

25   *id.* at 879-82.) The La Jolla Skeletons are even older than Kennewick Man, and are estimated to

26   date back 8977 to 9603 years B.P. (Verified Writ Petition and Complaint, ¶ 10; *see also id.*,

27   Exh. B, p. 1.)

12

28   MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' EX PARTE
APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE REGARDING
PRELIMINARY INJUNCTION, CASE NO. RG 12-625891

1    The Ninth Circuit noted that little is known about the people and cultures that existed in
2  Kennewick Man's world. (*Bonnichsen, supra*, 367 F.3d at 868, 882.)  The same is true for the
3  La Jolla Skeletons, (*see* Bettinger Decl., ¶ 3), which predate the Kennewick Man.  What facts are
4  known do not support the University's purported "finding" that the La Jolla Skeletons are
5  "Native American."  The burial pattern and skeletal morphology of the La Jolla Skeletons do not
6  show a connection to a presently existing tribe, people, or culture. (Schoeninger Decl., ¶ 10.)
7  Preliminary carbon and nitrogen stable isotope analysis of human bone collagen from the La
8  Jolla Skeletons suggests they enjoyed a different type of diet than the Kumeyaay. (*Id.*, ¶ 10.)
9  Because the University has not allowed any genetic testing, there is no genetic evidence that
10  would establish a link between the La Jolla Skeletons and any presently existing Native
11  American tribe. (*Id.*, ¶ 10.)

12    The only other basis for the University's decision to repatriate to the La Posta Band of
13  Mission Indians appears to be geography. (*See id.*, ¶ 9, Exh. A; *see also* Verified Writ Petition
14  and Complaint, Exh. B, p. 1.)  The tribe's claim that the remains were found on land that the
15  Kumeyaay's ancestors occupied (or occasionally used) in the nineteenth century has no
16  significance, however.  The University cites no evidence that any Kumeyaay tribe occupied the
17  University's land at the time the La Jolla Skeletons would have been buried.  Even if one
18  assumes that the ancestors of the Kumeyaay resided there 10,000 years ago, that fact alone
19  would not establish that they were the only occupiers of the area and that the La Jolla Skeletons
20  belonged to their people. (*See Bonnichsen, supra*, 367 F.3d at 881-82 (finding the record
21  established only that the tribal claimants' ancestors had lived in the region for a very long time).)

22    In summary, neither the age of the skeletons nor their geographic location provide an
23  adequate basis for declaring them to be "Native American" under NAGPRA, or in other words,
24  for declaring that they bear some relationship to a presently existing tribe, people, or culture.
25  The University has failed to make the required threshold determination that the La Jolla
26  Skeletons, or any objects contemporaneously discovered, are even covered by NAGPRA.  To the
27  extent defendants are relying on the newly enacted DOI regulation, 43 C.F.R. § 10.11, this

13

28

1   regulation does not apply until the University makes the required threshold determination.

2   Plaintiffs have established a reasonable likelihood of prevailing on the merits, and respectfully

3   request that this Court exercise its discretion to grant them a TRO and preliminary injunction.

4          IV.    **A COURT ORDER PRESERVING THE LA JOLLA SKELETONS IN**
                   **THEIR CURRENT CONDITION AND LOCATION IS WARRANTED**
5                  **AND NECESSARY TO PROTECT THEIR RESEARCH VALUE.**

6          Without a court order preventing defendants from changing the current conditions in

7   which the La Jolla Skeletons are kept, and also from moving them to another location without

8   notice to plaintiffs or permission from the Court, the skeletons will be inadequately protected,

9   and damage may result. *Bonnichsen* illustrates the consequences of allowing defendants too

10  much discretion in the curation of ancient remains. In *Bonnichsen*, the Army Corps of Engineers

11  temporarily lost bones, allowed tribal representatives to take bones from the "secure" storage

12  facility and secretly bury them, stored bones with inadequate padding and environmental

13  controls, allowed tribal representatives to conduct religious ceremonies without notifying the

14  court or opposing parties, and allowed the bones to be handled in a manner that failed to protect

15  them from possible contamination by modern DNA. (*Bonnichsen, supra,* 217 F. Supp. 2d at

16  1123-24.) The court eventually ordered the remains transferred to a climate-controlled museum,

17  but not before the Corps had already taken steps to damage them. (*See id.* at 1124.)

18         The order in this case must preserve both the skeletons' condition and their location, to

19  minimize the risk of similar misconduct. Defendants' insistence that (1) there must be an

20  exception for "exigent circumstances," and (2) they be the sole arbiters of when the skeletons

21  must be moved due to "exigent circumstances," has no basis in law or fact. In the very unlikely

22  event that a true emergency somehow required the skeletons to be moved, it is even more

23  unlikely that a true emergency would result in contempt liability for defendants. Such language

24  also leaves the door open for defendants to define "exigent circumstances" to suit their own

25  purposes, without any accountability to plaintiffs or this Court. Defendants' refusal to stipulate

26  to preserve the La Jolla Skeletons in their current location and condition without such language

27  serves only to create unnecessary work for plaintiffs and the Court, and waste judicial resources.

                                                14

28  MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' EX PARTE
    APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE REGARDING
    PRELIMINARY INJUNCTION, CASE NO. RG 12-625891

1  **V.    DEFENDANTS HAVE TWICE PREVIOUSLY AGREED TO KEEP THE
LA JOLLA SKELETONS IN THE SAME LOCATION AND CONDITION
2      WHILE THE PARTIES ATTEMPT TO RESOLVE THEIR DISPUTE.**

3  Defendants previously agreed to preserve the La Jolla Skeletons in the same location and

4  condition, without any exceptions or conditions: (1) in the parties' Tolling Agreement, which

5  expires on April 30, 2012; and (2) in the University's April 4, 2012 letter.  (Peek Decl., ¶¶ 12,

6  14, Exhs. K and M.)  The University's April 4, 2012 letter specifically stated, "[a]ssuming

7  Plaintiffs file [their complaint] the week of April 16, 2012, and assuming that Plaintiffs do not

8  unreasonably attempt to delay the progress of the litigation, Defendants will agree to keep the

9  human remains in the same location and condition while the litigation is pending."  Defendants'

10  refusal to stipulate to this simple agreement, and their attempts to impose unworkable exceptions

11  and conditions, are unreasonable.  Plaintiffs respectfully request an order preserving the status

12  quo during the pendency of this action.

13                                   **CONCLUSION**

14  For the reasons set forth above, plaintiffs request that this Court grant their request for a

15  temporary restraining order and preliminary injunction prohibiting defendants from changing in

16  any manner the current condition and location of the La Jolla Skeletons during the pendency of

17  this action.

18

19  DATED: April 18, 2012                    McMANIS FAULKNER

20

21                                           *Christine E. Peek*
                                             JAMES MCMANIS
22                                           CHRISTINE PEEK

23                                           Attorneys for Petitioners and Plaintiffs,

24                                           TIMOTHY WHITE,
                                             ROBERT L. BETTINGER, and
25                                           MARGARET SCHOENINGER

26

27
                                             15
28  MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' EX PARTE
APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE REGARDING
PRELIMINARY INJUNCTION, CASE NO. RG 12-625891

*10239726*

1  JAMES McMANIS (40958)
   CHRISTINE PEEK (234573)
2  BRANDON ROSE (269196)
   JENNIFER MURAKAMI (273603)
3  McMANIS FAULKNER
   A Professional Corporation
4  50 West San Fernando Street, 10th Floor
   San Jose, California 95113
5  Telephone:    (408) 279-8700
   Facsimile:    (408) 279-3244
6  Email:    cpeek@mcmanislaw.com

7  Attorneys for Petitioners and Plaintiffs,
   TIMOTHY WHITE,
8  ROBERT L. BETTINGER, and
   MARGARET SCHOENINGER
9

**FILED**
**ALAMEDA COUNTY**

APR 1 0 2012

By _____

10         SUPERIOR COURT OF THE STATE OF CALIFORNIA

11              FOR THE COUNTY OF ALAMEDA

| | |
|---|---|
| 12  TIMOTHY WHITE, an individual; ROBERT L. BETTINGER, an individual; and 13  MARGARET SCHOENINGER, an individual, | Case No. RG 12-625891 |
| 14 | **DECLARATION OF CHRISTINE PEEK IN SUPPORT OF PLAINTIFFS' EX** |
|     Petitioners and Plaintiffs, | **PARTE APPLICATION FOR** |
| 15 | **TEMPORARY RESTRAINING ORDER** |
|      vs. | **AND ORDER TO SHOW CAUSE** |
| 16 | **REGARDING PRELIMINARY** |
| 17  THE UNIVERSITY OF CALIFORNIA; THE REGENTS OF THE UNIVERSITY OF CALIFORNIA; MARK G. YUDOF, in his | **INJUNCTION** |
| 18  individual and official capacity as President of the University; MARYE ANNE FOX, in her | Date:  April 23, 2012 |
| 19  individual and official capacity as Chancellor of the University of California, San Diego; GARY | Time:  9:00 a.m. |
| 20  MATTHEWS, in his individual and official capacity as Vice Chancellor of the University of | Dept.:  31 |
| 21  California, San Diego; and DOES 1-50, inclusive, | Judge: The Hon. Evelio Grillo |
| 22 | Trial Date:  None |
| 23          Respondents and Defendants. | Reservation # 1281986 |

24

25

26

27

1

1    I, Christine Peek, declare:

2    1.    I am an attorney at law licensed to practice before all courts of the State of

3    California.  I am a partner at McManis Faulkner, attorneys of record for plaintiffs, Timothy

4    White, Robert L. Bettinger, and Margaret Schoeninger, in the above-captioned matter.  I make

5    this declaration based upon my personal knowledge and if called upon, could and would testify

6    competently to the matters contained herein.

7    2.    On April 16, 2012, plaintiffs filed their Petition For Writ Of Mandamus (Code

8    Civ. Proc., § 1085), Or In The Alternative, For Writ Of Administrative Mandamus (Code Civ.

9    Proc., § 1094.5); Complaint For Declaratory And Injunctive Relief (Code Civ. Proc., §§ 526a,

10   1060) ("Verified Writ Petition and Complaint") in the Alameda County Superior Court.

11   Attached as Exhibit A is a true and correct copy of the Verified Writ Petition and Complaint.

12   3.    Attached hereto as Exhibit B is a true and correct copy of page 12387 of volume

13   75 of the Federal Register.

14   4.    On December 20, 2011, our office delivered a letter to defendants' counsel by

15   email and by certified mail, asking them to stipulate to retain the La Jolla Skeletons in their

16   current condition and location at the San Diego Archaeological Center ("SDAC"), until their

17   legal status could be determined.  Attached as Exhibit C is a true and correct copy of the letter

18   dated December 20, 2011, to attorneys Dan Park (Chief Campus Counsel and Associate General

19   Counsel, University of California, San Diego) and Charles Robinson (Vice President and

20   General Counsel for Legal Affairs, University of California).

21   5.    On December 21, 2011, our office forwarded the December 20, 2011 letter to

22   attorney Dennis Klein, because we received a message that Mr. Park was out of the office.

23   Attached as Exhibit D is a true and correct copy of our email forwarding the December 20, 2011

24   letter.

25   6.    On December 22, 2011, Mr. Klein wrote to our office, acknowledging receipt of

26   the December 20, 2011 letter, but stating that UCSD's campus was closed from December 24,

27   2011 to January 2, 2012.  Attached as Exhibit E is a true and correct copy of Mr. Klein's

28

2

1 │ December 22, 2011 email to James McManis.

2 │      7.     On December 22, 2011, I wrote to Mr. Klein, advising him this was a time-

3 │ sensitive matter that required immediate attention. Attached as Exhibit F is a true and correct

4 │ copy of my December 22, 2011 email to Mr. Klein. I asked him for a written assurance that no

5 │ transfer of possession would occur until the parties have at least had an opportunity to discuss

6 │ some interim arrangement to preserve the status quo pending further proceedings.

7 │      8.     On December 23, 2011, Mr. Klein responded to my December 22, 2011 email,

8 │ stating, "[t]he campus does not intend to transfer possession of the remains before having an

9 │ opportunity to communicate with you further, after the campus reopens." Attached as Exhibit G

10 │ is a true and correct copy of Mr. Klein's December 23, 2011 response.

11 │      9.     Because Mr. Klein's response did not include an assurance that the skeletons

12 │ would not be transferred after January 4, 2012, I replied to his email, asking him if the University

13 │ would agree to give our office 20 days written notice before transferring possession. Attached as

14 │ Exhibit H is a true and correct copy of my reply to Mr. Klein's December 23, 2011 email.

15 │      10.     Mr. Klein again replied, but stated merely that he would pass along my request for

16 │ consideration, and that they would be in touch after the campus reopened. Attached as Exhibit I

17 │ is a true and correct copy of Mr. Klein's December 23, 2011 email.

18 │      11.     On December 30, 2011, I sent a letter to attorneys Park, Klein, and Robinson,

19 │ reminding them of the short deadline and asking them not to transfer possession of the skeletons

20 │ until plaintiffs had an opportunity to present their request for a temporary restraining order and

21 │ preliminary injunction to the Court. Attached as Exhibit J is a true and correct copy of my

22 │ December 30, 2011 letter. In the December 30, 2011 letter, I gave defendants' counsel notice

23 │ that our office intended to seek a temporary restraining order and preliminary injunction on

24 │ January 4, 2011 in this Court, if we could not reach an agreement in time to preserve the

25 │ skeletons.

26 │      12.     On January 3, 2012, University Counsel contacted our office, and agreed to

27 │ maintain the status quo on a temporary basis until Wednesday, January 18, 2012. This deadline

                                                 3

28 │

1  was extended in various writings until the parties were able to agree on a formal Tolling

2  Agreement. A true and correct copy of the Tolling Agreement is attached as Exhibit K. The

3  Tolling Agreement stated, "The parties agree that defendants will continue to retain the La Jolla

4  Skeletons in their current condition and location at the SDAC, to and including April 30, 2012."

5       13.     The purpose of the Tolling Agreement was to enable the parties to attempt to

6  resolve the dispute over the La Jolla Skeletons without litigation. The parties so far have been

7  unable to resolve the dispute. On March 22, 2012, I sent a letter to University Counsel, Margaret

8  Wu and Dennis Klein, advising them that plaintiffs could not agree to the University's conditions

9  for settlement negotiations. Attached as Exhibit L is a true and correct copy of my March 22,

10  2012 letter. The letter suggested that the parties discuss a procedure to preserve the status quo

11  with respect to the La Jolla Skeletons, specifically, an order keeping them in the same location

12  and condition while litigation was pending.

13       **14.**     **On April 4, 2012, Michelle Friedland of Munger, Tolles & Olson, responded**

14  **to my March 22, 2012 letter on behalf of the University. Attached as Exhibit M is a true**

15  **and correct copy of Ms. Friedland's April 4, 2012 letter. The letter stated, "[a]ssuming**

16  **Plaintiffs file [their complaint] the week of April 16, 2012, and assuming that Plaintiffs do**

17  **not unreasonably attempt to delay the progress of the litigation, Defendants will agree to**

18  **keep the human remains in the same location and condition while the litigation is pending."**

19       15.     On April 9, 2012, I sent Ms. Friedland a draft Stipulation and Proposed Order

20  Preserving the La Jolla Skeletons In Their Current Location And Condition. Attached as Exhibit

21  N is a true and correct copy of my April 9, 2012 cover letter and draft to Ms. Friedland. The

22  draft stipulation and order tracked the language of the parties' Tolling Agreement – which

23  defendants had already signed – and Ms. Friedland's April 4, 2012 letter.

24       16.     Many drafts later, the parties reached an impasse. With each successive draft, the

25  University had more demands. Attached as Exhibit O are true and correct copies of emails and

26  draft stipulations dated April 11, 2012, through April 13, 2012. Ultimately, plaintiffs could not

27  agree to the University's demands, which included a needless and unworkable exception for

4

28  DECL. OF CHRISTINE PEEK IN SUPPORT OF PLAINTIFFS' EX PARTE APPLICATION FOR TEMPORARY
RESTRAINING ORDER AND ORDER TO SHOW CAUSE REGARDING PRELIMINARY INJUNCTION,
CASE NO. RG 12-625891

1   "exigent circumstances," a term the University declined to define, and no requirement that the

2   University notify plaintiffs or obtain the Court's permission before moving the La Jolla

3   Skeletons from their current location. (*See* April 13, 2012 email from Michelle Friedland to

4   Christine Peek, at 3:16 PM, and attached drafts.)

5       17.    Because the parties had reached an impasse, on Friday, April 13, 2012, I sent an

6   email to Ms. Friedland informing her that the University's unreasonable demands compelled

7   plaintiffs to seek a TRO. Attached as Exhibit P is a true and correct copy of my email to Ms.

8   Friedland.

9       18.    On Friday, April 13, 2012, at 10:48 PM, Bradley Phillips of Munger, Tolles &

10  Olson replied to my email to Ms. Friedland, offering to stipulate to a variation of the University's

11  "exigent circumstances" exception. As had previously been explained to Ms. Friedland, this

12  language is not acceptable to plaintiffs. On April 14, 2012, I replied to Mr. Phillips, reattaching

13  plaintiffs' latest draft of the stipulation and order for his signature. Attached as Exhibit Q are

14  true and correct copies of Mr. Phillips' April 13, 2012 email and my April 14, 2012 reply.

15      19.    As of the date this application was filed, the University had not agreed to enter

16  into any stipulation for the preservation of the La Jolla Skeletons.

17      20.    On April 17, 2012, I sent an email to defendants' counsel notifying them that this

18  matter would be heard on the ex parte calendar on April 23, 2012, at 9:00 a.m., in Department 31

19  of the Alameda County Superior Court. Attached as Exhibit R is a true and correct copy of my

20  April 17, 2012 email.

21      I declare under penalty of perjury under the laws of the State of California, that the above

22  is true and correct.

23

24  DATED:    4/18/12              Christine F. Peek

                                    CHRISTINE PEEK
25

26

27

28  ────────────────────────────────────────────
    DECL. OF CHRISTINE PEEK IN SUPPORT OF PLAINTIFFS' EX PARTE APPLICATION FOR TEMPORARY
    RESTRAINING ORDER AND ORDER TO SHOW CAUSE REGARDING PRELIMINARY INJUNCTION,
    CASE NO. RG 12-625891