1  JAMES McMANIS (40958)
   CHRISTINE PEEK (234573)
2  BRANDON ROSE (269196)
   JENNIFER MURAKAMI (273603)
3  McMANIS FAULKNER
   A Professional Corporation
4  50 West San Fernando Street, 10th Floor
   San Jose, California 95113
5  Telephone:    (408) 279-8700
   Facsimile:    (408) 279-3244
6  Email:        cpeek@mcmanislaw.com

7  Attorneys for Petitioners and Plaintiffs,
   TIMOTHY WHITE,
8  ROBERT L. BETTINGER, and
   MARGARET SCHOENINGER
9

10                  UNITED STATES DISTRICT COURT

11               NORTHERN DISTRICT OF CALIFORNIA

12                  SAN FRANCISCO DIVISION

13  TIMOTHY WHITE, an individual; ROBERT          Case No. C 12-01978 RS
    L. BETTINGER, an individual; and
14  MARGARET SCHOENINGER, an individual,

15                                                **PETITION FOR WRIT OF MANDAMUS
                                                  (CODE CIV. PROC., § 1085), OR IN THE
16                  Petitioners and plaintiffs,   ALTERNATIVE, FOR WRIT OF
                                                  ADMINISTRATIVE MANDAMUS (CODE
17          vs.                                   CIV. PROC., § 1094.5); FIRST AMENDED
                                                  COMPLAINT FOR DECLARATORY
18  THE UNIVERSITY OF CALIFORNIA; THE             AND INJUNCTIVE RELIEF (CODE CIV.
    REGENTS OF THE UNIVERSITY OF                  PROC., §§ 526a, 1060)**
19  CALIFORNIA; MARK G. YUDOF, in his
    individual and official capacity as President of
20  the University; MARYE ANNE FOX, in her
    individual and official capacity as Chancellor of
21  the University of California, San Diego; GARY
    MATTHEWS, in his individual and official
22  capacity as Vice Chancellor of the University of
    California, San Diego; KUMEYAAY
23  CULTURAL REPATRIATION COMMITTEE;
    and DOES 1-50, inclusive,
24

25                  Respondents and defendants.

26

27

28

                                                1

1      1.      Petitioners and plaintiffs, TIMOTHY WHITE ("WHITE"), ROBERT L.

2 BETTINGER ("BETTINGER"), and MARGARET SCHOENINGER ("SCHOENINGER"),

3 (collectively "petitioners" or "plaintiffs"), allege as follows:

4 <div align="center">**PARTIES**</div>

5      2.      Plaintiff WHITE is an individual who lives in Berkeley, California.  He is a real

6 property owner in and resident of the County of Alameda and the State of California, and pays

7 federal, state, and local taxes.  WHITE is a professor of Integrative Biology at the University of

8 California, Berkeley.  He holds Bachelor of Science degrees in both Biology and Anthropology

9 from the University of California, Riverside, and a Master of Arts and Ph.D. in Biological

10 Anthropology from the University of Michigan, Ann Arbor.  He is renowned for his work in the

11 study of ancient humans.  For example, in the 1990's, WHITE led an expedition in Ethiopia that

12 resulted in the discovery of a 4.4 million-year-old skeleton, dubbed "Ardi," which predated Lucy

13 by 1.2 million years.

14      3.      Plaintiff BETTINGER is an individual who lives in Davis, California.  He is a

15 real property owner in and resident of the County of Solano and the State of California, and pays

16 federal, state, and local taxes.  BETTINGER is a professor of Anthropology at the University of

17 California, Davis.  He holds a Bachelor of Arts and a Ph.D. in Anthropology from the University

18 of California, Riverside.  BETTINGER's scholarship and fieldwork have focused on hunter-

19 gatherers and the population expansions of hunter-gatherers.

20      4.      Plaintiff SCHOENINGER is an individual who lives in Encinitas, California.  She

21 is a real property owner in and resident of the County of San Diego and the State of California,

22 and pays federal, state, and local taxes.  SCHOENINGER is a professor of Anthropology at the

23 University of California, San Diego.  She holds a Bachelor of Arts in Anthropology from the

24 University of Florida, a Master of Arts in Anthropology from the University of Cincinnati, and a

25 Ph.D. in Anthropology from the University of Michigan.  SCHOENINGER's research centers on

26 the subsistence strategies of early humans.

27      5.      Defendant UNIVERSITY OF CALIFORNIA ("UNIVERSITY") is a public trust

28 established by article IX of the California Constitution.

1      6.    Defendant THE REGENTS OF THE UNIVERSITY OF CALIFORNIA

2 ("REGENTS") is a public corporation that administers the UNIVERSITY.  (Cal. Const., art. IX,

3 § 9, subd. (a).)

4      7.    Defendant MARK YUDOF ("YUDOF") is an individual, who serves as President

5 of the UNIVERSITY.  The President is the chief executive officer of the UNIVERSITY, and

6 governs through authority delegated by the REGENTS.  The President is responsible directly to

7 the REGENTS.  Moreover, the President "shall serve as the guardian of the public trust, ensuring

8 legal and ethical compliance, managing system risk, and providing information regarding

9 University activities."  (*See* Regents Policy 1500, Statement of Expectations of The President of

10 The University (March 2011) ("Regents Policy"), *available at*

11 http://www.universityofcalifornia.edu/regents/policies/1500.html.)  YUDOF is sued here in his

12 individual and official capacities.

13      8.    Defendant MARYE ANNE FOX ("FOX") is an individual employed by

14 employed by the UNIVERSITY as the Chancellor of its San Diego campus ("UCSD").  The

15 campus Chancellor is the chief campus officer and executive head of all campus activities.  FOX

16 is sued here in her individual and official capacities.

17      9.    Defendant GARY MATTHEWS ("MATTHEWS") is an individual employed by

18 the UNIVERSITY as Vice Chancellor, Resource Management and Planning, at UCSD.  He is

19 sued here in his individual and official capacities.

20      10.    Defendant KUMEYAAY CULTURAL REPATRIATION COMMITTEE

21 ("KCRC") is a California corporation that represents the following twelve federally recognized

22 Kumeyaay Indian tribes: Barona Group of Capitan Grande Band of Mission Indians of the

23 Barona Reservation, California; Campo Band of Diegueno Mission Indians of the Campo Indian

24 Reservation, California; Ewiiaapaayp Band of Kumeyaay Indians, California; Iipay Nation of

25 Santa Ysabel, California (formerly the Santa Ysabel Band of Diegueno Mission Indians of the

26 Santa Ysabel Reservation); Inaja Band of Diegueno Mission Indians of the Inaja and Cosmit

27 Reservation, California; Jamul Indian Village of California; La Posta Band of Diegueno Mission

28 Indians of the La Posta Indian Reservation, California; Manzanita Band of Diegueno Mission

1  Indians of the Manzanita Reservation, California; Mesa Grande Band of Dieguano Mission

2  Indians of the Mesa Grande Reservation, California; San Pasqual Band of Dieguano Mission

3  Indians of California; Sycuan Band of the Kumeyaay Nation; and the Viejas (Baron Long)

4  Group of Capitan Grande Band of Mission Indians of the Viejas Reservation, California.

5       11.    Plaintiffs do not know the true names and capacities of defendants DOES 1

6  through 50, inclusive, and therefore sue these defendants by such fictitious names.  Plaintiffs

7  may amend this Writ Petition and Complaint to allege their true names and capacities when

8  ascertained.  Plaintiffs are informed and believe that each of the fictitiously named defendants is

9  responsible in some manner for the occurrences herein alleged, and that the illegal acts as herein

10  alleged were proximately caused by their conduct.

11       12.    At all times referenced herein, defendants, including those named as DOES 1

12  through 50, were the agents, servants, and employees of their co-defendants, and in doing the

13  things alleged were acting in the scope of their authority as such agents, servants and employees,

14  under the direction and supervision and with the permission and consent of their co-defendants.

15  **GENERAL ALLEGATIONS**

16       13.    In 1976, Professor Gail Kennedy of UCLA led an archaeological field excavation

17  project on University property in San Diego (the "site").  The Chancellor's official residence,

18  University House, is also located on the site.  Professor Kennedy's team discovered a rare double

19  burial.  The bones have great scientific significance due to the age of the two skeletons ("La Jolla

20  Skeletons"), which are estimated to date back 8977 to 9603 years ago.  The La Jolla Skeletons

21  are extremely old by North American osteological standards.  They are similar to, though likely

22  older than, another skeleton found in Kennewick in 1996, which was the subject of federal

23  litigation that resolved in 2004.  (*See Bonnichsen v. United States* (9th Cir. 2004) 367 F.3d 864.)

24  Because of their extreme age and relatively good condition, the La Jolla Skeletons represent a

25  unique opportunity for all people to understand human origins in North America.

26       14.    The SAN DIEGO ARCHAEOLOGICAL CENTER ("SDAC") presently has

27  physical custody of the La Jolla Skeletons, and holds them on behalf of the UNIVERSITY.  The

28  SDAC is a California nonprofit corporation located in Escondido, California.  By taking custody

1  of the La Jolla Skeletons on behalf of the UNIVERSITY, the SDAC is acting as the

2  UNIVERSITY's agent with respect to the La Jolla Skeletons.

3       15.    In 1990, Congress passed the Native American Graves Protection and

4  Repatriation Act ("NAGPRA").  NAGPRA imposes various requirements on, inter alia, state

5  government agencies and institutions of higher learning that receive federal funds, and that hold

6  "Native American" human remains or cultural items.  NAGPRA defines "Native American" as

7  follows:

8          'Native American' means of, or relating to, a tribe, people, or culture that is
          indigenous to the United States.
9

10  (25 U.S.C. § 3001(9).)  The Ninth Circuit has held that human remains must bear some

11  relationship to a presently existing tribe, people, or culture to be considered "Native American"

12  within the meaning of NAGPRA.  (*See Bonnichsen v. United States*, *supra*, 367 F.3d at 875-76.)

13  NAGPRA does not apply to remains that are not "Native American" or "Native Hawaiian."  For

14  remains or cultural items that are "Native American," NAGPRA may require that they be

15  "repatriated" or returned to a tribe, depending on whether or not certain conditions are met.

16  NAGPRA's statutory scheme does not require repatriation of "culturally unidentifiable" human

17  remains, however.

18       16.    NAGPRA requires those entities subject to it to compile an inventory of "Native

19  American" human remains and cultural objects in their possession, and to submit the inventory

20  to the DOI.  (25 U.S.C. § 3003.)

21       17.    The UNIVERSITY has created a system-wide University Advisory Group on

22  Cultural Repatriation and Human Remains and Cultural Items ("Advisory Group").  (*See*

23  University of California Policies and Procedures On Curation and Repatriation of Human

24  Remains and Cultural Items ("Human Remains Policies").)  The Human Remains Policies are

25  attached as Exhibit A.  If a tribe requests repatriation, the Advisory Group must review all

26  campus determinations and report its findings and recommendations to the President or the

27  President's designee.  The President or the President's designee has final authority to approve or

28  disapprove determinations regarding disposition of remains and cultural items.

1    18.    Under the Human Remains Policies, each campus with a collection of Native

2 American remains or cultural items must designate a liaison to work with native communities

3 considering or requesting repatriation from the UNIVERSITY.  Defendant MATTHEWS is the

4 liaison for the San Diego campus.

5    19.    The Kumeyaay Nation ("Kumeyaay"), a coalition of 12 Native American tribes,

6 claims to have occupied the site on which the La Jolla Skeletons were found.  Although the

7 Kumeyaay have asserted that the La Jolla Skeletons are culturally affiliated with their coalition

8 of tribes, there is insufficient evidence to support the conclusion that the Kumeyaay are

9 descended from the people who were buried at the site, approximately 10,000 years ago.  In

10 addition, there is insufficient evidence to conclude that any Kumeyaay tribe actually occupied

11 the site at the time the La Jolla Skeletons were buried there.  The evidence does not support a

12 finding that there is any link between the La Jolla Skeletons and any Kumeyaay tribe, or any

13 currently existing Native American tribe, for the following reasons, among other reasons:

14    a.    The burial pattern of the La Jolla Skeletons differs from that of the

15 Kumeyaay as reported in early ethnographies.  Before the Spanish explorers made

16 contact with North America, the Kumeyaay cremated, rather than buried, their dead.

17    b.    Preliminary carbon and nitrogen stable isotope analysis of human bone

18 collagen from the La Jolla Skeletons is consistent with a year-round diet of open-ocean

19 and some nearshore marine fish or marine mammals.  This contrasts with the diet of the

20 Kumeyaay, who lived on wild plants, supplemented with more small than large game,

21 and in some places, fish.  Seasonal dependence on marine foods would produce lower

22 values of the isotope signals than those recovered from the La Jolla Skeletons.

23    c.    The skeletal morphology of the La Jolla Skeletons does not show any link

24 to the Kumeyaay, or any other Native American tribe.  The La Jolla Skeletons have long,

25 narrow cranial vaults and short, relatively narrow faces compared with extant Native

26 Americans.  A detailed 2007 morphological study by Professor Douglas Owsley

27 concluded the La Jolla Skeletons were not Native American.

28 ///

PETITION FOR WRIT OF MANDAMUS, OR IN THE ALT., FOR WRIT OF ADMIN. MANDAMUS; FIRST
AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, CASE NO. C 12-01978 RS

d.      Because there has been no genetic testing of the La Jolla Skeletons (because the UNIVERSITY has not allowed any testing), there is no genetic or DNA evidence linking the Kumeyaay or any other Native American tribe to the La Jolla Skeletons.

20.      On or about October 22, 2008, the UNIVERSITY submitted a "Notice of Inventory Completion" and inventory to the United States Department Of The Interior ("DOI"), which included the La Jolla Skeletons and various other items said to be associated with the remains.  The DOI includes, as a bureau, the National Park Service ("NPS").  In turn, the NPS includes the Native American Graves Protection and Repatriation Review Committee ("NAGPRA Review Committee").

21.      The inventory was based on a 2008 report written by the local UC San Diego NAGPRA Review Committee.  The 2008 report was silent on whether the La Jolla Skeletons were "Native American" within the meaning of NAGPRA, and made no attempt to determine whether or not the La Jolla Skeletons were subject to NAGPRA.  The 2008 report did conclude, however, that there was insufficient evidence to conclude the remains were culturally affiliated with the Kumeyaay.

22.      Because there is insufficient evidence to conclude the La Jolla Skeletons are "Native American" within the meaning of NAGPRA, defendants' decision to include them on the October 22, 2008 inventory was legally erroneous.  NAGPRA and its accompanying regulations do not apply to the La Jolla Skeletons at all, because the La Jolla Skeletons do not fall within the class of human remains that NAGPRA covers.  Therefore, the La Jolla Skeletons should not have been included on any federal inventory.

23.      On or about February 23, 2009, MATTHEWS submitted to the DOI, through its NAGPRA Review Committee, a Request by a Museum or Federal Agency that the Review Committee Act on an Agreement Concerning the Disposition of Human Remains and Associated Funerary Objects Determined to be Unidentifiable ("2009 Repatriation Request").  MATTHEWS requested that the DOI approve an agreement between FOX and the KUMEYAAY CULTURAL REPATRIATION COMMITTEE ("KCRC") to transfer custody of

7

1  the La Jolla Skeletons to the KCRC.  The KCRC is a coalition of 12 different Kumeyaay tribes

2  of San Diego County.  The 2009 Repatriation Request was later withdrawn.

3      24.    In 2010, the DOI and its Secretary Ken Salazar ("Salazar") purported to

4  promulgate a new federal regulation governing the disposition of "culturally unidentifiable"

5  human remains that meet NAGPRA's definition of "Native American."  For all "culturally

6  unidentifiable" "Native American" human remains, Salazar and the DOI purported to impose the

7  following requirements, among other requirements:

8          a.    Requirements that the federal agency or museum in possession of the

9      remains consult with tribal representatives concerning culturally unidentifiable remains

10     and associated funerary objects;

11         b.    Requirements that federal agencies and museums offer to transfer control

12     of such remains to "(i) [t]he Indian tribe . . . from whose tribal land, at the time of the

13     excavation or removal, the human remains were removed; or (ii) [t]he Indian tribe or

14     tribes that are recognized as aboriginal to the area from which the human remains were

15     removed," unless the agency or museum can prove a right of possession;

16         c.    Authorization for federal agencies and museums to transfer control to

17     other tribes or Native Hawaiian organizations, in the event no tribe described above

18     agrees to accept the remains; and

19         d.    Notification requirements.

20     25.    On or about June 4, 2010, YUDOF wrote to FOX, stating that he planned to give

21  "significant deference" to the Chancellors of the respective UC campuses regarding decisions

22  about the disposition of remains.  YUDOF instructed FOX that the UCSD campus had the

23  responsibility to conduct consultations and analysis required under NAGPRA, and to make

24  initial determinations and recommendations regarding cultural affiliation.  YUDOF further

25  instructed FOX that once UCSD completed its assessment, it should determine whether it needed

26  to amend the previous NAGPRA inventory or prepare a new draft Notice of Inventory

27  Completion.

28  ///

PETITION FOR WRIT OF MANDAMUS, OR IN THE ALT., FOR WRIT OF ADMIN. MANDAMUS; FIRST
AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, CASE NO. C 12-01978 RS

1    26.      The La Posta Band of Diegueno Mission Indians of the La Posta Reservation ("La

2  Posta Band of Mission Indians") is a federally recognized tribe of Kumeyaay people.

3    27.      On or about August 2, 2010, Steve Banegas, a spokesperson for the KCRC, wrote

4  to the UCSD campus and requested that the La Jolla Skeletons be repatriated to the La Posta

5  Band of Mission Indians, along with certain other objects previously excavated from the site.

6    28.      On or about October 21, 2010, MATTHEWS circulated a new Draft Notice of

7  Inventory Completion ("Draft Notice") for review by the Advisory Group.  The new notice was

8  deficient for many reasons.  It referred to "associated funerary items," even though the published

9  paper describing the burials stated that no cultural items were found in association with the La

10  Jolla Skeletons.  It asserted that stone and shell recovered from the site was "reasonably believed

11  to have been placed with or near" the La Jolla Skeletons, "at the time of death or later as part of

12  the death rite or ceremony," without any factual support, and in apparent contradiction to Gail

13  Kennedy's account of the excavation.  The Draft Notice referred to the La Jolla Skeletons as

14  "Native American," despite a detailed 2007 morphological study by Professor Owsley

15  concluding they were not Native American.  Finally, the Draft Notice stated that a detailed

16  assessment of the La Jolla Skeletons had been made by UC professional staff, when in fact, the

17  only staff who had seen the La Jolla Skeletons included Gail Kennedy (who did not refer to them

18  as Native American), Philip Walker (now deceased, who concluded they were not Native

19  American), and plaintiff SCHOENINGER.  SCHOENINGER never made any determination that

20  the remains were "Native American" within the meaning of NAGPRA, nor was she asked to do

21  so.  In its responses to comments published along with the final version of 43 C.F.R. § 10.11, the

22  DOI included language indicating that museums must make a "threshold determination" that

23  culturally unidentifiable remains are "Native American" before including them on a federal

24  inventory.  (*See* 75 Fed.Reg. 12387 (response to Comment 55).)

25    29.      On or about March 2, 2011, the Advisory Group considered MATTHEWS' Draft

26  Notice and submitted a summary and report.  The Advisory Group recommended that UCSD

27  should not forward the Draft Notice without further consultation with tribes other than the

28  Kumeyaay.  The Advisory Group also recommended that the San Diego campus reanalyze

PETITION FOR WRIT OF MANDAMUS, OR IN THE ALT., FOR WRIT OF ADMIN. MANDAMUS; FIRST
AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, CASE NO. C 12-01978 RS

1  whether the supposed "associated funerary objects" are, in fact, funerary objects, and if not, to

2  revise the Draft Notice accordingly.  The Advisory Group did not reach a consensus on any other

3  recommendations.

4          30.     On or about May 11, 2011, YUDOF wrote to FOX, stating that he intended to

5  defer to the campus's determination on the issue of whether or not the remains were "Native

6  American" under NAGPRA, and to authorize the campus to proceed under the NAGPRA

7  process.  YUDOF authorized UCSD to dispose of the La Jolla Skeletons under NAGPRA,

8  subject to the following directions and recommendations:

9          a.     UCSD was required to reanalyze, including through expert analysis,

10                whether the materials listed on the Draft Notice were funerary objects, and if not, to

11                revise the Draft Notice.

12         b.     YUDOF advised UCSD to revise its Notice of Inventory Completion to

13                acknowledge an alleged "division among experts" on the issue of whether the La Jolla

14                Skeletons are "Native American" within the meaning of NAGPRA.

15         c.     YUDOF instructed UCSD to consult more broadly with other tribes in the

16                region.  Following this consultation, if UCSD determined that additional tribes were

17                aboriginal to the site, YUDOFF instructed UCSD to revise its Notice of Inventory

18                Completion accordingly.  If there were no competing claims, however, YUDOF

19                authorized FOX to dispose of the La Jolla Skeletons to the La Posta Band of Mission

20                Indians in accordance with NAGPRA, 30 days after publication in the Federal Register.

21         31.    The La Jolla Skeletons are in good enough condition that it may be possible to

22  retrieve DNA samples and perform DNA sequencing.  Not only would this provide a wealth of

23  information of interest to the general public, such sequences also could be used to assess whether

24  or not the remains share any genetic affiliation with modern Native American groups.

25         32.    FOX and UCSD have authority to grant requests to study the La Jolla Skeletons,

26  but have refused to allow any research to be conducted.

27         33.    On or about August 16, 2010, BETTINGER requested permission to study the La

28  Jolla Skeletons.  He proposed to perform (1) macro-morphological work; (2) stable isotope

PETITION FOR WRIT OF MANDAMUS, OR IN THE ALT., FOR WRIT OF ADMIN. MANDAMUS; FIRST
AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, CASE NO. C 12-01978 RS

analyses to determine diet and place of origin; and (3) ancient DNA work to establish genetic affinity.  These studies are essential to understanding the colonization of California and Western North America, and of the New World generally.  These studies are also central to BETTINGER's long-standing research on hunter gatherers and hunter gatherer expansions.  Dr. Art Ellis, UCSD Vice Chancellor for Research, replied that UCSD was finalizing procedures for dealing with such requests and that while he (Ellis) was shortly leaving UCSD, he had forwarded BETTINGER's request to Associate Vice Chancellor George Tynan, whom BETTINGER could look forward to hearing from.  BETTINGER never heard back from Tynan.  If the repatriation does not go forward, BETTINGER and other experts in the field of ancient DNA and stable isotope analysis plan to pursue these studies.  Because they are so well preserved, and because there are two of them, the La Jolla Skeletons present a unique opportunity to study patterns at a population level rather than an individual level, enabling scientists to apply the results of the studies in a wide variety of other contexts.  No other set of New World remains holds such a high degree of research potential.

34.     In or about April, 2009, WHITE asked to study the La Jolla Skeletons.  He engaged in communications with various UNIVERSITY representatives regarding his request from 2009 to 2011 without ever receiving a final response to his request.  For WHITE, the La Jolla Skeletons represent part of a worldwide sample of early humanity, which is critical to the understanding of the species, *Homo sapiens*.  If the La Jolla Skeletons are not repatriated, WHITE still plans to study them.

35.     In 2009, SCHOENINGER spoke informally to the Senior Vice Chancellor for Academic Affairs, Paul Drake, and the then Vice Chancellor for Research at UCSD, Art Ellis, about studying the La Jolla Skeletons.  She gave a presentation to the Academic Senate Council regarding the research value of the skeletons in 2009.  The Academic Senate Council told SCHOENINGER she could not study the La Jolla Skeletons or involve herself further in any requests to study them, because she allegedly had a "conflict of interest."  SCHOENINGER wants to preserve the opportunity to study the La Jolla Skeletons in the future, especially in the

PETITION FOR WRIT OF MANDAMUS, OR IN THE ALT., FOR WRIT OF ADMIN. MANDAMUS; FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, CASE NO. C 12-01978 RS

1   event that studies by BETTINGER or WHITE implicate new research questions in her area of

2   focus.

3          36.    The University's policy is that remains and cultural items shall normally remain

4   accessible for research by qualified investigators such as plaintiffs.  Therefore, it is highly

5   probable that plaintiffs will be allowed to study the La Jolla Skeletons if they remain in the

6   University's possession.

7          37.    On or about December 5, 2011, defendants published, or caused to be published,

8   in the Federal Register, a Notice of Inventory Completion: The University of California, San

9   Diego, San Diego, CA ("Repatriation Notice").  The Repatriation Notice is attached as Exhibit

10  B.  The Repatriation Notice stated that if no one else came forward and claimed the La Jolla

11  Skeletons by January 4, 2012, the La Jolla Skeletons would be repatriated to the La Posta Band

12  of Mission Indians after that date.  The Repatriation Notice also made the following purported

13  findings, among other findings:

14         a.     The La Jolla Skeletons are "Native American," pursuant to 25 U.S.C. §

15  3001(9).

16         b.     Pursuant to 25 U.S.C. § 3001(2), a relationship of shared group identity

17  cannot be reasonably traced between the La Jolla Skeletons and any present-day Indian tribe.

18         c.     Pursuant to 25 U.S.C. § 3001(3)(A), approximately 25 objects found at the

19  site are "reasonably believed to have been placed with or near" the La Jolla Skeletons, "at the

20  time of death or later as part of the death rite or ceremony."

21         d.     Pursuant to 43 C.F.R. § 10.11(c)(1), and based upon request from the

22  KUMEYAAY CULTURAL REPATRIATION COMMITTEE, on behalf of the 12 associated

23  Kumeyaay tribes, disposition of the La Jolla Skeletons is to the La Posta Band of Dieguено

24  Mission Indians of the La Posta Indian Reservation, California.

25         38.    On or about January 25, 2012, the parties entered into a Tolling Agreement, by

26  which respondents and defendants agreed that, "any and all statutes of limitation applicable to

27  any claims whatsoever that plaintiffs may have against defendants relating to the La Jolla

28  Skeletons that have not already expired shall be tolled to and including April 16, 2012."

PETITION FOR WRIT OF MANDAMUS, OR IN THE ALT., FOR WRIT OF ADMIN. MANDAMUS; FIRST
AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, CASE NO. C 12-01978 RS

**PETITION FOR WRIT OF MANDAMUS (Code Civ. Proc. § 1085), OR IN THE ALTERNATIVE, FOR WRIT OF ADMINISTRATIVE MANDAMUS (Code Civ. Proc. § 1094.5)**

**[All Petitioners Against UNIVERSITY, REGENTS, YUDOF, FOX, MATTHEWS, And DOES 1-50, INCLUSIVE]**

39. Petitioners hereby incorporate by reference paragraphs 1 through 38, inclusive.

40. NAGPRA only applies to the La Jolla Skeletons if they meet the legal definition of "Native American" under NAGPRA. Title 43, part 10.11, subdivision (a) of the Code of Federal Regulations also specifically states that it applies "to human remains previously determined to be Native American under § 10.9, but for which no lineal descendant or culturally affiliated Indian tribe or Native Hawaiian organization has been identified."

41. Under NAGPRA and its accompanying regulations, the UNIVERSITY, REGENTS, YUDOF, FOX, MATTHEWS, and DOES 1-50, INCLUSIVE, (collectively, "the Regents"), have a clear, present, mandatory and ministerial duty to make a formal determination whether or not the La Jolla Skeletons are "Native American" within the meaning of NAGPRA, before repatriating them under the alleged authority of 43 C.F.R. § 10.11.

42. Under article I, sections 7 and 15 of the California Constitution, and the Fourteenth Amendment to the United States Constitution, the Regents have a clear, present, mandatory and ministerial duty to comply with the minimum requirements of due process, including a clear, present, mandatory and ministerial duty to avoid imposition of arbitrary adjudicative procedures.

43. In addition, the Regents have a clear, present, mandatory and ministerial duty to administer the UNIVERSITY as a public trust, pursuant to the state constitutional mandate. "[D]ecisions are to be made solely to promote the best interests of the University as a public trust, rather than the interests of a particular constituency, and that Board members will disclose personal, familial, business relationships, or other potential conflicts of interest as appropriate." (*See* Regents Policy 1100, Statement Of Expectations Of The Members Of The Board Of Regents (Jan. 2010), *available at* http://www.universityofcalifornia.edu/regents/policies/

1   1100.html.)  The public has an interest in preserving scientifically and historically significant

2   items, as does the UNIVERSITY.

3          44.     Petitioners are beneficially interested in the issuance of a writ of mandamus,

4   because they have a clear, present, substantial and vested right in the Regents' performance of

5   their duty to determine whether or not NAGPRA and its accompanying regulations actually

6   apply to the La Jolla Skeletons, before the Regents dispose of them to the Kumeyaay.  A

7   disposition without such a formal determination would arbitrarily and illegally destroy the La

8   Jolla Skeletons' incalculable scientific value to petitioners, and to the public at large, and would

9   violate NAGPRA.

10          45.     In addition, petitioners are beneficially interested as citizens and taxpayers in the

11   Regents' performance of their duties under the law.  The Regents' threatened act of repatriation

12   not only would deprive petitioners' of any opportunity to research the La Jolla Skeletons, it

13   would also arbitrarily and illegally deprive all members of the public of the opportunity to

14   understand the origins of humanity in North America.

15          46.     The above-described actions of the Regents, including but not limited to, the

16   Regents' inclusion of the La Jolla Skeletons on the October 22, 2008 Notice of Inventory

17   Completion and the Repatriation Notice, were arbitrary and capricious, in excess of the Regents'

18   jurisdiction, a prejudicial abuse of their discretion, and/or there was not a fair trial, for, inter alia,

19   the following reasons:

20          a.     The Regents failed to make a formal and adequate finding or

21          determination whether or not the La Jolla Skeletons are "Native American" under

22          NAGPRA.  On information and belief, the Regents failed to consider any evidence or

23          conduct a hearing on this issue.  In failing to make this decision using procedures that

24          meet minimum constitutional standards, and in making their purported "findings" without

25          considering any evidence or providing petitioners a full and fair opportunity to present

26          evidence,  the Regents acted in an arbitrary and capricious manner, in violation of

27          petitioners' fundamental due process rights, and in violation of the Regents' duty to

28          administer the University as a public trust;

14

PETITION FOR WRIT OF MANDAMUS, OR IN THE ALT., FOR WRIT OF ADMIN. MANDAMUS; FIRST
AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, CASE NO. C 12-01978 RS

b.      For the same reasons, the Regents' decision to include the La Jolla Skeletons on the October 22, 2008 Notice of Inventory Completion and the Repatriation Notice was not supported by an adequate finding or determination that the La Jolla Skeletons are "Native American" under NAGPRA;

c.      To the extent the Regents made a formal finding or determination that the La Jolla Skeletons were "Native American" under NAGPRA, their determination was arbitrary and capricious, not supported by the weight of the evidence, and/or was not supported by substantial evidence in light of the whole record.  The Regents' decision was further flawed in that the Regents apparently based their decision on the geographic relationship of the Kumeyaay to the UCSD site, even though the "aboriginal territories" occupied and defined for historic Indian tribes are not in any way linked to the prehistoric territories that their lineal ancestors may have occupied;

d.      Petitioners were not allowed to present evidence in opposition to the Regents' summary conclusion that the La Jolla Skeletons were "Native American" within the meaning of NAGPRA;

e.      On information and belief, the Regents did not reanalyze whether the materials listed on the Draft Notice were funerary objects, as required by YUDOF's May 11, 2011 letter;

f.      On information and belief, the Regents' purported finding that the 25 objects were "reasonably believed" to have been placed at the site at or near the time of death or later as part of the "death rite or ceremony" is not supported by any evidence in the record, and/or petitioners were not allowed to present evidence in opposition to  the Regents' summary conclusion.  The Regents' purported finding is arbitrary and capricious ;

g.      The Human Remains Policies that the Regents' followed in drafting and submitting the Notice of Inventory Completion and Repatriation Notice are fatally flawed, because they provide no guidelines for determining whether remains are "Native American" within the meaning of NAGPRA.  Furthermore, they provide no standards

PETITION FOR WRIT OF MANDAMUS, OR IN THE ALT., FOR WRIT OF ADMIN. MANDAMUS; FIRST
AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, CASE NO. C 12-01978 RS

1    governing what evidence is admissible on the question of whether the remains are

2    "Native American" within the meaning of NAGPRA, or what weight the evidence is to

3    be given.  The lack of standards renders it impossible for petitioners to challenge the

4    evidence presented or the Regents' summary conclusion.  The Human Remains Policies

5    do not provide notice of what evidence may be relied upon in the evaluation of whether

6    remains are or are not "Native American."  The lack of procedures and standards renders

7    the Human Remains Policies unconstitutionally vague and violates due process.

8        47.    By including the La Jolla Skeletons on the October 22, 2008 Notice of Inventory

9    Completion and Repatriation Notice, the Regents acted in an arbitrary and capricious manner and

10   in violation of petitioners' and the public's right to a fair determination of whether or not the La

11   Jolla Skeletons are "Native American" within the meaning of NAGPRA.

12       48.    Petitioners have no plain, speedy, and adequate remedy in the ordinary course of

13   law other than the relief sought by this petition.

14       49.    Petitioners have exhausted all administrative procedures required of them by law.

15       50.    If the relief sought by this petition is not granted, petitioners and the general

16   public will suffer irreparable injury and harm, in that the ability to study the La Jolla Skeletons

17   will be lost forever.  Petitioners are informed and believe that the Regents will repatriate the

18   remains to the La Posta Band of Mission Indians as soon as possible after January 4, 2012,

19   unless the Regents are restrained by this Court.  Petitioners are informed and believe that the La

20   Posta Band of Mission Indians will fail to maintain the skeletons in a manner that preserves their

21   scientific value, and therefore the skeletons' scientific value will be destroyed, unless the

22   Regents are restrained by this Court.

23       WHEREFORE, petitioners pray for judgment against the Regents as set forth below.

24   ///

25   ///

26   ///

27   ///

28   ///

PETITION FOR WRIT OF MANDAMUS, OR IN THE ALT., FOR WRIT OF ADMIN. MANDAMUS; FIRST
AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, CASE NO. C 12-01978 RS

**COMPLAINT**

**FIRST CAUSE OF ACTION – DECLARATORY AND INJUNCTIVE RELIEF -
VIOLATION OF NAGPRA (Code Civ. Proc. §§ 526a, 1060)**

**[All Plaintiffs Against All Defendants]**

51.    Plaintiffs hereby incorporate by reference paragraphs 1 through 50, inclusive.

52.    NAGPRA only applies to the La Jolla Skeletons if they meet the legal definition of "Native American" under NAGPRA.  Title 43, part 10.11, subdivision (a) of the Code of Federal Regulations also specifically states that it applies "to human remains previously determined to be Native American under § 10.9, but for which no lineal descendant or culturally affiliated Indian tribe or Native Hawaiian organization has been identified."  Defendants' UNIVERSITY, REGENTS, YUDOF, FOX, MATTHEWS, and DOES 1-50, inclusive, (collectively, "the Regents") approval of the transfer of the La Jolla Skeletons to the La Posta Band of Mission Indians is illegal, invalid, null and void, because the Regents failed to make a finding or determination, or failed to make an adequate finding or determination, that the remains are "Native American" within the meaning of NAGPRA.  Defendants' actions are also illegal, invalid, null and void to the extent the Regents concluded the remains were "Native American," because their conclusion is not supported by the evidence.

53.    The Regents have expended public funds in support of their illegal efforts to repatriate the La Jolla Skeletons, without determining whether they are "Native American" within the meaning of NAGPRA, and/or without considering all of the evidence concerning whether or not the La Jolla Skeletons are "Native American" within the meaning of NAGPRA.

54.    An actual, present controversy exists between plaintiffs and the Regents, because plaintiffs contend and the Regents deny that that the Regents' actions in approving the transfer of the La Jolla Skeletons to the La Posta Band of Mission Indians are illegal, invalid, null and void.

55.    An actual, present controversy exists between plaintiffs and KCRC, because KCRC claims, and plaintiffs deny, that disposition of the La Jolla Skeletons should be to the La Posta Band of Diegueno Mission Indians of the La Posta Indian Reservation, California.    The Regents' December 5, 2011 Repatriation Notice determining that disposition would be to the La

1  Posta Band of Diegueno Mission Indians of the La Posta Indian Reservation, California, states

2  that KCRC requested disposition of the La Jolla Skeletons to the La Posta Band of Diegueno

3  Mission Indians of the La Posta Indian Reservation, California.

4       56.    Plaintiffs desire a judicial determination that the Regents' actions in approving the

5  transfer of the La Jolla Skeletons to the La Posta Band of Mission Indians are illegal, invalid,

6  null and void.  A judicial declaration is necessary and appropriate at this time, so that plaintiffs

7  may ascertain their rights, the rights of the general public, and the Regents' duties under the law.

8       57.    Unless the Regents are enjoined, plaintiffs and the general public will suffer

9  irreparable injury and harm, in that the ability to study the La Jolla Skeletons will be lost forever.

10 Plaintiffs are informed and believe that the Regents will repatriate the remains to the La Posta

11 Band of Mission Indians as soon as possible after January 4, 2012, unless the Regents are

12 restrained by this Court.  Plaintiffs are informed and believe that the La Posta Band of Mission

13 Indians will fail to maintain the skeletons in a manner that preserves their scientific value, and

14 therefore the skeletons' scientific value will be destroyed, unless the Regents are restrained by

15 this Court.

16      58.    Plaintiffs and the general public have no plain, adequate, or speedy remedy at law

17 and are entitled to injunctive relief against the Regents.  Plaintiffs and the general public have no

18 administrative remedy because the Regents' procedures for approving the transfer of the La Jolla

19 Skeletons, and the short timeframe for repatriation after the Regents published their Repatriation

20 Notice preclude any administrative relief.

21

22      **SECOND CAUSE OF ACTION – DECLARATORY AND INJUNCTIVE RELIEF -
23      BREACH OF PUBLIC TRUST**

24      **[All Plaintiffs Against Defendants REGENTS, YUDOF, FOX and MATTHEWS]**

25      59.    Plaintiffs hereby incorporate by reference paragraphs 1 through 58, inclusive.

26      60.    The UNIVERSITY is a public trust established by article nine of the California

27 Constitution.

28 ///

PETITION FOR WRIT OF MANDAMUS, OR IN THE ALT., FOR WRIT OF ADMIN. MANDAMUS; FIRST
AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, CASE NO. C 12-01978 RS

61.     The La Jolla Skeletons are part of the public trust that is the UNIVERSITY.  In addition, the UNIVERSITY maintains its collections of human remains and cultural items – to which the La Jolla Skeletons belong – as a public trust.

62.     Defendants REGENTS and YUDOF are trustees of the UNIVERSITY.  FOX is an agent of YUDOF when she is performing YUDOF's duties as trustee of the UNIVERSITY. MATTHEWS is an agent of YUDOF when acting as an agent of FOX when she is performing YUDOF's duties as trustee of the UNIVERSITY.  Plaintiffs are informed and believe that YUDOF and the REGENTS neglected to take reasonable steps to compel FOX and MATTHEWS to correct what defendants knew or should have known were violations of NAGPRA.

63.     Plaintiffs and the general public are beneficiaries of the public trust, of which the La Jolla Skeletons are a part.

64.     Defendants have a duty to administer the UNIVERSITY as a public trust, pursuant to the state constitutional mandate.  (*See* Regents Policy 1100 (REGENTS are to serve as trustees for the people of the State of California and as stewards for the University of California, "acting to govern the University in fulfillment of its educational, research, and public service missions in the best interests of the people of California"); *see also* Regents Policy 1500 ("The President is expected to direct the management and administration of the University of California system consistent with the Bylaws and Standing Orders, administering the University in fulfillment of its educational, research, and public service missions in the best interests of the people of California").)  Defendants have a duty to fulfill the UNIVERSITY's educational, research, and public service missions in the best interests of the people of California.

65.     Defendants breached their duty to plaintiffs and to the public to administer the public trust for the public interest by (1) arbitrarily and capriciously including the La Jolla Skeletons on the October 22, 2008 Notice of Inventory Completion and Repatriation Notice, even though defendants lacked a reasonable or good faith belief that the remains are "Native American" within the meaning of NAGPRA; (2) approving the transfer of the La Jolla Skeletons to the La Posta Band of Mission Indians, even though defendants lacked a reasonable or good

faith belief that the remains are "Native American" within the meaning of NAGPRA, or that they had any relationship to the tribe known as the La Posta Band of Mission Indians; (3) failing to conduct a good faith inquiry and make a formal determination whether or not the remains are "Native American" within the meaning of NAGPRA; and (4) misrepresenting that "25 objects" were "reasonably believed" to have been placed at the site at or near the time of death or later as part of the "death rite or ceremony," contrary to Gail Kennedy's account of the excavation.

66.     An actual, present controversy exists between plaintiffs and defendants, because plaintiffs contend and defendants deny that that defendants' actions alleged above constitute a breach of trust.

67.     Plaintiffs desire a judicial determination that defendants' actions constitute a breach of trust.  A judicial declaration is necessary and appropriate at this time, so that plaintiffs may ascertain their rights and the rights of the general public, and defendants' duties under the law.

68.     Plaintiffs seek to compel the trustees to perform their duties and to enjoin the trustees from committing future breaches.  Plaintiffs are informed and believe that defendants will repatriate the remains to the La Posta Band of Mission Indians as soon as possible after January 4, 2012, unless defendants are restrained by this Court.  Plaintiffs are informed and believe that the La Posta Band of Mission Indians will fail to maintain the skeletons in a manner that preserves their scientific value, and therefore the skeletons' scientific value will be destroyed, contrary to the public interest, unless defendants are restrained by this Court.

69.     Plaintiffs and the general public have no plain, adequate, or speedy remedy at law and are entitled to injunctive relief against defendants.  Plaintiffs and the general public have no administrative remedy because defendants' procedures for approving the transfer of the La Jolla Skeletons, and the short timeframe for repatriation after defendants published their Repatriation Notice, preclude any administrative relief.

///

///

///

PETITION FOR WRIT OF MANDAMUS, OR IN THE ALT., FOR WRIT OF ADMIN. MANDAMUS; FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, CASE NO. C 12-01978 RS

## THIRD CAUSE OF ACTION – 42 U.S.C. § 1983 AND THE UNITED STATES CONSTITUTION – FIRST AMENDMENT

### [All Plaintiffs Against Defendants YUDOF, FOX, and MATTHEWS]

70.     Plaintiffs hereby incorporate by reference paragraphs 1 through 63, inclusive.

71.     Plaintiffs have a First Amendment right to receive information and ideas.  The opportunity to use the La Jolla Skeletons for research purposes is the only means of accessing the information and ideas contained within them.

72.     Defendants' actions alleged above have deprived, and will continue to deprive, plaintiffs of their right to receive information under the First Amendment to the United States Constitution.  Plaintiffs have been unable to study the remains, despite having made study requests.  The government may not, "consistently with the spirit of the First Amendment, contract the spectrum of available knowledge."  (*See Griswold v. Connecticut* (1965) 381 U.S. 479, 482.)

73.     In committing the acts herein alleged, defendants were acting under color of state law.

74.     Plaintiffs desire a judicial determination that defendants' actions violate plaintiffs' First Amendment right to receive information.  A judicial declaration is necessary and appropriate at this time, so that plaintiffs may ascertain their rights and the rights of the general public, and defendants' duties under the law.

75.     An actual and immediate controversy has arisen and now exists between plaintiffs and defendants related to their respective rights and duties.  Plaintiffs contend, and defendants deny, that defendants' actions have deprived, and will continue to deprive, plaintiffs of their right to receive information under the First Amendment to the United States Constitution.

76.     Plaintiffs and the general public have no plain, adequate, or speedy remedy at law and are entitled to injunctive relief against defendants.  Unless defendants are enjoined, plaintiffs and the general public will suffer irreparable injury and harm, in that the ability to study the La Jolla Skeletons will be lost forever.  Plaintiffs are informed and believe that defendants will repatriate the remains to the La Posta Band of Mission Indians as soon as possible after January 4, 2012, unless defendants are restrained by this Court.  Plaintiffs are informed and believe that

21

1   the La Posta Band of Mission Indians will fail to maintain the skeletons in a manner that

2   preserves their scientific value, and therefore the skeletons' scientific value will be destroyed,

3   unless defendants are restrained by this Court.

4   **<u>PRAYER FOR RELIEF</u>**

5        Petitioners and plaintiffs pray for judgment against respondents and defendants as

6   follows:

7        1.     On the petition for writ of traditional mandamus, or in the alternative, writ of

8   administrative mandamus:

9        (a)     For a peremptory writ directing respondents to set aside the Notice of

10   Inventory Completion of October 22, 2008 and December 5, 2011, respectively; AND

11        (b)     For a peremptory writ directing respondents to make a formal

12   determination whether or not the La Jolla Skeletons are "Native American" within the

13   meaning of NAGPRA; AND

14        (c)     For a peremptory writ directing respondents to set aside and cease and

15   desist from any actions taken to implement the decision to transfer possession of the La

16   Jolla Skeletons to the La Posta Band of Mission Indians, unless and until respondents

17   have made a formal determination that the remains are "Native American" within the

18   meaning of NAGPRA.

19   OR IN THE ALTERNATIVE:

20        (a)     For a peremptory writ directing respondents to set aside the Notice of

21   Inventory Completion of October 22, 2008 and December 5, 2011, respectively; AND

22        (b)     For a peremptory writ prohibiting respondents from transferring

23   possession of the La Jolla Skeletons to the La Posta Band of Mission Indians, on the

24   ground that they are not "Native American" within the meaning of NAGPRA.

25        2.     On the first cause of action for declaratory and injunctive relief:

26        (a)     A declaration, order and judgment that the La Jolla Skeletons are not

27   "Native American" within the meaning of NAGPRA; AND

28

PETITION FOR WRIT OF MANDAMUS, OR IN THE ALT., FOR WRIT OF ADMIN. MANDAMUS; FIRST
AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, CASE NO. C 12-01978 RS

(b)     A declaration, order and judgment that defendants, in attempting to transfer possession of the La Jolla Skeletons to the La Posta Band of Mission Indians, acted arbitrarily and without jurisdiction or authority, and that defendants' decision to approve such transfer, and all subsequent actions to implement such transfer, are illegal, invalid, null and void; AND

(c)     A preliminary and permanent injunction requiring defendants to set aside and cease and desist from any and all actions implementing the decision to transfer possession of the La Jolla Skeletons to the La Posta Band of Mission Indians; AND

(d)     A permanent injunction prohibiting defendants from taking any action in the future to approve or implement a transfer of possession of the La Jolla Skeletons to the La Posta Band of Mission Indians, or any other Native American tribe.

3.     On the second cause of action for breach of trust:

(a)     A declaration, order and judgment defendants' actions constituted a breach of trust; AND

(b)     A preliminary and permanent injunction requiring defendants to perform their duties as trustees of the UNIVERSITY and protect the UNIVERSITY's research assets from destruction; AND

(c)     A preliminary and permanent injunction requiring defendants set aside and cease and desist from any and all actions implementing the decision to transfer possession of the La Jolla Skeletons to the La Posta Band of Mission Indians; AND

(d)     A permanent injunction prohibiting defendants from taking any action in the future to approve or implement a transfer of possession of the La Jolla Skeletons to the La Posta Band of Mission Indians, or any other Native American tribe.

4.     On the third cause of action for violation of the First Amendment:

(a)     A declaration, order and judgment that defendants' actions violate plaintiffs' First Amendment right to receive information; AND

(b)     A preliminary and permanent injunction requiring defendants to set aside and cease and desist from any and all actions implementing the decision to transfer

23

PETITION FOR WRIT OF MANDAMUS, OR IN THE ALT., FOR WRIT OF ADMIN. MANDAMUS; FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, CASE NO. C 12-01978 RS

1    possession of the La Jolla Skeletons to the La Posta Band of Mission Indians; AND

2           (c)     A permanent injunction prohibiting defendants from taking any action in

3    the future to approve or implement a transfer of possession of the La Jolla Skeletons to

4    the La Posta Band of Mission Indians, or any other Native American tribe.

5       5.      For petitioners' and plaintiffs' costs of suit;

6       6.      For petitioners' and plaintiffs' attorneys' fees; AND

7       7.      For any other and further relief that this Court may deem just and proper.

8    DATED:  May 23, 2012                     McMANIS FAULKNER

9

10                                             /s/  Christine Peek

11                                             JAMES MCMANIS
                                               CHRISTINE PEEK

12                                             Attorneys for Petitioners and Plaintiffs,

13                                             TIMOTHY WHITE,
                                               ROBERT L. BETTINGER, and
14                                             MARGARET SCHOENINGER

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PETITION FOR WRIT OF MANDAMUS, OR IN THE ALT., FOR WRIT OF ADMIN. MANDAMUS; FIRST
AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, CASE NO. C 12-01978 RS

**VERIFICATION TO PETITION FOR WRIT OF MANDAMUS
(CODE CIV. PROC., § 1085), OR IN THE ALTERNATIVE,
FOR WRIT OF ADMINISTRATIVE MANDAMUS (CODE CIV. PROC., § 1094.5)**

I, Timothy White, Ph.D., declare:

I am one of the petitioners and plaintiffs in the instant action.  I have read the Petition For Writ Of Mandamus (Code Civ. Proc., § 1085), Or In The Alternative, For Writ Of Administrative Mandamus (Code Civ. Proc., § 1094.5) against respondents and know its contents.  The allegations of the Petition For Writ Of Mandamus (Code Civ. Proc., § 1085), Or In The Alternative, For Writ Of Administrative Mandamus (Code Civ. Proc., § 1094.5) are true of my own knowledge, except as to those matters which are alleged on information and belief, and as to those matters, I believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Date: MAY 23, 2012

Name:   Timothy White, Ph.D.

VERIFICATION TO PETITION FOR WRIT OF MANDAMUS, OR IN THE ALT., FOR WRIT OF ADMIN.
MANDAMUS, CASE NO. C 12-01978 RS

# EXHIBIT A

University of California
May 1, 2001

# UNIVERSITY OF CALIFORNIA POLICY AND PROCEDURES ON CURATION AND REPATRIATION OF HUMAN REMAINS AND CULTURAL ITEMS

## I. GENERAL PRINCIPLES

It is the policy of the University of California to assure the respectful and dignified treatment of human remains and the consideration of living descendants of those deceased. The University recognizes that individuals and communities have cultural and religious concerns that must be considered in determining the treatment and disposition of human remains in its collections.

At the same time, the University's collections of human remains and cultural items serve valuable educational and research purposes important to the enhancement of knowledge in various disciplines. The University maintains these collections as a public trust and is responsible for preserving them according to the highest standards while fulfilling its mission to provide education and understanding about the past and present through continued teaching, research and public service.

The general principles of this policy, as stated above, apply to all human remains in the University's collections. The remainder of this policy pertains to Native American and Native Hawaiian human remains and "cultural items." "Cultural items," as used throughout this policy, refers to associated and unassociated funerary objects, sacred objects, and objects of cultural patrimony, as defined by the federal Native American Graves Protection and Repatriation Act ("NAGPRA;" P.L. 101-601). This policy is intended to ensure both adherence to the above statement of principles and compliance with NAGPRA.

## II. POLICY REGARDING NATIVE AMERICAN HUMAN REMAINS AND CULTURAL ITEMS

It is the policy of the University of California to respect Native American and Native Hawaiian concerns regarding the treatment and disposition of Native American and Native Hawaiian remains and cultural items that are part of the University's collections, and to repatriate such remains and cultural items to lineal descendants (as defined by NAGPRA), Indian tribes, and Native Hawaiian organizations under specified conditions, in accordance with federal and state law.

With respect to implementation of the requirements of NAGPRA, Indian tribes are defined as federally-recognized tribes (that is, as any tribe, band, nation or community of Indians "recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians") [43 CFR Part 10, Subpart A, §10.2 (b) (2)].

NAGPRA does not give standing to non-federally-recognized groups to seek repatriation of human remains or cultural items. However, in the event that the State of California develops a process for according official state recognition for repatriation purposes to Native American tribes, bands, nations, rancherias or other entities that is consistent with state and federal law including the California and United

States constitutions, the University, in addition to repatriating to federally-recognized tribes under specified conditions, will also repatriate to such state-recognized tribes under specified conditions and to the extent permissible under law.

The University recognizes the right of all native peoples, including non-federally-recognized tribes, to make inquiries to its museums about possible cultural relationships to the human remains and cultural items in its collections, to visit the collections, and to study them under normal museum procedures. The University recognizes that the participation of such groups may lend a different and vital perspective to the present understanding of scholars and others studying the collections and also that such participation may allow Native Americans and Native Hawaiians to enrich their own cultural knowledge.

## III. UNIVERSITY ADVISORY GROUP ON CULTURAL AFFILIATION AND REPATRIATION OF HUMAN REMAINS AND CULTURAL ITEMS

A.   **Composition.** The President or the President's designee shall establish a University Advisory Group on Cultural Affiliation and Repatriation of Human Remains and Cultural Items ("Advisory Group"), which shall be composed of one University faculty member delegated principal responsibility for compliance with this policy from each of those campuses that house collections covered by NAGPRA, and two Native American members to be selected by the President or designee from among nominees submitted by each campus. The Vice Provost for Research (or designee) will be the UC Office of the President liaison to the Advisory Group.

B.   **Responsibilities.** The Advisory Group shall:

1. Review and advise the President or designee regarding campus implementation of and compliance with this policy and related applicable law and regulations;

2. Review campus decisions regarding potential cultural affiliation and repatriation of Native American or Native Hawaiian remains and cultural items, and report its findings and recommendations to the President or designee;

3. Make recommendations to the President or designee for revisions to this policy and any associated guidelines; and

4. Assist in the resolution of disputes that may arise in connection with this policy.

C.   **Additional input.** Campuses are encouraged to solicit input on significant policy matters, as appropriate, from members of Native American and Native Hawaiian groups and from additional University faculty members drawn from a variety of disciplines in which the study, treatment, curation, and repatriation of human remains is relevant. Campuses are encouraged to forward input received from such consultations to the Office of the President via their Advisory Group representative.

The following procedures and criteria shall be utilized to implement this policy:

## IV.   REVIEW OF COLLECTIONS: INVENTORIES AND SUMMARIES

A.   **Inventories of Native American and Native Hawaiian human remains and associated funerary objects.**

In accordance with NAGPRA, each campus with Native American or Native Hawaiian human remains and associated funerary objects shall complete inventories of all such remains and associated funerary objects in its collections by reviewing existing documentation. Campus inventories shall draw on the best available academic expertise and involve consultation with tribal authorities representing Native American and Native Hawaiian groups.  The inventories shall include descriptions of human remains and associated funerary objects and shall, to the extent possible, identify the geographical and cultural affiliation of those human remains and associated cultural items, as required by NAGPRA.

Final campus inventories and notices of inventory completion shall be transmitted to the Advisory Group and to the President or designee upon completion.  Upon approval, the President or designee shall direct the campus to make them available to federal agencies and to lineal descendants, Native American tribes and Native Hawaiian organizations, as required by law.

Upon request by lineal descendants or appropriate tribal authorities, the campus shall provide additional available documentation to supplement the information provided in the campus inventories.  Existing information is sufficient to fulfill this requirement; no additional scientific studies need be undertaken to provide such information.

B.   **Summaries of unassociated funerary objects, sacred objects, and objects of cultural patrimony.**

In accordance with NAGPRA, each campus shall complete a written summary of Native American and Native Hawaiian unassociated funerary objects, sacred objects, and objects of cultural patrimony held in its collections.  These summaries provide a basis for further consultations with Native American and Native Hawaiian tribal authorities to determine cultural affiliation.  Final campus summaries shall be submitted to federal agencies, lineal descendants, Native American tribes and Native Hawaiian organizations, as required by law.

Upon request by lineal descendants or appropriate tribal authorities, the campus shall provide access to records, catalogues, relevant studies, or other pertinent data for the purpose of determining the geographic origin, cultural affiliation and basic facts surrounding the acquisition and accession of objects covered in the summary.

C.   **Updates to inventories and summaries.**

In the course of the review of their collections and of continuing NAGPRA implementation efforts, campuses may determine that their inventories or summaries require additions or revisions.  Such revisions to campus inventories shall be transmitted to the Advisory Group and to the President or designee upon completion.  Upon approval, the President or designee shall direct the campus to make them available to federal agencies and to the appropriate lineal descendants, Native American tribes and Native Hawaiian organizations.

## V. DETERMINATION OF CULTURAL AFFILIATION

To the extent possible, campus inventories and summaries shall identify the cultural affiliation of human remains, funerary objects, sacred objects, and objects of cultural patrimony, as defined by federal law. "Cultural affiliation" refers to a relationship of shared group identity that can be reasonably traced historically or prehistorically between a present-day Native Hawaiian organization or federally-recognized Indian tribe and an identifiable earlier group.

Under NAGPRA, all of the following requirements must be met to determine cultural affiliation between a present-day Indian tribe or Native Hawaiian organization and human remains, funerary objects, sacred objects, or objects of cultural patrimony of an earlier group:

A.  Existence of an identifiable present-day Indian tribe or Native Hawaiian organization with standing under NAGPRA;

A.  Existence of an identifiable earlier group; and

B.  Existence of a shared group identity that can be reasonably traced between the present-day Indian tribe or Native Hawaiian organization and the earlier group.  Evidence to support this requirement must establish that a present-day Indian tribe or Native Hawaiian organization has been identified from prehistoric or historic times to the present as descending from the earlier group.

Evidence to establish cultural affiliation may include biological, geographical, kinship, archaeological, anthropological, linguistic, folkloric, oral tradition, historical, or other relevant information or expert opinion.  All campus determinations of cultural affiliation shall be reviewed by the Advisory Group, which shall make a recommendation to the President or designee regarding final determinations.

In accordance with NAGPRA, remains and cultural items that cannot be identified as affiliated with a particular lineal descendent or federally-recognized Indian tribe or Native Hawaiian organization are to be classified on inventories as culturally unidentifiable.

Tribal authorities shall be permitted reasonable access to examine items in the University's collections in order to evaluate the cultural affiliation of items listed in the inventory as culturally unidentifiable.  They shall also be given reasonable opportunity, upon request, to present their views orally or in writing to campus officials responsible for NAGPRA implementation regarding the identification of any such human remains, funerary objects, sacred objects, or objects of cultural patrimony.  The perspectives of such tribal authorities shall be considered in determining cultural affiliation.

## VI. REQUESTS FOR REPATRIATION

### A.  General

Campus review of repatriation requests shall reflect consideration of academic expertise and Native American or Native Hawaiian viewpoints, and shall provide for consultation with requesting

individuals or tribes, as required by NAGPRA.

All campus determinations of cultural affiliation and all campus determinations regarding repatriation requests made pursuant to this policy shall be reviewed by the Advisory Group, which shall report its findings and recommendations to the President or designee. The President or designee shall have final authority to approve or disapprove determinations regarding disposition of remains and cultural items in University collections. The University shall follow guidelines and procedures for implementing repatriation that are in accordance with accepted professional museum standards and federal and state law and regulations. Campuses may proceed with the deaccession and repatriation of materials in the University's collections, pursuant to this policy, after obtaining the written approval for such action from the President or designee.

**B.    Requests from Lineal Descendants and Federally-recognized Indian Tribes and Native Hawaiian Organizations.**

Upon the written request of a lineal descendant, Indian tribe or Native Hawaiian organization, the University will expeditiously repatriate human remains, funerary objects, sacred objects, and objects of cultural patrimony if lineal descent has been established or if cultural affiliation between the requesting tribe or organization and the requested remains or cultural items has been established in accordance with federal law and if all other requirements for repatriation of such human remains or cultural items as set forth in federal law are met.

**C.    Requests from California-recognized Indian tribes.**

In the case of a written request from an Indian tribe, band, nation, rancheria, reservation or other entity that is California-recognized but not federally-recognized, the University will expeditiously repatriate human remains, funerary objects, sacred objects, and objects of cultural patrimony if it is established that all requirements for repatriation under the federal law have been met except the requirement that the requesting tribe or group be federally-recognized.

In order for repatriation to a non-federally-recognized California-recognized tribe to take place, it must be determined that:

1. "Cultural association" exists; i.e., affiliation between the requesting tribe and the requested remains or cultural items would have been established in accordance with federal law if the requesting tribe were federally-recognized. In order for this criterion to be met, it must be determined that the requesting tribe is an identifiable present-day tribe, and that there is evidence establishing that the requesting tribe has been identified from prehistoric or historic times to the present as descended from an identifiable earlier group from whom the requested human remains or cultural items originated; and

2. The standards for repatriation of such human remains or cultural items as set forth in federal law are met.

In addition, in the case of human remains that meet the above criteria and that have been (or should

have been) reported on the campus inventory as "culturally unidentifiable," the University will consult with the Secretary of the Interior ("Secretary"), and will proceed with repatriation only upon recommendation of the Secretary, as specified in federal law. The University also will consult with the Secretary prior to repatriating cultural items that have been (or that should have been) reported on the campus inventory as "culturally unidentifiable," and will proceed with repatriation only upon recommendation of the Secretary. Prior to any repatriation under this section, the University will seek to notify all other Native American or Native Hawaiian tribes or organizations that have been determined to have a potential interest in the requested remains or cultural items. Repatriation will not take place until there has been a reasonable opportunity for other potentially-interested groups to notify the University of any conflicting claims.

## VII.  Liaisons, Conflicts, and Mediation

### A.   Liaison.

Each campus with a collection of Native American or Native Hawaiian remains, funerary objects, sacred objects, or objects of cultural patrimony shall designate a liaison to work with native communities considering or requesting repatriation from the University's collections. The liaison shall be a person familiar with NAGPRA and the repatriation process, and shall cultivate a positive relationship with Native American communities. It will be the responsibility of the liaison to make University collections of Native remains and items accessible to all tribes, and to assist tribes in understanding and invoking the repatriation process. The liaison will assist tribes in planning for repatriation of culturally affiliated items. With respect to human remains and cultural items in campus collections that are categorized as "culturally unidentifiable," the liaison will facilitate examination of the items by tribal authorities.

### B.   Resolution of Disputed Claims for Cultural Affiliation and Repatriation.

Tribal authorities who disagree with determinations regarding cultural affiliation (or cultural association) and repatriation are encouraged to work with campus museum officials at the campus where the remains or cultural items at issue are housed and with the campus liaison to resolve disputes. Tribal authorities shall be given reasonable opportunity, upon request, to present their views orally or in writing to campus authorities responsible for making determinations relating to cultural affiliation and repatriation.

Third-party mediation is encouraged to assist in efforts to reach agreement about disputed claims to items in the University's collections. Such mediation may include any means mutually agreed to by all parties to a repatriation discussion and approved by the Chancellor of the campus that houses the disputed items.

Repatriation disputes remaining unresolved following initial dialogue among the parties shall be reviewed and decided by the Chancellor, subject to review by the President or designee. The President or designee may seek a recommendation from the University Advisory Group, and shall have final authority regarding disposition of Native American remains and cultural items in University collections, in accordance with this policy and applicable laws and regulations.

C.    **Multiple Claims for Repatriation.**

Where there are multiple requests for repatriation, and where the University is unable to determine which requesting party is the most appropriate claimant, the University shall retain and preserve the human remains or cultural items until the requesting parties reach agreement on proper disposition or until the dispute is resolved by mediation, a court of competent jurisdiction, or other appropriate means. The parties may choose mediation by a third party, which may be the NAGPRA Review Committee established by federal law or other appropriate entity mutually agreeable to the disputants.

In cases involving multiple repatriation claims, the Native American claimants may determine for themselves the proper disposition of the remains or cultural items.  Once the multiple claimants agree upon a proper disposition, and once the University is provided with assurance of protection against multiple liability (either under the provisions of NAGPRA or under an agreement among the claimants), the University will repatriate to the Native American tribe specified in such an agreement, provided that the tribe is one that has been determined by the University to be entitled to repatriation under this policy.   If the conflict is not resolved by this means, then the matter may be resolved by a court of competent jurisdiction through a declaratory or interpleader action, or by other appropriate means.

## VIII. TEACHING AND RESEARCH USE OF REMAINS AND CULTURAL ITEMS IN UNIVERSITY COLLECTIONS

Campuses are granted the authority to make decisions about the use of Native American or Native Hawaiian human remains, associated and unassociated funerary objects, sacred objects, and objects of cultural patrimony in University collections for teaching and research purposes, subject to the following guidelines:

A.    Given the importance of the study of human osteology in archaeology, paleontology, and comparative morphology, and the importance of skeletal material in training students at the lower division, upper division and graduate level, campuses normally retain the discretion to use such items in teaching. Campuses are encouraged to take into consideration the views and concerns of Native American and Native Hawaiian representatives when making decisions regarding the teaching and research use of Native American and Native Hawaiian skeletal materials.

B.    Remains and cultural items covered by this policy shall normally remain accessible for research by qualified investigators, subject to approval by the curator of the relevant campus collection.

C.    Once a repatriation request has been granted and actual repatriation is pending, the remains and cultural items covered by the request shall not be used in teaching or research unless expressly permitted by the tribal authority that has been granted jurisdiction over the materials, subject to exceptions provided by federal law.

D.    In circumstances in which cultural affiliation (or cultural association) has been established and other repatriation requirements have been met but in which an affiliated (or associated) tribe has chosen not to request repatriation, an affiliated (or associated) tribe may request that the affiliated (or

associated) remains or cultural items  not be used for teaching or research.  The decision of the affiliated (or associated) tribe as to whether the remains and cultural items can be used in teaching or research shall normally be accepted as final by the University, subject to exceptions provided by federal law.

Questions concerning the implementation of any part of this policy may be directed to the Vice Provost for Research in the Office of the President.

May 1, 2001                                                                                         Page 8 of 8

# EXHIBIT  B

75908          Federal Register / Vol. 76, No. 233 / Monday, December 5, 2011 / Notices

## Determinations Made by the Minnesota Indian Affairs Council

Officials of the MIAC have determined that:

• Based on non-destructive physical analysis and catalogue records, the human remains are Native American.

• Pursuant to 25 U.S.C. 3001(2), a relationship of shared group identity cannot be reasonably traced between the Native American human remains and any present-day Indian tribe.

• According to final judgments of the Indian Claims Commission, the land from which the Native American human remains and associated funerary objects were removed is the aboriginal land of The Tribes.

• Pursuant to 25 U.S.C. 3001(9), the human remains described in this notice represent the physical remains of two individuals of Native American ancestry.

• Pursuant to 25 U.S.C. 3001(3)(A), the one object described above is reasonably believed to have been placed with or near individual human remains at the time of death or later as part of the death rite or ceremony.

• Pursuant to 43 CFR 10.11(c)(1), the disposition of the human remains is to The Tribes.

### Additional Requestors and Disposition

Representatives of any Indian tribe that believes itself to be culturally affiliated with the human remains or any other Indian tribe that believes it satisfies the criteria in 43 CFR 10.11(c)(1) should contact James L. (Jim) Jones, Cultural Resource Director, Minnesota Indian Affairs Council, 3801 Bemidji Avenue NW., Suite 5, Bemidji, MN 56601, telephone (218) 755–3223, before January 4, 2012. Disposition of the human remains to The Tribes may proceed after that date if no additional requestors come forward.

The Minnesota Indian Affairs Council is responsible for notifying The Tribes that this notice has been published.

Dated: November 29, 2011.

**Sherry Hutt,**
*Manager, National NAGPRA Program.*
[FR Doc. 2011–31072 Filed 12–2–11; 8:45 am]
**BILLING CODE 4312–50–P**

## DEPARTMENT OF THE INTERIOR

### National Park Service

[2253–665]

### Notice of Inventory Completion: The University of California, San Diego, San Diego, CA

**AGENCY:** National Park Service, Interior.

**ACTION:** Notice.

**SUMMARY:** The Regents of the University of California on behalf of the University of California, San Diego, have completed an inventory of human remains and associated funerary objects, in consultation with the appropriate Indian tribes, and have determined that there is no cultural affiliation between the remains and any present-day Indian tribe. Representatives of any Indian tribe that believes itself to be culturally affiliated with the human remains may contact the University of California, San Diego. Disposition of the human remains and associated funerary objects to the Indian tribes stated below may occur if no additional requestors come forward.

**DATES:** Representatives of any Indian tribe that believes it has a cultural affiliation with the human remains should contact the University of California, San Diego at the address below by January 4, 2012.

**ADDRESSES:** Gary C. Matthews, Vice Chancellor Resource Management & Planning, University of California, San Diego, 9500 Gilman Drive #0057, La Jolla, CA 92093–0057, telephone (858) 534–6820.

**SUPPLEMENTARY INFORMATION:** Notice is hereby given in accordance with the Native American Graves Protection and Repatriation Act (NAGPRA), 25 U.S.C. 3003, of the completion of an inventory of human remains and associated funerary objects in the possession of the University of California, San Diego. The human remains and associated funerary objects were removed from the University of California, San Diego's University House site in San Diego County, CA.

This notice is published as part of the National Park Service's administrative responsibilities under NAGPRA, 25 U.S.C. 3003(d)(3) and 43 CFR 10.11(d). The determinations in this notice are the sole responsibility of the museum, institution, or Federal agency that has control of the Native American human remains. The National Park Service is not responsible for the determinations in this notice.

### Consultation

A detailed assessment of the human remains was made by University of California professional staff in consultation with representatives of the Barona Group of Capitan Grande Band of Mission Indians of the Barona Reservation, California; Campo Band of Dieguено Mission Indians of the Campo Indian Reservation, California; Ewiiaapaayp Band of Kumeyaay

Indians, California; Iipay Nation of Santa Ysabel, California (formerly the Santa Ysabel Band of Dieguено Mission Indians of the Santa Ysabel Reservation); Inaja Band of Dieguено Mission Indians of the Inaja and Cosmit Reservation, California; Jamul Indian Village of California; La Posta Band of Dieguено Mission Indians of the La Posta Indian Reservation, California; Manzanita Band of Dieguено Mission Indians of the Manzanita Reservation, California; Mesa Grande Band of Dieguено Mission Indians of the Mesa Grande Reservation, California; San Pasqual Band of Dieguено Mission Indians of California; Sycuan Band of the Kumeyaay Nation; and the Viejas (Baron Long) Group of Capitan Grande Band of Mission Indians of the Viejas Reservation, California (herein after referred to as "The Tribes").

### History and Description of the Remains

In 1976, human remains representing, at minimum, two individuals were removed from the University of California, San Diego's University House site, in San Diego, CA. The site is variously referred to as the Black, William House; SDM–W–12A (as recorded by the San Diego Museum of Man); CA–SDI–4669 (as recorded with the State of California); and NPS No.: 08000343. No known individuals were identified. The approximately 25 associated funerary objects consist of shell, stone, charcoal, and bone.

### Determinations Made by the University of California, San Diego

Officials of the University of California, San Diego have determined that:

• The calibrated dates for the human remains are believed to fall between 8,977 and 9,603 years B.P.

• The human remains are Native American.

• Pursuant to 25 U.S.C. 3001(2), a relationship of shared group identity cannot be reasonably traced between the Native American human remains and any present-day Indian tribe.

• Evidence indicates that the land from which the Native American human remains were removed is the aboriginal land of the Dieguено (Kumeyaay) Tribe. As noted in the Schedule of Indian Land Cessions, on or about January 7, 1852, the Dieguено (Kumeyaay) ceded to the United States an area that includes present-day San Diego County.

• The present-day descendants of the Dieguено (Kumeyaay) are The Tribes.

• Pursuant to 25 U.S.C. 3001(9), the human remains described in this notice represent the physical remains of two

individuals of Native American ancestry.

• Pursuant to 25 U.S.C. 3001(3)(A), the approximately 25 objects described above are reasonably believed to have been placed with or near individual human remains at the time of death or later as part of the death rite or ceremony.

• Pursuant to 43 CFR 10.11(c)(1), and based upon request from the Kumeyaay Cultural Repatriation Committee, on behalf of The Tribes, disposition of the human remains is to the La Posta Band of Diegueno Mission Indians of the La Posta Indian Reservation, California.

## Additional Requestors and Disposition

Representatives of any Indian tribe that believes itself to be culturally affiliated with the human remains or any other Indian tribe that believes it satisfies the criteria in 43 CFR 10.11(c)(1) should contact Gary C. Matthews, Vice Chancellor Resource Management & Planning, University of California, San Diego, 9500 Gilman Drive #0057, La Jolla, CA 92093–0057, telephone (858) 534–6820, before January 4, 2012. Disposition of the human remains to the La Posta Band of Diegueno Mission Indians of the La Posta Indian Reservation, California may proceed after that date if no additional requestors come forward.

The University of California, San Diego is responsible for notifying The Tribes that this notice has been published.

Dated: November 29, 2011.

Sherry Hutt,
*Manager, National NAGPRA Program.*
[FR Doc. 2011–31068 Filed 12–2–11; 8:45 am]
BILLING CODE 4312–50–P

---

## DEPARTMENT OF THE INTERIOR

### National Park Service

[2253–665]

## Notice of Inventory Completion: Minnesota Indian Affairs Council, Bemidji, MN

AGENCY: National Park Service, Interior.
ACTION: Notice.

SUMMARY: The Minnesota Indian Affairs Council has completed an inventory of human remains in consultation with the appropriate Indian tribes, and has determined that there is no cultural affiliation between the remains and any present-day Indian tribe. Representatives of any Indian tribe that believes itself to be culturally affiliated with the human remains may contact the Minnesota Indian Affairs Council.

Disposition of the human remains to the Indian tribes stated below may occur if no additional requestors come forward.

DATES: Representatives of any Indian tribe that believes it has a cultural affiliation with the human remains should contact the Minnesota Indian Affairs Council at the address below by January 4, 2012.

ADDRESSES: James L. (Jim) Jones, Cultural Resource Director, Minnesota Indian Affairs Council, 3801 Bemidji Avenue NW., Suite 5, Bemidji, MN 56601, telephone (218) 755–3223.

SUPPLEMENTARY INFORMATION: Notice is here given in accordance with the Native American Graves Protection and Repatriation Act (NAGPRA), 25 U.S.C. 3003, of the completion of an inventory of human remains in the possession of the Minnesota Indian Affairs Council (MIAC). The human remains were removed from Marshall County, MN.

This notice is published as part of the National Park Service's administrative responsibilities under NAGPRA, 25 U.S.C. 3003(d)(3) and 43 CFR 10.11(d). The determinations in this notice are the sole responsibility of the museum, institution, or Federal agency that has control of the Native American human remains. The National Park Service is not responsible for the determinations in this notice.

### Consultation

A detailed assessment of the human remains was made by the MIAC professional staff in consultation with representatives of the Lower Sioux Indian Community in the State of Minnesota; Prairie Island Indian Community in the State of Minnesota; Red Lake Band of Chippewa Indians, Minnesota; Sisseton-Wahpeton Oyate of the Lake Traverse Reservation, South Dakota; Turtle Mountain Band of Chippewa Indians of North Dakota (hereinafter referred to as "The Tribes").

### History and Description of the Remains

In 1998, human remains representing, at minimum, three individuals were recovered from site 21–MA–70, Wright Quarry, in Marshall County during gravel quarrying operations by the Marshall County Highway Department. In 1999, the human remains were transferred to the Minnesota Office of the State Archaeologist. In 2002, the human remains were transferred to the MIAC (H375). No known individuals were identified. No associated funerary objects are present.

Examination of the site context by professional staff of the Minnesota Office of the State Archaeologist suggests a pre-contact burial site.

Additionally, a number of pre-historic sites are recorded in the immediate vicinity. Cranial, dental and femora morphology identify the human remains as American Indian. These human remains have no archeological classification and cannot be associated with any present-day Indian tribe.

In 2009, human remains representing, at minimum, one individual were unearthed from an unknown site in Warren, MN, during new home construction. The human remains were transferred to the Marshall County Sheriff's Department, to the Minnesota Bureau of Criminal Apprehension Laboratory, and then to the Human Identification Laboratory at the University of North Dakota for identification. The human remains were then transferred to the MIAC (H443). No known individuals were identified. No associated funerary objects are present.

The burial context and morphology of the human remains suggest identification as pre-contact American Indian. These human remains have no archeological classification and cannot be associated with any present-day Indian tribe.

### Determinations Made by the Minnesota Indian Affairs Council

Officials of the MIAC have determined that:

• Based on non-destructive physical analysis and catalogue records, the human remains are Native American.

• Pursuant to 25 U.S.C. 3001(2), a relationship of shared group identity cannot be reasonably traced between the Native American human remains and any present-day Indian tribe.

• According to final judgments of the Indian Claims Commission, the land from which the Native American human remains were removed is the aboriginal land of The Tribes.

• Pursuant to 25 U.S.C. 3001(9), the human remains described in this notice represent the physical remains of four individuals of Native American ancestry.

• Pursuant to 43 CFR 10.11(c)(1), the disposition of the human remains is to The Tribes.

### Additional Requestors and Disposition

Representatives of any Indian tribe that believes itself to be culturally affiliated with the human remains or any other Indian tribe that believes it satisfies the criteria in 43 CFR 10.11(c)(1) should contact James L. (Jim) Jones, Cultural Resource Director, Minnesota Indian Affairs Council, 3801 Bemidji Avenue NW., Suite 5, Bemidji, MN 56601, telephone (218) 755–3223, before January 4, 2012. Disposition of