1

2

3

4

5        IN THE UNITED STATES DISTRICT COURT

6        FOR THE NORTHERN DISTRICT OF CALIFORNIA

7        SAN FRANCISCO DIVISION

8

9    TIMOTHY WHITE, *et al.*,                          No. C 12-01978 RS

10              Plaintiffs,

11       v.                                            **ORDER GRANTING KUMEYAAY
                                                       CULTURAL REPATRIATION
                                                       COMMITTEE'S MOTION TO
12   UNIVERSITY OF CALIFORNIA, *et al.*,               DISMISS AND GRANTING
                                                       REGENTS' OF THE UNIVERSITY OF
13              Defendants.                            CALIFORNIA MOTION TO DISMISS**

14   _____/

15                        I. INTRODUCTION

16          In 1976, an archaeological team discovered an exceedingly ancient and rare double human

17   burial site on the official residence of the Chancellor of the University of California, San Diego

18   (UCSD), on a La Jolla bluff, overlooking the Pacific Ocean.  According to plaintiffs, University of

19   California Professors Timothy White, Robert L. Bettinger, and Margaret Schoeninger, the unearthed

20   remains, known as the "La Jolla Remains," are of profound scientific significance, due to their

21   relatively good condition and extraordinary age – between 8,977 to 9,603 years, or roughly five

22   hundred generations old.  Since the discovery, the University has maintained custody of the

23   Remains, and in recent years, plaintiffs have requested an opportunity to study them, but to no avail.

24   The University, meanwhile, in an attempt to comply with the Native American Graves Protection

25   and Repatriation Act (NAGPRA), 25 U.S.C § 3001, *et seq*., has inventoried the La Jolla Remains

26   and artifacts found with them, and determined to grant a request from the Kumeyaay Cultural

27   Repatriation Committee (KCRC) to transfer them to the La Posta Band of the Diegueño Mission

28

Indians, a federally-recognized Kumeyaay tribe.[1]  The KCRC asserts a cultural affiliation to, and a right to repatriation of, the Remains, and intends to inter them.

Plaintiffs contend the Kumeyaay tribes cannot establish a right to repatriation, and filed this suit to block the transfer.  Crediting plaintiffs' concern that the Kumeyaay would promptly bury the Remains, irreparably destroying their scientific value, this Court temporarily enjoined the University from transferring or altering the condition of the Remains, and the parties subsequently stipulated to a similarly structured preliminary injunction, pending resolution of this litigation.  The University defendants[2] now move to dismiss the First Amended Complaint (FAC) pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 12(b)(7), on the grounds that the Kumeyaay tribes are indispensible parties, yet sovereign immune from suit.  Defendant KCRC made a special appearance to move to dismiss, also on the grounds that it enjoys immunity as an "arm of the tribe."  Plaintiffs filed a single opposition to both motions.  In consideration of the briefs, the arguments raised at the hearing, and for all the reasons set forth below, the KCRC's motion to dismiss must be granted, and the University defendants' motion to dismiss must also be granted.  Such result is not reached lightly.  It is, rather, compelled by tribal immunity, and admittedly, raises troubling questions about the availability of judicial review under NAGPRA.  As will become clear, while plaintiffs and the public interest are threatened with profound harm in this case, the statutory scheme and controlling case law leaves this Court with no alternative.

## II. BACKGROUND[3]

The instant suit weighs the claims of plaintiffs, three academic scientists who specialize in the study of early humans and wish to preserve the La Jolla Remains for future research, against the

---

[1] The Kumeyaay nation is a consortium of federally recognized tribes that encompasses: the Barona, Inja-Cosmit, La Posta, Manzanita, Mesa Grande, and San Pasqual Bands of Diegueño Mission Indians, the Campo, Ewiiaapaayp, Sycuan, and Viejas Bands of Kumeyaay Indians, the Jamul Indian Village, and the Iipay Nation of Santa Ysabel.

[2] The University defendants include: (1) the University of California itself, (2) the Regents, (3) Mark G. Yudof, sued individually and in his capacity as president, (4) Marye Anne Fox, sued individually and in her capacity as Chancellor of UCSD, (5) Gary Matthews, sued as an individual and in his capacity as Vice Chancellor of UCSD.  Defendants correctly maintain that the "University of California" is not a proper defendant, and that the Regents must be sued in its place. *See* Cal. Const. art IX, § 9(f); Cal. Gov't Code § 811.2.  The University is therefore dismissed as a named party.

[3] The facts set forth in the FAC, which may be accepted as true for purposes of the motions to dismiss, are set forth below.

interests of the KCRC, which maintains the Remains are the sacred property of the Kumeyaay. Added to the mix is the University of California, which believes it has complied with the law by preparing to deliver the Remains to the Kumeyaay.[4]  In an effort to resolve such competing claims, and in recognition of "the unique relationship between the Federal Government and Indian tribes," *see* 25 U.S.C. § 3010,  Congress passed NAGPRA in 1990, conferring ownership rights over remains and associated objects upon Native Americans in certain circumstances.  *Id.* at § 3002.  There can be no question that the law was "intended to protect the dignity of the human body after death by ensuring that Native American graves and remains be treated with respect."  *Bonnichsen v. United States*, 367 F.3d 864, 876 (9th Cir. 2004) (citing S. Rep. No. 101-473, at 6 (1990)).  Yet the law's key ownership provision "was not intended merely to benefit American Indians, but rather to strike a balance between the needs of scientists, educators, and historians on the one hand, and American Indians on the other."  *Id.* at 874 n.14.

It follows that "Congress's purpose is served by requiring the return to modern-day American Indians of human remains that bear some significant relationship to them."  *Id.* at 877. *See also* 5 U.S.C. § 3002(a) (preconditions for "ownership or control").  NAGPRA generally requires state agencies and institutions of higher learning that receive federal funds to inventory Native American remains and associated funerary items, in consultation with relevant tribes, in order to "identify the geographical and cultural affiliation of each item."  *Id.* at § 3003.  Once the inventory is complete and if repatriation appears warranted, the custodian of the remains submits the inventory to the Department of Interior (DOI), *id.* at § 3003, it is published in the Federal Register, and if no other parties come forward to assert a claim, the remains are transferred.  *Id.* at § 3005. *See also* H.R. Rep. 101-877, *reprinted at* 1990 U.S.C.C.A.N. 4367, 4367-68 ("The Act also sets up a process by which Federal agencies and museums receiving federal funds will inventory  holdings of such remains and objects and work with appropriate Indian tribes and Native Hawaiian organizations to reach agreement on repatriation or other disposition of these remains and objects").

The Secretary of the Interior is authorized to adopt regulations pursuant to NAGPRA under § 3011 of the Act.  Of particular relevance here, in 2010, the Secretary promulgated a regulation

---

[4] The La Jolla Remains, as well as a set of artifacts contemporaneously, such as stones and shells, are currently housed at the San Diego Archaeological Center on the University's behalf.

governing the disposition of "culturally unidentifiable" remains that meet NAGPRA's definition of "Native American." 43 C.F.R. § 10.11. The rule requires institutions in possession of such remains to transfer them to "(i) [t]he Indian tribe … from whose tribal land, at the time of excavation or removal, the human remains were removed; or (ii) [t]he Indian tribe or tribes that are recognized as aboriginal to the area from which the human remains were removed." *Id.* at 10.11(c).

Significantly, NAGPRA includes an enforcement provision that creates a private right of action: "The United States district courts shall have jurisdiction over any action brought by any person alleging a violation of this chapter and shall have the authority to issue such orders as may be necessary to enforce the provisions of this chapter." *See* 25 U.S.C. § 3013; *Bonnichsen v. U.S. Dep't of Army*, 969 F. Supp. 614, 627 (D. Or. 1997) (NAGPRA creates private right of action that provides for declaratory and injunctive relief). Finally, as the University defendants emphasize, the law also includes a savings clause whereby "[n]othing in this chapter shall be construed to … limit the authority of any … museum to … return or repatriate Native American cultural items to Indian tribes." *Id.* at § 3009.

In 2010, the KCRC wrote to the University to request repatriation of the La Jolla Remains. In response, UCSD Vice Chancellor Gary Matthews circulated a draft Notice of Inventory Completion to the University-wide Advisory Group on Cultural Repatriation and Human Remains and Cultural Items ("the Advisory Group") for review.[5] According to plaintiffs, the draft Notice was deficient in a number of respects, and in particular, incorrectly concluded that the La Jolla Remains were "Native American." It also recognized the Remains to be "culturally unidentifiable" or in other words, there is insufficient evidence to support a cultural link to the Kumeyaay.[6] Upon review, the Advisory Group recommended that UCSD: (1) not forward the draft without first consulting with tribes other than the Kumeyaay, and (2) reassess whether the items found with the

---

[5] Under the University's "Policies and Procedures On Curation and Repatriation of Human Remains and Cultural Items," *see* Exh. A to FAC, the Advisory Group must review determinations made by individual University campuses in response to NAGPRA requests for repatriation. The Group reports its findings and recommendations to the University president, who has discretion to accept or reject its advice.

[6] In 2006, and again in 2008, the Advisory Group concluded that the La Jolla Remains were "culturally unidentifiable." Formal Notices of Inventory Completion stating as much were forwarded to the Department of the Interior, and published in the Federal Register. As the earlier Notices took no position as to whether or not the Remains were "Native American," plaintiffs maintain the Notices never should have been filed.

Remains qualify as "associated funerary objects," and if not, revise the draft accordingly. According to plaintiffs, there was no consensus within the Advisory Group as to what else, if anything, to recommend.

In 2011, University President Mark Yudof wrote to UCSD Chancellor Marye Anne Fox, stating that he would defer to UCSD's determination, reflected in the draft Notice, that the Remains are "Native American," and instructed her to proceed with repatriating them to the La Posta Band of the Dieguno Mission Indians, subject to the conditions that UCSD was to: (1) reanalyze whether the items found with the remains constitute "funerary objects" and revise the draft inventory accordingly, (2) revise the draft to recognize a "division among experts" as to whether the Remains qualify as "Native American" under NAGPRA, and (3) consult more broadly with other tribes to determine whether competing claims existed. Plaintiffs allege that UCSD failed to reconsider the supposed funerary items and the published Notice does not reflect recognition of "division among experts" about the Native American status of the Remains.

On December 5, 2011, the University's final Notice of Inventory Completion was published in the Federal Register. It concluded that the La Jolla Remains are "Native American," that the approximately 25 objects found at the same site are "reasonably believed to have been placed with or near" the Remains "at the time of death or later as part of the death rite or ceremony," and that "the land from which the Native American human remains were removed is the aboriginal land of the Dieguno (Kumeyaay) Tribe. *See* Exh. B to FAC. It stated that the Remains would be repatriated to the La Posta Band if no other party laid claim to them by January 4, 2012.

According to the FAC, the University's general policy is that remains and cultural items are to be made available for research by qualified investigators. Plaintiffs therefore allege it is highly probable they will be permitted to study the La Jolla Remains if the University retains possession of them. To date, however, they have been denied that opportunity, despite repeated requests to University administrators. Plaintiffs initiated the instant suit in the Alameda Superior Court on April 16, 2012, and defendants subsequently removed the case to this Court. The FAC alleges that the University defendants wrongfully concluded the La Jolla Remains are "Native Americans" and seek declaratory relief to that effect, or an order requiring a formal finding from the University.

1    Plaintiffs further allege that transferring the Remains would breach defendants' duty to administer

2    the University as a public trust and in the public interest.  Finally, plaintiffs assert that transfer

3    would violate their First Amendment right to study the Remains.  The FAC seeks, among other

4    remedies, declaratory relief and a permanent injunction prohibiting the University from transferring

5    the Remains to any Native American tribe.

6         Some background on the KCRC is warranted: it is a California corporation that represents

7    the 12 tribes of the Kumeyaay nation.[7]  According to the KCRC, it was formed in 1997 by

8    resolution of the 12 tribes, and is comprised of representatives from each, who are appointed and

9    removed only by their respective tribes.[8]  It is funded exclusively by contributions from its member

10   tribes, though not necessarily all contribute.  It describes its purpose as, "to ensure that tribal

11   interests are fully protected under NAGPRA and to further public understanding of the importance

12   of preservation of Indian culture and values."  Banegas Decl. In Supp. of KCRC's Mot. to Dismiss

13   at ¶ 5.  It claims to be the "designated" entity to receive remains and artifacts under NAGPRA for

14   the Kumeyaay tribes, and its authority flows from, and may be limited or withdrawn by them.  *Id.*;

15   Notice of Inventory Completion, 68 Fed. Reg. 42757-42758 (July 18, 2003) (recognizing KCRC as

16   the authorized NAGPRA representative of the La Posta Band).  When a federal agency or museum

17   notifies KCRC of remains or artifacts to be repatriated, the tribe that is located in closest proximity

18   to the site where the items were discovered acts as the recipient.  If, for some reason, that tribe

19   cannot accept the items, the KCRC will, by consensus and with permission, designate another tribe

20   to receive the items in question.  Although, as noted, the KCRC argues here it is entitled to

21   sovereign immunity as an "arm of the tribe," and must be dismissed, days before this action was

22   commenced, it sued the University in the District Court for the Southern District of California,

23

---

24   [7] Plaintiffs request judicial notice of the fact that the KCRC is currently listed as "suspended" by the
     California Secretary of State.  *See* Exh. T to Pls.' Req. for Jud. Notice.  That fact, even if assumed to
25   be true, is of no legal significance.
     [8] The Court may consider facts beyond the pleadings for purposes of a motion to dismiss for failure
26   to join a necessary party.  *First Fin. Ins. Co v. Butler Chamberlain-Neilsen Ranch Ltd.*, No. C 10-
     2004, 2010 WL 4502151, at *2 (N.D. Cal. Nov. 2, 2010).  The KCRC has filed a declaration from a
27   member and spokesperson attesting to the facts stated herein, as well as copies of the tribal
     resolutions that created the KCRC.  Plaintiffs provisionally request an opportunity to conduct
28   discovery on the KCRC for purposes of fully briefing this motion, a request not warranted in light of
     the sufficiently developed record as to the identity of the KCRC.

No. C 12-01978 RS
ORDER

contending that the University's failure to complete the transfer of the Remains violated NAGPRA. The University filed a motion to dismiss on May 11, 2012, which currently remains pending.

### III. LEGAL STANDARD

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Pleadings are "so construed as to do substantial justice." Fed. R. Civ. P. 8(f). A complaint must have sufficient factual allegations to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim may be dismissed under Federal Rule of Civil Procedure 12(b)(6) based on the "lack of a cognizable legal theory" or on "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). When evaluating such a motion, the court must accept all material allegations in the complaint as true, even if doubtful, and construe them in the light most favorable to the non-moving party. *Twombly*, 550 U.S. at 570. "[C]onclusory allegations of law and unwarranted inferences," however, "are insufficient to defeat a motion to dismiss for failure to state a claim." *Epstein v. Wash. Energy Co.*, 83 F.3d 1136, 1140 (9th Cir. 1996). When dismissing a complaint, leave to amend must be granted unless it is clear that the complaint's deficiencies cannot be cured by amendment. *Lucas v. Dep't of Corrections*, 66 F.3d 245, 248 (9th Cir. 1995).

Failure to join a party deemed "indispensible" under Rule 19 provides a basis for dismissal. Fed. R. Civ. P. 12(b)(7); *Quileute Indian Tribe v. Babbitt*, 18 F.3d 1459, 1458 (9th Cir. 1994). The requisite analysis under Rule 19 proceeds in three stages. *EEOC v. Peabody W. Coal Co.*, 610 F.3d 1070, 1078 (9th Cir. 2010) ("*Peabody II*"). First, a party "who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction" is "necessary" to the maintenance of the action if "that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may: (i) as a practical matter impair or impede the person's ability to protect the interest; or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest." Fed. R. Civ. P. 19(a); *Peabody II*, 610 F.3d at 1078, *Quileute*, 18 F.3d at 1458. In other words, a nonparty is "necessary" if joinder is "desirable in the interests of just adjudication." *EEOC*

*v. Peabody W. Coal Co.*, 400 F.3d 774, 779 (9th Cir. 2005) ("*Peabody I*") (quoting Fed. R. Civ. P. 19 Advisory Committee Note (1966)). To perform this analysis, the Court "must determine whether the absent party has a *legally protected interest* in the suit," and if so, whether "that interest will be impaired or impeded by the suit." *Makah Indian Tribe v. Verity,* 910 F.2d 555, 558 (9th Cir. 1990) (emphasis in original). "'There is no precise formula for determining whether a particular nonparty should be joined under Rule 19(a).... The determination is heavily influenced by the facts and circumstances of each case.'" *Peabody II,* 610 F.3d at 1081 (quoting *N. Alaska Envtl. Ctr. v. Hodel,* 803 F.2d 466, 468 (9th Cir. 1986)).

If a party is deemed "necessary" under Rule 19(a), the second question is whether joinder is feasible. Joinder may be unavailable if, for instance, venue is improper, the Court lacks personal jurisdiction over the party, or joinder would destroy subject matter jurisdiction. *Peabody I,* 400 F.3d at 779. Of relevance here, if a party enjoys sovereign immunity, subject matter jurisdiction is deficient. *Kiowa Tribe of Okla. v. Manufacturing Techs., Inc.*, 523 U.S. 751, 754 (1998); *Cook v. AVI Casino Enters., Inc.*, 548 F.3d 718, 722 (9th Cir. 2008) (affirming dismissal for lack of subject matter jurisdiction due to tribal entity's sovereign immunity).

Third and finally, if joinder is not feasible, the Court must determine whether the party is "indispensible" under Rule 19(b), that is, whether "in equity and good conscience, the action should proceed among the existing parties or should be dismissed." To make that determination, the Court is to consider: "(1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties; (2) the extent to which any prejudice could be lessened or avoided...; (3) whether a judgment rendered in the person's absence would be adequate; and (4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder." Fed. R. Civ. P. 19(b); *Peabody II*, 610 F.3d at 1078 (an "indispensable party" is "one who not only has an interest in the controversy, but has an interest of such a nature that a final decree cannot be made without either affecting that interest, or leaving the controversy in such a condition that its final termination may be wholly inconsistent with equity and good conscience.").

In order to determine whether Rule 19 requires the joinder of additional parties, the court may consider evidence outside of the pleadings. *See McShan v. Sherrill,* 283 F.2d 462, 464 (9th Cir.

1960). The party moving for dismissal under Rule 12(b)(7) "bear[s] the burden in producing evidence in support of the motion." *See Biagro Western Sales, Inc. v. Helena Chem. Co.,* 160 F. Supp. 2d 1136, 1141 (E.D.Cal. 2001) (citing *Citizen Band Potawatomi Indian Tribe of Okla. v. Collier,* 17 F.3d 1292, 1293 (10th Cir. 1994)).

## IV. DISCUSSION

### A. Sovereign immunity

The University defendants argue both the KCRC and the tribes themselves enjoy sovereign immunity and may not be sued. The KCRC agrees it is entitled to immunity. Of course, if the KCRC is immune, it must be dismissed for lack of subject matter jurisdiction. In that event, the tribes themselves would also be entitled to immunity, a result the University defendants contend would preclude further litigation under Rule 19.[9] Plaintiffs maintain that the KCRC is not immune, or else has waived its immunity by bringing suit in the Southern District in California. Neither side, however, has identified a case directly addressing whether Native American tribes may claim sovereign immunity as a defense to claims advanced under NAGPRA.[10] As a general matter, "Indian tribes are 'domestic dependent nations' that exercise inherent sovereign authority over their members and territories." *Okla. Tax Com'n v. Citizen Band of Potawatomi Indian Tribe of Okla.*, 498 U.S. 505, 509 (1991) (citing *Cherokee Nation v. Georgia*, 5 Pet. 1, 17 (1831)). Consequently, they are "subject to suit only where Congress has authorized the suit or the tribe has waived its immunity." *Kiowa Tribes*, 523 U.S. at 754 (1998) (collecting cases).

#### 1. Legislative waiver

Although the parties have not briefed the issue of legislative waiver, given the eventual result reached in this order, and the concerns raised by such result, it is instructive to note that

---

[9] The KCRC takes no position as to whether it or the tribes are "indispensible" to the litigation under Rule 19, leaving that argument to the University defendants.

[10] The only case to address the issue indirectly, *Rosales v. United States*, 89 Fed. Cl. 565, (Fed. Cl. 2009), held that, where members of the Jamul Indian Village (a tribe of the Kumeyaay) sued the United States on a variety of theories, including violation of NAGPRA, seeking to take ownership of land allegedly taken without just compensation by the federal government, all of the plaintiffs' claims were time-barred as well as collaterally estopped. In the alternative, the Court of Federal Claims held that the tribal government was also a necessary and indispensible party, yet immune, warranting dismissal. *Id.* at 586. *Rosales*, however, did not expressly discuss the application of immunity to NAGPRA claims in particular, and in any case, the relevant portion of the opinion is plainly dicta.

Congress does not appear to have waived the tribes' right to sovereign immunity against claims brought under NAGPRA. While the law does contain an enforcement provision, § 3013, it does not expressly waive tribal immunity, and the Ninth Circuit has cautioned that "such a waiver may not be lightly implied." *People of State of Cal. v. Quechan Tribe of Indians*, 595 F.2d 1153, 1156 (9th Cir. 1979). Multiple courts have found that the federal government's immunity is waived under NAGPRA, by operation of the law's enforcement provision, and the Administrative Procedure Act. *See, e.g, Bonnischen*, 969 F. Supp. at 627. No case, however, has considered, in depth, tribal sovereign immunity under NAGPRA, and the law's legislative history does not reflect consideration of the issue.

Congress unquestionably has the power to limit the tribes' sovereign immunity, and as a corollary to this principle, "laws of general applicability" presumptively apply to the tribes.[11] *See FPC v. Tuscarora Indian Nation*, 362 U.S. 99, 116 (1960). That is, a "general statute applying to all persons includes Indians and their property interests." *Id. See also United States v. Farris*, 624 F.2d 890, 893 (9th Cir. 1980) ("federal laws generally applicable throughout the United States apply with equal force to Indians on reservations"), *and Donovan v. Coeur d'Alene Tribal Farm*, 751 F.2d 1113, 1115-16 (9th Cir. 1985) (collecting cases). Here, the parties appear to assume that NAGPRA is not a law of general applicability, and that position is certainly plausible given that by its terms NAGPRA creates obligations only applicable to federal agencies and museums that receive federal funds. *See* 11 U.S.C. §§ 3003, 3001.

2. "Arm of the tribe"

Assuming that the Kumeyaay tribes themselves could claim immunity from suit under NAGPRA were they named as parties – a premise that is not debated – the first disputed question is

---

[11] The Ninth Circuit has recognized several exceptions to the foregoing rule, applicable when the law at issue does not extend to Native Americans by its express terms, and when: "(1) the law touches exclusive rights of self-governance in purely intramural matters'[,] (2) the application of the law to the tribe would 'abrogate rights guaranteed by Indian treaties'[,] or (3) there is proof 'by legislative history or some other means that Congress intended [the law] not to apply to Indians on their reservations ....'" *Coeur d'Alene*, 751 F.2d at 1116 (citing *Farris*, 624 F.2d at 893-94). Assuming that is a correct premise, in such instances, the tribes are accorded immunity from suit. Application of the *Coeur d'Alene* rules to other statutory frameworks has produced a variety of results. *See, e.g.,Coeur d'Arlene*, 751 F.2d at 1116 (Occupational Health and Safety Act applicable to tribally owned commercial enterprise); *Lumber Indus. Pension Fund v. Warm Springs Forest Prods. Indus.*, 939 F.2d 683 (9th Cir. 1991) (Employee Retirement Income Security Act applicable to tribally operated health center).

whether the KCRC is entitled to immunity as an "arm of the tribe." "[T]he settled law of our circuit is that tribal corporations acting as an arm of the tribe enjoy the same sovereign immunity granted to a tribe itself." *Cook*, 548 F.3d at 725. The key inquiry in this regard is "whether the entity acts as an arm of the tribe so that its activities are properly deemed to be those of the tribe." *Id.* (quoting *Allen v. Gold Country Casino*, 464 F.3d 1044, 1046 (9th Cir. 2006)). Plaintiffs and the KCRC look to the Tenth Circuit's seminal case, *Breakthrough Management Group, Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1187 (10th Cir. 2010), for guidance, and although that opinion is of persuasive authority only, it comports with the Ninth Circuit's approach to "arm of the tribe" analysis. *Breakthrough* assesses the nature of the tribal entity by examining six factors, namely: (1) the entity's formation, (2) its purpose, (3) its structure, ownership, and management, including the level of control the tribe exercises, (4) whether the tribe intended to extend its sovereign immunity to the entity, (5) the financial relationship between the tribe and the entity, and (6) whether the purposes of tribal immunity are served by granting immunity. *Id.* *See also Cook*, 548 F.3d at 726 (extending sovereign immunity to casino based on tribe's formation, management, financial relationship, and control).

Plaintiffs argue that they do not have access to sufficient facts to assess whether or not the KCRC is acting as an "arm of the tribes." While in other circumstances, some preliminary discovery might be appropriate, here it is sufficiently clear on the current record that the KCRC is acting as an extension of the tribe and therefore entitled to immunity. The evidence submitted by the KCRC reflects that it was created by resolution of each of the 12 Kumeyaay tribes, and thus derives its power directly from their sovereign authority. It is comprised solely of members of the tribes, who act on its behalf. Although plaintiffs point out that the KCRC's deliberative and decision-making process is not entirely clear, which they suggest defeats any inference that the KCRC truly "represents" the tribes, as noted above, it is at least evident how it designates the particular tribe to receive remains under NAGPRA. Plaintiffs likewise suggest it is significant that financial "contributions" from the tribes are voluntary. For purposes of determining whether the KCRC is a "subordinate economic entity" of the tribes, however, the more salient fact is that it is funded exclusively in that manner. *See generally Breakthrough*, 629 F.3d at 1187-89. Because it

does not receive financial support from non-tribal entities, the KCRC cannot fairly be seen as a vehicle for other interests.[12]

That said, plaintiffs are correct that the self-interested and unsupported claim by KCRC that its constituent tribes intended their sovereign immunity to extend to the Committee, cannot, without more, stand. Similarly, the KCRC also argues that the tribes have not granted it authority to waive immunity, but that is inconsistent with the fact that the KCRC has apparently done so in the action before the Southern California District Court. Ultimately, that factor is not dispositive, however, given all of the foregoing, and the fact that the KCRC's purpose – to recover tribal remains, and educate the public accordingly – is core to the notion of sovereignty. As the KCRC itself points out, disregarding immunity in these circumstances would undermine the sovereign rights of the tribes to self-determination, i.e., their right to organize, and to determine how best to exercise and defend their rights under NAGPRA. *See Breakthrough*, 629 F.3d at 1188 (quoting *Dixon v. Picopa Constr. Co.*, 160 Ariz. 251, 258 (1989)) (purposes of immunity include the "preservation of tribal cultural autonomy, [and] preservation of tribal self-determination"). Plaintiffs' suggestion to the contrary, that allowing litigation to proceed does not implicate the tribes' sovereignty, is untenable and, not surprisingly, unsupported by precedent. In sum, the KCRC is entitled to immunity as an "arm" of the Kumeyaay tribes.

### 3. Voluntary waiver

Supposing the KCRC can claim immunity, plaintiffs suggest it has nonetheless waived it by filing suit against the University in the Southern District of California, or by incorporating under California law. A voluntary waiver by a tribe must be "unequivocally expressed." *Pit River Home and Agr. Co-op. Ass'n v. United States*, 30 F.3d 1088, 1100 (9th Cir. 1994) (citing *People of State of Cal. ex. rel. Cal. Dep't of Fish and Game v. Quechan Tribe of Indians*, 595 F.2d 1153, 1155 (9th Cir. 1979)). Waiving immunity as to one particular issue does not operate as a general waiver. Thus, when a tribe files suit, it only submits to jurisdiction for purposes of adjudicating its claims, but not other matters, even if related. *Okl. Tax Com'n*, 498 U.S. at 509.

---

[12] To the extent the parties debate it, the "protection of the tribe's monies," is not implicated by the current case because the requested relief is declaratory and injunctive, rather than a monetary judgment. *Breakthrough*, 629 F.3d at 1888 (citing *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 218-19 (1987)).

That was the rule applied by the United States Supreme Court in *Oklahoma Tax Commission*. In that case, the tribe sued for injunctive relief to prevent the Tax Commission from enforcing an assessment based upon cigarette sales to tribal members and non-members that occurred on the reservation. The Tax Commission counterclaimed to enforce the assessment. The Supreme Court held that the tribe was immune, and that the District Court lacked jurisdiction to hear the counterclaim, despite the tribe's initiation of litigation. *Id.* (citing *United States v. U.S. Fidelity & Guaranty Co.*, 309 U.S. 506, 513 (1940)) ("a tribe does not waive its sovereign immunity from actions that could not otherwise be brought against it merely because those actions were pleaded in a counterclaim to an action filed by the tribe"). *See also McClendon*, 885 F.2d at 630 ("[A] tribe's waiver of sovereign immunity may be limited to the issues necessary to decide the action brought by the tribe; the waiver is not necessarily broad enough to encompass related matters, even if those matters arise from the same set of underlying facts."), *and Jicarilla Apache Tribe v. Hodel*, 821 F.2d 537, 539 (10th Cir. 1987) ("Although the Tribe's filing of the *Jicarilla* litigation may have waived its immunity with regard to Dome's intervention in that suit, we cannot construe the act of filing that suit as a sufficiently unequivocal expression of waiver in subsequent actions [brought by Dome] related to the same leases [at issue in *Jicarilla*].").

Here, KCRC has apparently submitted to jurisdiction before the District Court for the Southern District of California by filing suit against the University, seeking to compel transfer of the Remains. While plaintiffs stress that the subject matter of the Southern California action is identical to the issue presented in this case, they are unable to muster any authority for the proposition that waiving immunity in that forum also effects a waiver here. Plaintiffs invoke *United States v. Oregon*, 657 F.2d 1009, 1014-16 (9th Cir. 1981), but misconstrue the facts of the case to suggest that the tribe waived its immunity by "intervening in a prior action." Pls.' Opp'n at 10:11. Actually, in *Oregon*, the tribe successfully intervened in the litigation under Rule 24(a)(2) of the Federal Rules of Civil Procedure, and also entered into a consent decree that required any disputes between the parties to be settled by the District Court in Oregon. Both of those actions provided a basis for jurisdiction, according to the Ninth Circuit. 657 F.2d at 1014-16. Here, by contrast, there is no independent agreement by the KCRC or the Kumeyaay to submit to jurisdiction, and neither

group has intervened in this action. *Oregon* therefore does not support the proposition that a suit over the same subject matters renders a tribe amenable to suit in a different forum, and plaintiffs are unable to locate any other case that so holds. Consequently, the Southern California suit cannot amount to a waiver of immunity in these proceedings.

Plaintiff's alternative suggestion, that incorporation by the KCRC effects a waiver is even less tenable. Plaintiffs' only authority for this argument is a decision by the Washington State Supreme Court. *See Wright v. Colville Tribal Enter. Corp.*, 159 P.2d 1275, 1280 (Wash. 2006). *Wright* merely notes that "[a] tribe *may* waive the immunity of a tribal governmental corporation by charter." *Id* (emphasis added). It does not suggest that incorporation necessarily waives immunity. That result would also plainly contravene binding Ninth Circuit precedent holding, "[a] tribe that elects to incorporate [itself] does not automatically waive its tribal sovereign immunity by doing so." *Am. Vantage Cos. v. Table Mountain Racheria*, 292 F.3d 1091, 1099 (9th Cir. 2002). Consequently, the suggestion that the KCRC's corporate status impacts its claim to immunity must be rejected. Because the KCRC may claim the benefit of immunity as an "arm of the tribes," and has not affirmatively waived it, its motion to dismiss must be granted.

## B. Rule 19

The University defendants move to dismiss the FAC in its entirety on the grounds that the Kumeyaay tribes are "indispensible" parties under Rule 19 of the Federal Rules of Civil Procedure, yet have not been joined. *See* Fed. R. Civ. P. 12(b)(7) ("failure to join a party under Rule 19" provides basis for dismissal). As noted above, the required analysis under Rule 19 proceeds in three steps.

### 1. Necessity

The first question is whether the tribes are "necessary," in the sense that they "claim[] an interest relating to the subject of the action" and are "so situated that disposing of the action in the [tribes'] absence may: (i) as a practical matter impair or impede [their] ability to protect the interest; or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest." Fed. R. Civ. P. 19(a). To perform this analysis, the Court "must determine whether the absent party has a *legally protected interest* in the suit," and

if so, whether "that interest will be impaired or impeded by the suit." *Makah Indian Tribe,* 910 F.2d at 558 (emphasis in original). Although there are few "categorical rules informing this inquiry" into whether or not a legally protected interest is at play, *see Cachil Dehe Band of Wintun Indians of the Colusa Indian Community v. California*, 547 F.3d 962, 970 (9th Cir. 2008), such interest "must be more than a financial stake, and more than speculation about a future event." *Id.* (citations omitted). *See McLaughlin v. Int'l Ass'n of Machinists and Aerospace Workers, AFL-CIO*, 847 F.2d 620, 621 (9th Cir. 1988) (quoting *Northrup Corp. v. McDonnell Douglas Corp.*, 705 F.2d 1030, 1046 (9th Cir. 1983)) ("Speculation about the occurrence of a future event ordinarily does not render all parties potentially affected by that future event necessary or indispensable parties under Rule 19."). A "substantial" interest, such as a claim under a contract, or "an interest in a fixed fund or limited resource that the Court is asked to allocate may also be protected." *Cachil Dehe Band*, 547 F.3d at 970-71 (citing *Makah Indian Tribe*, 910 F.2d at 558-59). On the other hand, the interest need not rise to the level of "property in the sense of the due process clause." *Makah Indian Tribe*, 910 F.2d 558. Again, the determination is "practical" in nature and "fact-specific." *Cachil Dehe Band*, 547 F.3d at 970 (quoting *Makah Indian Tribe*, 910 F.2d 558).

The next question is whether or not the Kumeyaay, or the La Posta Band at least, advance a "legally protectable" interest. Plaintiffs' suggestion that the Kumeyaay have no valid claim to the Remains because they are not "Native American," as NAGPRA requires, may be correct on the merits, but it would plainly be premature to reach that ultimate, disputed question to assess necessity under Rule 19. It is impossible to escape the conclusion that the tribes possess a sufficiently concrete and substantial interest to qualify under Rule 19 as a necessary party. NAGPRA extends rights of "ownership" and "control" over human remains and funerary items to qualifying tribes. Accordingly, the present dispute is appropriately analogized to an ordinary property dispute, in which the parties assert conflicting ownership interests. It is true, of course, that the tribes' asserted right to the Remains has not yet been tested or upheld in this litigation, and thus, in some sense it might be seen as contingent upon future rulings. On the other hand, the University has already determined that the La Posta Band is the proper recipient of the Remains, and there is clearly no need for the tribes' interest in the Remains to be vested, as might be required for due process

purposes. In addition, there can be no doubt that it is the substantive ownership interest the tribes seek to vindicate, not some less concrete interest in compliance with administrative procedures. *Compare with Makah*, 910 F.2d at 559 ("The absent interest would not be prejudiced because all of the tribes have an equal interest in an administrative process that is lawful.").

Plaintiffs insist the Kumeyaay tribes cannot credibly claim an interest in the Remains because only the La Posta Band has asserted such an interest during the administrative process. Defendants reply that the La Posta Band is the designated tribe to receive the Remains, but all of the tribes, acting through the KCRC, asserted an interest in them. The dispute is of little apparent consequence because, even assuming plaintiffs are correct, the question becomes whether or not the La Posta Band is "necessary."[13] In other words, the distinction drawn by plaintiffs between the La Posta Band and the Kumeyaay has no apparent legal significance under Rule 19. Given the foregoing discussion, there can be little serious question the La Posta Band, at least, claims "an interest relating to the subject of the action," and that adjudication of plaintiffs' claims in its absence would practically impair its ability to defend its asserted interest in the Remains.

To the latter point, plaintiffs alternatively urge that the University may act as an adequate representative of tribal interests, such that the tribe faces no disadvantage. The University persuasively contends it has a broad obligation to serve the interests of the people of California, rather than any particular subset, such as the people of the Kumeyaay tribes. Plaintiffs counter that the University has abrogated its responsibilities to the public and protected only the interests of the tribes. It draws this inference from the assumption that the University may have shared information about pre-litigation negotiations between itself and plaintiffs with the tribes.[14] That speculation does not, without more, compel the conclusion the University's interests are aligned with those of

---

[13] The parties also dispute whether the KCRC can adequately represent tribal interests. The University defendants maintain that the KCRC cannot adequately defend the interests of the La Posta Band, because unspecified conflicts could arise between the 12 tribes represented by the KCRC. That concern does not appear to be shared by the KCRC itself, and is entirely speculative, given that no other tribe has asserted a claim to the Remains at issue. Plaintiffs maintain the KCRC is an adequate representative, as it is the authorized NAGPRA representative for the La Posta Band, even if it is not an "Indian *tribe*," and therefore not an appropriate recipient of the Remains. *See* 25 U.S.C. § 3002 (emphasis added); Banegas Decl. at ¶ 5; 68 Fed. Reg. 42757-42758 (July 18, 2003). Even assuming KCRC were an appropriate representative, however, it is sovereign immune as an "arm of the tribe" and may not be joined.

[14] Plaintiffs draw that inference based on the fact that the KCRC filed suit in the Southern District one day before the expiration of a tolling agreement between plaintiffs and the University.

the tribes. The University, of course, insists it has merely attempted to satisfy its legal obligations under NAGPRA. Indeed, legal compliance appears to be the University's only demonstrated interest in the present action; it represents it has not yet determined what to do with the Remains if plaintiffs prevail in obtaining a judicial declaration that there is no obligation under NAGPRA to transfer the Remains to the Kumeyaay. Moreover, as a practical matter, it is difficult to accept plaintiffs' suggestion that the University is conspiring to divest itself of a precious artifact that some of its own professors are willing to sue to retain. There is simply no indication in the record why the University would pursue such a course of action, absent some legal obligation. Accordingly, it cannot be concluded that tribal interests will be adequately represented so long as the University participates. Either the La Posta Band, or its representative the KCRC, is a "necessary" party under Rule 19.

2. Joinder

If a party is deemed "necessary" under Rule 19(a), the second question is whether joinder is feasible. Joinder may be unavailable if, for instance, venue is improper, the Court lacks personal jurisdiction over the party, or joinder would destroy subject matter jurisdiction. *Peabody I*, 400 F.3d at 779. Of relevance here, if a party enjoys sovereign immunity, subject matter jurisdiction is deficient as to that party. *Kiowa Tribes*, 523 U.S. at 754; *Cook*, 548 F.3d at 722 (affirming dismissal for lack of subject matter jurisdiction due to tribal entity's sovereign immunity). Here, neither the La Posta Band nor the KCRC can be joined due to sovereign immunity.

3. Indispensability

Third and finally, if joinder is not feasible, the Court must determine whether the party is "indispensible" under Rule 19(b), that is, whether "in equity and good conscience, the action should proceed among the existing parties or should be dismissed." To make that determination, the Court is to consider: "(1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties; (2) the extent to which any prejudice could be lessened or avoided…; (3) whether a judgment rendered in the person's absence would be adequate; and (4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder." Fed. R. Civ. P. 19(b). An "indispensable party" is "one who not only has an interest in the

1  controversy, but has an interest of such a nature that a final decree cannot be made without either

2  affecting that interest, or leaving the controversy in such a condition that its final termination may

3  be wholly inconsistent with equity and good conscience." *Peabody II*, 610 F.3d at 1078.

4      Plaintiffs insist the Kumeyaay do not have a meritorious claim under NAGPRA to the

5  Remains, and therefore cannot be prejudiced by a ruling in their absence. That line of reasoning

6  cannot be accepted, of course, because it simply assumes what plaintiffs set out to establish in this

7  action. There can be no serious question that the La Posta Band's interests in the Remains may be

8  prejudiced if these proceedings continue without them, given that plaintiffs expressly seek a

9  judgment that they have no such claim to the Remains. Alternatively, as a means to lessen such

10 prejudice, plaintiffs suggest the University can adequately represent the tribal interests so as to

11 eliminate any need for their participation. *See Makah Indian Tribe*, 910 F.2d at 559 ("the presence

12 of a representative may lessen prejudice"). For the reasons discussed above, however, that

13 contention is also unpersuasive. Finally, although the Kumeyaay could, of course, voluntarily

14 intervene to protect their interest, to do so they would have to waive their immunity. *Confederated*

15 *Tribes v. Lujan*, 928 F.2d 1496, 1500 (9th Cir. 1991) ("the ability to intervene if it requires a waiver

16 of immunity is not a factor that lessens prejudice"). In sum, the first and second factors clearly

17 militate against proceeding without the participation of the tribe.

18      The parties dispute whether the Court could enter a complete judgment without participation

19 of the tribes. Plaintiffs argue full relief can be afforded under Federal Rule of Civil Procedure 65,

20 which provides that injunctive relief may reach "the parties" and "other persons who are in active

21 concert or participation with" them. Fed. R. Civ. P. 65(d)(2). Defendants reply that the tribes are

22 not acting "in concert" with the University, and in any case, injunctive relief cannot reach non-

23 parties that are entitled to sovereign immunity. Indeed, as the Ninth Circuit explained in *In re*

24 *Estate of Ferdinand Marcos Human Rights Litig.*, 94 F.3d 539, 545 (9th Cir. 1996), "[w]hile Rule

25 65(d) indeed automatically makes the injunction … binding upon persons 'in active concert or

26 participation with' [parties] who have actual notice of the injunction," in order to enforce the

27 injunction against non-parties acting in concert with bound parties, there must be personal

28 jurisdiction. "An injunction against [a sovereign immune entity] in the absence of personal

jurisdiction over it would be futile, as the court would be powerless to enforce its injunction." *Id.* Defendants also insist the relief plaintiffs seek, if afforded them, would place the University at risk of incurring inconsistent obligations, depending on the outcome of the litigation initiated by the KCRC in the Southern District of California. Plaintiffs have not addressed this additional problem. The third factor therefore also appears to favor dismissal under Rule 19.

Plaintiffs correctly point out that the fourth factor – "whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder" – strongly disfavors dismissal. "[I]f no *alternative forum* is available to the plaintiff, the court should be 'extra cautious' before dismissing the suit." *Makah Indian Tribe*, 910 F.2d at 560 (citing *Hodel*, 788 F.2d at 777). The University, for its part, does not appear to contest that if this action is dismissed, relief would effectively be unavailable to plaintiffs.[15] Instead, defendants simply argue that dismissal is required under the case law. They rely on the Ninth Circuit's direction in *Quileute Indian Tribe v. Babbit*, 18 F.3d 1456, 1460 (9th Cir. 1994):

> We have noted, however, that when the necessary party is immune from suit, there may be "very little need for balancing Rule 19(b) factors because immunity itself may be viewed as the compelling factor." Nevertheless, we have directed district courts to apply the four-part test to determine whether Indian tribes are indispensable parties.

*Id.* (citations omitted). Defendants also invoke *Na Iwi O Na Kupuna O Mokapu v. Dalton*, 894 F. Supp. 1397, 1405 (D. Haw. 1995), which held that native Hawaiian groups not party to NAGPRA litigation could not be adequately represented by the federal government and were "indispensable parties who must be joined before a repatriation claim may proceed." *Id.* The Court's analysis, however, was confined to a few sentences, and did not address any of the four factors under Rule 19. Plaintiffs reply that the Court should determine, per Rule 19, and "in equity and good conscience, the action should proceed among the existing parties or should be dismissed." While that language would appear to afford the Court some discretion in determining whether or not to dismiss under Rule 19, neither plaintiffs nor the Court, in its own research, have identified a case in

---

[15] At the hearing, plaintiffs represented that they were concerned intervention in the Southern District action would not provide them an opportunity to obtain relief because the KCRC arguably has not subjected itself to jurisdiction on the threshold issue of whether or not the Remains qualify as "North American" under NAGPRA.

which litigation proceeded without a party deemed "necessary," yet entitled to sovereign immunity. Instead, virtually all cases to consider the question appear to dismiss under Rule 19, regardless of whether a remedy is available, if the absent parties are Indian tribes invested with sovereign immunity. *See, e.g., Am. Greyhound Racing, Inc. v. Hull*, 305 F.3d 1015 (9th Cir. 2002); *Dawavendewa v. Salt River Project Agric. Improvement & Power Dist.*, 276 F.3d 1150 (9th Cir. 2002); *Manybeads v. United States*, 209 F.3d 1164 (9th Cir. 2000); *Clinton v. Babbit*, 180 F.3d 1081 (9th Cir. 1999); *Kescoli v. Babbit*, 101 F.3d 1304 (9th Cir. 1996); *McClendon*, 885 F.2d 627. Although plaintiffs seek to distinguish these cases as concerning contracts to which the tribes were a party, that distinction does not appear to be material to the analysis. Rather, these cases reflect the broader judgment that a "'[p]laintiff's interest in litigating a claim may be outweighed by a tribe's interest in maintaining its sovereign immunity' [because] 'society has consciously opted to shield Indian tribes from suit without congressional or tribal consent.'" *Quileute,* 18 F.3d at 1460-61 (citations omitted).

The sole exception to this trend is *Manygoats v. Klepe*, 558 F.2d 556, 557-58 (10th Cir. 1977), which reversed a dismissal order by the District Court in an action by private plaintiffs challenging the adequacy of an environmental impact statement. Contrary to the weight of authority, the Court held that although the interests of the Navajo tribe, which granted Exxon the right to explore for and mine uranium, were implicated, it was not an "indispensible" party to the litigation:

> Dismissal of the action for nonjoinder of the Tribe would produce an anomalous result. No one, except the Tribe, could seek review of an environmental impact statement covering significant federal action relating to leases or agreements for development of natural resources on Indian lands. NEPA is concerned with national environmental interests. Tribal interests may not coincide with national interests. We find nothing in NEPA which excepts Indian lands from national environmental policy. The controlling test of Rule 19(b) is whether in equity and good conscience the case can proceed in the absence of the Tribe. … In equity and good conscience the case should and can proceed without the presence of the Tribe as a party.

*Id.* Although there is a strong case to be made that the same result should obtain here, *Manygoats* is an out-of-circuit decision which has not been embraced by the Ninth Circuit in the many years that have followed. Instead, this Circuit has consistently dismissed actions under Rule 19 where it concludes an Indian tribe is "necessary" yet not capable of joinder

due to sovereign immunity, and therefore, this Court does not have the discretion to decide otherwise.[16]

### 4. Public rights exception

In a final attempt to avoid dismissal, plaintiffs argue this case falls under the "public rights" exception to Rule 19. That doctrine permits the relaxation of traditional joinder rules. *Makah Indian Tribe*, 910 F.2d at 560. Under the exception, "[i]n a proceeding ... narrowly restricted to the protection and enforcement of *public rights,* there is little scope or need for the traditional rules governing the joinder of parties in litigation determining private rights." *Nat'l Licorice Co. v. NLRB*, 309 U.S. 350, 363 (1940) (emphasis in original). For the exception to apply, "the litigation must transcend the private interests of the litigants and seek to vindicate a public right." *Kescoli v. Babbitt*, 101 F.3d 1304, 1311 (9th Cir. 1996) (citing *Kickapoo Tribe of Indians v. Babbitt*, 43 F.3d 1491, 1500 (D.C. Cir. 1995). Further, "although the litigation may adversely affect the absent parties' interests, the litigation must not 'destroy the legal entitlements of the absent parties.'" *Id.* (citing *Conner v. Burford*, 848 F.2d 1331, 1459 (9th Cir. 1988). Because plaintiffs are asserting the University wrongly concluded the Remains are "Native American" under NAGPRA, rather than, for example, some defect in the administrative process, it appears doubtful that this case is properly characterized as vindicating "public rights." *Makah Indian Tribe*, 910 F.2d at 559 ("To the extent the Makah seek to enforce the duty of the PFMC and the Secretary to follow statutory procedures in the future, this is a 'public right' and this action becomes one that potentially benefits all who participate in the ocean fishery."). Ultimately, that question need not be decided, however, because as defendants correctly note, the public rights doctrine is not properly invoked where, as here, the tribe's asserted interest in the Remains will be extinguished if plaintiffs prevail. For that reason, the public rights exception does not apply, and this case must be dismissed under Rule 19.

The troubling implications of that conclusion are worth noting. As the issuance of temporary and preliminary injunctive relief in this matter reflects, plaintiffs invoke important and substantial interests, reflecting the unique scientific and historical value of the Remains and artifacts

---

[16] Plaintiffs may, of course, elect to appeal this order, and invite the Ninth Circuit to consider whether the logic of *Manygoats* ought to be adopted in present circumstances. That decision, however, is properly reserved to the Court of Appeals.

at issue. Moreover, here, as in *Manygoats*, dismissal appears to conflict with certain aspects of NAGPRA, including its enforcement provision, which creates a private right of action. 25 U.S.C. § 3013 ("The United States district courts shall have jurisdiction over any action brought by any person alleging a violation of this chapter and shall have the authority to issue such orders as may be necessary to enforce the provisions of this chapter."); *Bonnichsen*, 969 F. Supp. at 627 (recognizing private right of action). There can be no question that Congress intended for judicial review of determinations made under NAGPRA, and as the Ninth Circuit held in *Bonnichsen*, relying on legislative history, the statute was not intended to protect the interests of Indians alone.[17] *Bonnichsen*, 367 F.3d at 874 n.14 (citing S. Rep. No. 101-473, at 6 (1990)) (NAGPRA "was not intended merely to benefit American Indians, but rather to strike a balance between the needs of scientists, educators, and historians on the one hand, and American Indians on the other."). It follows that plaintiffs like the scientists in this action unquestionably have standing to bring their claims under the enforcement provision: "§ 3013 does not limit jurisdiction to suits brought by American Indians or Indian tribes. 'Any person' means exactly that, and may not be interpreted restrictively to mean only "any *American Indian* person' or 'any Indian Tribe.'" *Id.* at 874 (emphasis in original).

The foregoing observations lead to the conclusion that Congress likely intended actions such as the one at bar to proceed. As noted above, NAGPRA does not appear to effect a legislative waiver, and the statute's legislative history reflects no consideration of how tribal sovereign immunity might impact the availability of judicial review for non-Indians. Yet this case leaves little doubt as to the doctrine's practical effect: honoring tribal sovereign immunity will permit tribes to frustrate review under NAGPRA by refusing to submit to jurisdiction where, as here, a regulated entity has made a determination favorable to the tribes and decided to repatriate remains. At the same time, tribes retain the option of waiving their immunity to challenge an unfavorable determination under NAGPRA – as the KCRC has done in the Southern District. In other words, invoking sovereign immunity selectively permits the tribes to claim the benefit of NAGPRA, without subjecting themselves to its attendant limitations. This is undeniably an unsatisfactory

---

[17] Neither the District Court, nor the Court of Appeals had occasion to address sovereign immunity in *Bonnischen* because, as it happened, the relevant tribes voluntarily intervened in the litigation.

result which a higher court or other branch of government may elect to address as a matter of policy. This Court, however, does not have that luxury but must dismiss this action, reluctantly, as the current state of the law requires.

C. Other arguments

Although the University defendants also request dismissal on the grounds that plaintiffs lack standing under NAGPRA, and have asserted First Amendment and public trust claims that are unripe, such matters need not be addressed because Rule 19 requires dismissal. Dismissal must be with prejudice. While plaintiffs request an opportunity to amend in order to name tribal officials as defendants under *Ex Parte Young*, 209 U.S. 123 (1908), that option is not available. Plaintiffs' theory is that "sovereign immunity does not extend to tribal officials acting beyond the scope of their authority, in violation of federal law." Pls.' Opp'n at 16. They therefore seek to name certain officials in their individual capacity. Personal-capacity suits are appropriate only where individual assets or personal actions are targeted. *Kentucky v. Graham*, 473 U.S. 159, 165-67 (1985). As defendants also rightly point out, advocating for transfer of the Remains to the Kumeyaay under NAGPRA is hardly a violation of federal law; in fact, such petitioning is almost certainly protected under the First Amendment. Finally, the Ninth Circuit has previously rejected attempts by plaintiffs to circumvent tribal immunity by naming individual officials rather than the tribe. *See, e.g., Dawavendewa*, 276 F.3d at 1159-60 (plaintiff's assertion of personal-capacity claims "strikes us as an attempted end run around tribal immunity" given that the "real claim" is against the tribe itself).

V. CONCLUSION

For the reasons set forth above, defendants' motions to dismiss must be granted without leave to amend.


IT IS SO ORDERED.


Dated: 10/9/12

_____
RICHARD SEEBORG
UNITED STATES DISTRICT JUDGE

No. C 12-01978 RS
ORDER

23