**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| TIMOTHY WHITE; MARGARET SCHOENINGER; ROBERT L. BETTINGER, *Plaintiffs-Appellants*, | No. 12-17489 D.C. No. 3:12-cv-01978-RS |
| v. | |
| UNIVERSITY OF CALIFORNIA; REGENTS OF THE UNIVERSITY OF CALIFORNIA; JANET NAPOLITANO; MARYE ANNE FOX, in her individual and official capacity as Chancellor of the University of California, San Diego; GARY MATTHEWS, in his individual and official capacity as Vice Chancellor of the University of California, San Diego; KUMEYAAY CULTURAL REPATRIATION COMMITTEE, *Defendants-Appellees*. | OPINION |

Appeal from the United States District Court
for the Northern District of California
Richard Seeborg, District Judge, Presiding

Argued and Submitted
December 3, 2013—San Francisco, California

Filed August 27, 2014

Before:  Stephen S. Trott, Sidney R. Thomas,
and Mary H. Murguia, Circuit Judges.

Opinion by Judge Sidney R. Thomas;
Dissent by Judge Murguia

**SUMMARY**[*]

**Native Graves Protection and Repatriation Act**

The panel affirmed the district court's dismissal of an action under the Native Graves Protection and Repatriation Act on the basis that the affected tribes and their representatives were indispensable parties and could not be joined in the action.

The action concerned the "La Jolla remains," two human skeletons discovered during an archaeological excavation on the property of the Chancellor's official residence at the University of California-San Diego.  The tribes claimed the right to compel repatriation of the La Jolla remains to one of the Kumeyaay Nation's member tribes.  Repatriation was opposed by the plaintiffs, University of California professors who wished to study the remains.  The professors sought a declaration that the remains were not "Native American" within the meaning of NAGPRA, which provides a framework for establishing ownership and control of newly

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

discovered Native American remains and funerary objects, as well as cultural items already held by certain federally funded museums and educational institutions.

The panel held that the plaintiffs had Article III standing to bring suit because if the La Jolla remains were repatriated, the plaintiffs would suffer a concrete injury that was fairly traceable to the challenged action. In addition, this injury was likely to be redressed by a favorable decision.

The panel held that NAGPRA does not abrogate tribal sovereign immunity because Congress did not unequivocally express that purpose. The panel held that the "Repatriation Committee," a tribal organization, was entitled to tribal sovereign immunity as an "arm of the tribe." In addition, the Repatriation Committee did not waive its sovereign immunity by filing a separate lawsuit against the University or by incorporating under California law.

The panel held that the tribes and the Repatriation Committee were necessary parties under Federal Rule of Civil Procedure 19(a)(1) and were indispensable under Rule 19(b). In addition, the "public rights" exception to Rule 19 did not apply. Accordingly, the district court properly dismissed the action.

Dissenting, Judge Murguia agreed with the majority that the plaintiffs had Article III standing, that NAGPRA did not abrogate the sovereign immunity of the tribes, and that the Repatriation Committee was entitled to sovereign immunity. She would hold, however, that the Committee was not a necessary and indispensable party because it was neither necessary nor indispensable to resolution of the question whether the University properly determined that the La Jolla

remains were Native American within the meaning of NAGPRA.

---

## COUNSEL

Lauren Coatney (argued), James McManis, Michael Reedy, and Christine Peek, McManis Faulkner, San Jose, California, for Plaintiffs-Appellants.

Michael Mongan (argued) and Michelle Friedland, Munger, Tolles & Olson LLP, San Francisco, California; Charles F. Robinson, Karen J. Petrulakis, and Margaret L. Wu, Office of the General Counsel, University of California, Oakland, California; Bradley Phillips, Munger, Tolles & Olson LLP, Los Angeles, California; Dennis Klein, Office of the Campus Counsel, University of California San Diego, La Jolla, California, for Defendants-Appellees Regents of the University of California, Mark G. Yudof, Janet Napolitano, Marye Anne Fox, and Gary Matthews.

Dorothy Alther (argued), California Indian Legal Services, Escondido, California, for Defendant-Appellee Kumeyaay Cultural Repatriation Committee.

---

## OPINION

THOMAS, Circuit Judge:

In this appeal, we consider whether the Native American Graves Protection and Repatriation Act ("NAGPRA" or "the Act") abrogates tribal sovereign immunity and, if not, whether the district court properly dismissed this declaratory

judgment action because the tribes and their representatives were indispensable parties under Fed. R. Civ. P. 19 and could not be joined in the action. We conclude that NAGPRA does not abrogate tribal sovereign immunity and that the affected tribes and their representatives were indispensable parties. Therefore, we affirm the district court's judgment.

I

In 1976, Gail Kennedy, a professor at the University of California-Los Angeles ("UCLA"), led an archaeological field excavation project on the property of the Chancellor's official residence at the University of California-San Diego ("UCSD" or "the University"). During the excavation, the archaeological team discovered a double burial site and uncovered two human skeletons (the "La Jolla remains"). Scientists estimate that the La Jolla remains are between 8977 to 9603 years old, making them among the earliest known human remains from North or South America.

The property on which the La Jolla remains were discovered was aboriginally occupied by members of the Kumeyaay Nation, which consists of a number of federally recognized Indian tribes.[1] The Kumeyaay, also known as the Ipai, Tipai, or the Diegueño, aboriginally occupied areas of the southwestern United States and northwest Mexico. The Kumeyaay Nation currently occupies various lands extending

---

[1] These tribes include the Barona Band of Mission Indians; Campo Band of Kumeyaay Indians; the Ewiiaapaayp Band of Kumeyaay Indians; the Inaja-Cosmit Band of Mission Indians; the Jamul Indian Village; the La Posta Band of Mission Indians; the San Pasqual Band of Mission Indians; the Iipay Nation of Santa Ysabel; the Sycuan Band of the Kumeyaay Nation; and the Viejas Band of Kumeyaay Indians (collectively "the Tribes" or the "Kumeyaay Nation").

from San Diego and Imperial Counties in California to 75 miles south of the Mexican border.[2]

Since their discovery, the University has maintained custody of the La Jolla remains, but they have been stored at multiple locations, including UCLA, the San Diego Museum of Man, the National Museum of Natural History, and the Smithsonian Institution. The La Jolla remains are presently in the physical custody of the San Diego Archaeological Center.

The present dispute is over the custody of the La Jolla remains. The Tribes and their representatives claim the right to compel repatriation of the La Jolla remains to one of the Kumeyaay Nation's member tribes. Repatriation is opposed by Plaintiffs Timothy White, Robert L. Bettinger, and Margaret Schoeninger ("Plaintiffs" or "the Scientists"), professors in the University of California system, who wish to study the La Jolla remains.

Resolution of the dispute is largely governed by NAGPRA, which was passed by Congress in 1990. NAGPRA provides a framework for establishing ownership and control of (1) newly discovered Native American remains and funerary objects (collectively "cultural items") and (2) cultural items already held by certain federally funded

---

[2] Aboriginal interest in land generally is described as a tribe's right to occupy the land. It is not a property right, but "amounts to a right of occupancy which the sovereign grants and protects against intrusion by third parties." *Tee-Hit-Ton Indians v. United States*, 348 U.S. 272, 279 (1955). The right, which is residual in nature, comes from the legal theory that discovery and conquest gave conquerors the right to own the land but did not disturb the tribe's right to occupy it. *See Johnson v. M'Intosh*, 21 U.S. 8 Wheat 543, 588–91 (1823).

museums and educational institutions. *See* 25 U.S.C. §§ 3001–3013. NAGPRA was enacted in response to widespread debate surrounding the rights of tribes to protect the remains and funerary objects of their ancestors and the rights of museums, educational institutions, and scientists to preserve and enhance the scientific value of their collections. *See, e.g.*, *Bonnichsen v. United States*, 367 F.3d 864, 874 n.14 (9th Cir. 2004); S. Rep. No. 101-473, at 3 (1990) (describing testimony "indicat[ing] the need for a process in which meaningful discussions between Indian tribes and museums regarding their respective interests in the disposition of human remains and objects in the museum[s'] collections could be discussed and the resolution of competing interests could be facilitated").

NAGPRA applies only to "Native American" cultural items, and it defines "Native American" to mean "of, or relating to, a tribe, people, or culture that is indigenous to the United States." 25 U.S.C. § 3001(9). In *Bonnichsen*, we interpreted NAGPRA's definition of "Native American" to mean of or relating to a "*presently existing* Indian trib[e]," people, or culture. 367 F.3d at 875.

The Department of the Interior is the agency charged with administering NAGPRA. Under NAGPRA, the Secretary must establish a review committee for the purpose of making findings and recommendations related to "the identity or cultural affiliation of cultural items" or "the return of such items." *See* 25 U.S.C. § 3006(c)(3). The Review Committee's recommendations are "advisory only and not binding on any person." 43 C.F.R. § 10.16(b).

NAGPRA contains, among other things, an "ownership" provision and a set of "repatriation" provisions. The

ownership provision applies only to Native American cultural items excavated on federal or tribal lands after the effective date of the Act. 25 U.S.C. § 3002. The provision generally vests ownership and control over the cultural items in the lineal descendants of a deceased Native American. § 3002(a)(1). If lineal descendants cannot be identified, then the provision vests ownership in the tribe on whose land the remains were discovered (if they were discovered on tribal lands), or in the tribe having the closest "cultural affiliation" with the remains (if they were discovered on non-tribal federal lands). § 3002(a)(2)(A)–(B). If the remains are discovered on non-tribal federal lands and no cultural affiliation can be established, then the ownership provision vests ownership and control in the tribe "that is recognized as aboriginally occupying the area in which the objects were discovered." § 3002(a)(2)(C)(1). NAGPRA defines "cultural affiliation" as "a relationship of shared group identity which can be reasonably traced historically or prehistorically between a present day Indian tribe or Native Hawaiian organization and an identifiable earlier group." § 3001(2). NAGPRA permits tribes to prove aboriginal occupation by way of a final judgment from the Indian Claims Commission or the United States Court of Federal Claims, a treaty, an Act of Congress, or an Executive Order. 43 C.F.R. § 10.11(b)(2)(ii).

NAGPRA's repatriation provisions apply to Native American cultural items already held by a federal agency or museum at the time that NAGPRA was enacted, and therefore apply to the La Jolla remains, which at that time were already in the University's possession. The Act's repatriation provisions require the agency or museum to compile an inventory of the "Native American" cultural items within its possession and to determine each item's "geographical and

cultural affiliation." 25 U.S.C. § 3003(a). Upon the request of a culturally affiliated tribe or organization, the agency or museum must "expeditiously return" culturally affiliated items to the tribe. § 3005(a)(1). If no cultural affiliation is established, then the provisions provide that "such Native American human remains and funerary objects shall be expeditiously returned where the requesting Indian tribe . . . can show cultural affiliation by a preponderance of the evidence based on geographical kinship, biological, archaeological, anthropological, linguistic, folkloric, oral traditional, historical, or other relevant information or expert opinion." § 3005(a)(4).

The repatriation provisions also permit the agency or museum to delay the return of culturally affiliated items if the items are "indispensable for completion of a specific scientific study, the outcome of which would be of major benefit to the United States." § 3005(b). The repatriation provisions do not, however, provide a course of action for circumstances in which the remains are "culturally unidentifiable." *See generally* Rebecca Tsosie, *NAGPRA and the Problem of "Culturally Unidentifiable" Remains: The Argument for a Human Rights Framework*, 44 Ariz. St. L.J. 809, 817 (2012) (describing Congress's intent to permit the Secretary of the Interior to promulgate regulations addressing culturally unidentifiable remains).

As a "museum" subject to NAGPRA,[3] the University promulgated "Policy and Procedures on Curation and Repatriation of Human Remains and Cultural Items." Pursuant to that policy, the University also established a systemwide "Advisory Group on Cultural Affiliation and Repatriation of Human Remains and Cultural Items" ("the University Advisory Group") to facilitate compliance with NAGPRA. The University Advisory Group reviews campus decisions regarding cultural affiliation and repatriation and assists in the resolution of disputes that arise involving cultural items in the University's possession. It is made up of at least "one University faculty member delegated principal responsibility for compliance with [the University's] policy" and "two Native American members to be selected by the President or designee from among nominees submitted by each campus." The Vice Provost for Research is the liaison to the University Advisory Group from the University's Office of the President.

The Native American Heritage Commission ("Heritage Commission") is the California state agency charged with identifying and cataloging Native American cultural resources. *See* Cal. Pub. Res. Code §§ 5097.91, 5097.94. Pursuant to its authority under state law, the Heritage Commission notifies the "most likely descend[ant]" of Native American remains and provides that descendant an opportunity to inspect the site from which the remains were removed. Cal. Pub. Res. Code § 5097.98. It also makes

---

[3] Section 3003 requires "[e]ach Federal agency and each museum" to compile an inventory of Native American cultural items. The University, as an "institution of higher learning," is a "museum" under NAGPRA. *See* § 3001(8). If the University does not comply with NAGPRA's provisions, it may incur a penalty. § 3007.

recommendations "for treatment or disposition, with appropriate dignity, of the human remains." *Id.* The state-law "most likely descend[ant]" determination does not resolve any questions of affiliation under NAGPRA.

In March 2007, the Heritage Commission identified the Kumeyaay Cultural Repatriation Committee ("the KCRC" or the "Repatriation Committee") as the "most likely descendant" for the La Jolla remains. The Repatriation Committee is a tribal organization that was formed in 1997 by tribal resolutions from each of its twelve Kumeyaay Nation member tribes. The organization describes itself as "an outgrowth of tribal leaders and members [sic] concerns over the repatriation efforts, or lack thereof, under [NAGPRA] in San Diego."

In August 2006, the Repatriation Committee sent a letter to the University requesting that the La Jolla remains be repatriated to one of its member tribes. In late 2007, the University began consulting with the Repatriation Committee to determine the geographical and cultural affiliation of the La Jolla remains. Concurrent to those consultation efforts, the University also conducted, pursuant to its policy for complying with NAGPRA, an academic assessment to determine the cultural affiliation of the La Jolla remains. The assessment was completed in May 2008.

The academic assessment concluded that the La Jolla remains are "culturally unidentifiable." The assessment found "that there is not a preponderance of evidence to support an affirmation of cultural identification or affiliation with any modern group." With respect to the Kumeyaay, the assessment concluded,

Although there is evidence from material culture that people have lived in the San Diego region since the late Pleistocene or early Holocene, the linguistic analyses and archaeological evidence indicate that the Kumeyaay moved into the region within the last few thousand years. Kumeyaay folklore and oral tradition emphasize water (both fresh and marine) and a specific region within the Mohave Desert as their places of origin. Given the early Holocene age of the skeletons, we placed less emphasis on the evidence from these sources. . . . [H]aplogroups present in a terminal Pleistocene skeleton from the Pacific Northwest and in extant coastal Native Californians are rare or absent in the few Kumeyaay mitochondrial genomes so far analyzed. The burial pattern of the 2 skeletons recovered from the UCSD property differs from that of the Kumeyaay as reported in early ethnographies.[4]

The assessment also concluded that "[a]ll that can be said conclusively is that the skeletal morphology of the two skeletons provides no support for a finding of cultural affiliation between the two and the Kumeyaay." Based on the

---

[4] The Pleistocene is the time period spanning 2.6 million to 11,700 years ago, and the Holocene is the time period spanning 11,700 years ago to the present. A "haplogroup" is a population sharing a common ancestor. The mitochondrial genome is the DNA string found in mitochondria, which is normally inherited only from the mother. *See* International Science Times, *Tracing the Earliest Americans Through Mitochondrial DNA*, http://www.isciencetimes.com/articles/6344/20131119/tracing-earliest-americans-through-mitochondrial-dna.htm (last visited July 23, 2014).

assessment, the University filed its required Notice of Inventory Completion and inventory with the Department of the Interior listing the La Jolla remains as not culturally identifiable with the Tribes. The inventory was silent regarding any determination of whether the La Jolla remains are "Native American" as that term is defined under NAGPRA.

After the academic assessment was completed, it was forwarded to the University Advisory Group for use in preparing a recommendation. At the same time, the University's Vice Chancellor for Resource Management and Planning, Gary Matthews, wrote to University Provost and Executive Vice President Rory Hume describing the 2006 repatriation request and urging the Provost to repatriate the La Jolla remains. Matthews noted that "[t]here are no competing requests for repatriation, and the KCRC is the legally recognized [most likely descendant] in San Diego, as confirmed by the State of California Native American Heritage Commission." Matthews went on to note that "Native Americans comprise less than 1% of the students at UC San Diego with not one Kumeyaay student represented in those meager numbers," and concluded that "[o]ne strategic and meaningful step forward would be to address the spirit of the law and required actions contained within NAGPRA" by repatriating the remains to the Repatriation Committee. "This action would have a profound effect on bridging the gap that is clearly evident between the Native American Community and the University of California."

In February 2009, the University prepared a proposed request form asking the Department of the Interior's NAGPRA review committee to act on an agreement between the University and the Repatriation Committee that would

permit transfer of the La Jolla remains to the Tribes. In that request for action, the University stated that the La Jolla remains were "determined to be Native American" based on their age, the location in which they were excavated, and oral traditional and folkloric information provided by the Tribes. Specifically, the form stated,

> [T]he Kumeyaay firmly believe that their people have lived in this region since the "beginning." For example, the Viejas Band considers the Kumeyaay (referred to as Digueno) to be the original native inhabitants of San Diego County – having lived in this region for more than 10,000 years. *See* http://www.viejasbandofkumeyaay.org/html /tribal_history/kumeyaay_history.html. Similarly, the Sycuan Band states that their ancestors have lived in the San Diego area for 12,000 years – "[t]he earliest documented inhabitants in what is now San Diego County are known as the San Dieguito Paleo-Indians, dating back to about 10,000 B.C." *See* http://sycuan.com/history.html. In addition, the local Kumeyaay "avow a deep sense of personal and communal responsibility for the recovery and proper reburial of all human remains of people who predate European settler society." (modification in original).

The form was submitted to the Department of the Interior, but was later withdrawn for reasons that are unclear from the record before us.

In May 2010, while the University Advisory Group was considering the academic assessment and developing a recommendation, the Department of the Interior promulgated regulations pertaining to the disposition of "culturally unidentifiable" remains and funerary objects. *See* 43 C.F.R. § 10.11. The regulations apply to "human remains previously determined to be Native American under § 10.9 [the regulation setting forth the inventorying process], but for which no lineal descendant or culturally affiliated Indian tribe or Native Hawaiian organization has been identified." § 10.11(a). Culturally unidentifiable remains removed from federal lands must be transferred to "[t]he Indian tribe or tribes that are recognized as aboriginal to the area from which the human remains were removed." *See* § 10.11(c)(1)(ii).

In June 2010, the Repatriation Committee wrote to the University presenting its legal position that the new NAGPRA regulations required the transfer of the La Jolla remains to the Repatriation Committee. According to the Repatriation Committee,

> The human remains are "Native American." NAGPRA is only concerned with Native American remains. By its own actions, UCSD has treated the human remains as "Native American." UCSD submitted the human remains in its NAGPRA inventory; submitted the inventory to the UCSD NAGPRA Working Group and has had several interactions with the NAGPRA Designated Federal Officer regarding the disposition of the human remains. This action, coupled with meetings with KCRC regarding the human remains, demonstrates

that UCSD has and continues to treat the human remains as "Native American." KCRC also points to the work of Dr. Mayes that shows through her analysis that a tooth from the female human remain has a prominent shoveling, which is a characteristic still present in modern day Native American populations.

The Repatriation Committee concluded that, because the La Jolla remains are "Native American" but "culturally unidentifiable," the new Department of the Interior regulations required the University to transfer the La Jolla remains to the Repatriation Committee, the group "recognized as aboriginal to the area from which the human remains were removed." *See* 43 C.F.R. § 10.11(c)(1)(ii).

In March 2011, the University Advisory Group issued its report and recommendations pertaining to the La Jolla remains. Among other things, the University Advisory Group addressed "whether the remains were 'Native American' as defined by NAGPRA and case law" and noted that the University may have "implicitly concluded that the remains were Native American" by filing a Notice of Inventory Completion and undergoing the process of establishing "cultural affiliation." Some members of the University Advisory Group "voiced strong concern that there had not been adequate review/analysis" of that question and "totally opposed the idea that UCSD should proceed as though the remains are Native American, even though they might not be." The University Advisory Group's discussion pertaining to disposition of the remains was "fractured," and so its recommendation "focused mostly on the issue of consultation and not on the issue of ultimate disposition." In its report, the

University Advisory Group recommended additional consultation, re-analysis of certain funerary objects listed with the La Jolla remains, and revisions to the Notice of Inventory Completion on the issue of whether the La Jolla remains were indeed "Native American." On the last issue,

> [o]ne suggested approach for addressing the uncertainty surrounding the matter of whether the remains are "Native American" was to insert language into the UCSD's new Notice of Inventory Completion acknowledging that given the age of the remains, there is some uncertainty on the matter of whether they meet the legal definition of "Native American," but that the campus has decided to proceed under the presumption that they are, given that the campus already circulated a previous NAGPRA inventory listing these remains, given that the campus wishes to make a disposition, and given that doing so will ensure that there is adequate notice to the public and to potentially interested tribes that a disposition is going to be made. This approach would avoid having to re-open an issue that already was dealt with in the previous inventory, but would partially address concerns expressed by experts about the scientific uncertainty that the remains are "Native American," and avoid taking a definitive possibly precedent-setting position in a high profile matter.

In May 2011, the University President, Mark Yudof, wrote to the Chancellor at UCSD, Marye Anne Fox,

authorizing disposition of the La Jolla remains subject to certain conditions and recommendations.   Specifically, President Yudof requested that UCSD engage in broader consultation efforts and revise its Notice of Inventory Completion to reflect the "deep division of opinion within the [University] Advisory Group, with regard to the status of the remains as Native American under NAGPRA."

In December 2011, the University issued its final Notice of Inventory Completion, which stated, "The human remains are Native American."  It further stated,

> Pursuant to 43 C.F.R. 10.11(c)(1), and based upon request from the Kumeyaay Cultural Repatriation Committee, on behalf of The Tribes, disposition of the human remains is to the La Posta Band of Diegueno Mission Indians of the La Posta Indian Reservation, California.[5]

The Plaintiffs, who teach at the University of California-Berkeley, University of California-Davis, and University of California-San Diego, allege that they requested an opportunity to study the La Jolla remains in 2009 and 2010

---

[5] The Repatriation Committee's policy is that the member tribe geographically closest to the location in which the remains were found should act as the tribe for the purposes of repatriation.  According to the Repatriation Committee, the La Posta Band is geographically closest to the La Jolla remains.  The land area of the La Posta reservation is approximately 3500 acres, and the reservation is located in and around Boulevard, California.  The tribe has 18 members.  *See* University of San Diego, *San Diego Native Americans–Indian Reservations in San Diego County*, http://www.sandiego.edu/nativeamerican/ reservations.php#LaPosta (last visited July 23, 2014).

but were never granted permission to do so by Chancellor Fox. The Scientists believe that they will have opportunities to study the La Jolla remains–which they allege hold the highest "degree of research potential" in the "New World"–if the University does not transfer the La Jolla remains to the La Posta Band.

Between December 2011, when the University filed its final Notice of Inventory Completion, and January 2012, Plaintiffs and the University attempted to resolve outside of court their dispute over the La Jolla remains. After those settlement discussions failed, the Repatriation Committee filed a complaint against the University in the U.S. District Court for the Southern District of California seeking declaratory relief and an injunction compelling the transfer of the La Jolla remains to the La Posta Band.[6]

Afterward, the Scientists filed a Petition for Writ of Administrative Mandamus and an initial complaint in California state court alleging causes of action for (1) violations of NAGPRA, (2) breach of the public trust, and (3) violation of Plaintiffs' First Amendment rights. On all of their claims, the Scientists alleged that the University failed to make a formal and adequate finding that the La Jolla remains were "Native American" within the meaning of NAGPRA, and that the University's decision to transfer the La Jolla remains pursuant to NAGPRA was therefore arbitrary and capricious and not supported by the evidence. The University removed the action to the United States District Court for the Northern District of California, and the

----

[6] After the district court denied the Repatriation Committee's and Defendants' joint motion to stay the proceedings in the Southern District of California, the parties stipulated to a dismissal without prejudice.

Scientists later amended their complaint to add the Repatriation Committee as a defendant.

The University moved to dismiss the complaint on the ground that the district court lacked subject-matter jurisdiction over the claim because (1) the Repatriation Committee and the twelve Kumeyaay tribes are necessary and indispensable parties who cannot be joined under Federal Rule of Civil Procedure 19 because they are immune from suit, (2) Plaintiffs lack standing under Article III, and (3) Plaintiffs' public trust and First Amendment claims are unripe.

The district court granted the University's motion to dismiss, concluding that the Repatriation Committee is a necessary and indispensable party under Fed R. Civ P. 19 that could not be joined because it is immune from suit. Plaintiffs timely appealed.

II

The first question we must decide is whether Plaintiffs have Article III standing to bring this lawsuit. In order to establish Article III standing, a plaintiff must show (1) a concrete injury, (2) fairly traceable to the challenged action of the defendant, (3) that is likely to be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

Plaintiff White is a professor of integrative biology at the University of California-Berkeley. He holds Bachelor of Science degrees in biology and anthropology from the University of California-Riverside, along with a Master of Arts and Ph.D in biological anthropology from the University

of Michigan-Ann Arbor. His field research concentrates on the study of ancient humans.

Plaintiff Bettinger is a Professor of Anthropology at the University of California-Davis. He holds a Bachelor of Arts and a Ph.D. in anthropology from the University of California-Riverside. His scholarship and fieldwork have focused on hunter-gatherers and the population expansions of hunter-gatherers.

Plaintiff Schoeninger is a professor of anthropology at the University of California-San Diego. She holds a Bachelor of Arts in anthropology from the University of Florida, a Master of Arts in anthropology from the University of Cincinnati, and a Ph.D. in anthropology from the University of Michigan. Her research centers on the subsistence strategies of early humans.

The University does not contest that if the La Jolla remains are repatriated, the Scientists will suffer a concrete injury that is fairly traceable to the challenged action. Instead, the University contends that the injury is not likely to be redressed by a favorable decision. We therefore focus on only the third *Lujan* factor.

To establish redressability under Article III, a plaintiff "must show only that a favorable decision is *likely* to redress his injury, not that a favorable decision *will inevitably* redress his injury." *Beno v. Shalala*, 30 F.3d 1057, 1065 (9th Cir. 1994). A showing that is "merely speculative" is insufficient. *Lujan*, 504 U.S. at 561 (internal quotation marks omitted).

The Scientists seek a declaration that the La Jolla remains are not "Native American" within the meaning of NAGPRA.

In their complaint, Plaintiffs seek the opportunity to study the La Jolla remains. In response, the University argues that, even if the remains are not Native American, the University would still have "unfettered discretion" to decide whether and how to dispose of them. Therefore, the University argues, the Scientists have not shown that they would likely be able to study the La Jolla remains even if they obtained relief.

As Plaintiffs point out, however, the University is bound by its "Human Remains and Cultural Items" policy. That policy requires the University to maintain human remains for the public trust for such purposes as "education[] and research." It also requires that "[r]emains . . . covered by this policy shall normally remain accessible for research by qualified investigators, subject to approval by the curator of the relevant campus collection." Taken together, those two provisions of the policy suggest that it is "likely" that qualified researchers would have the opportunity to study the remains if they are not "Native American" and subject to NAGPRA.

The University does not dispute that Plaintiffs are qualified researchers employed by the University of California system. And we assume that the University follows its established policies. Thus, if the La Jolla remains are not "Native American" and subject to NAGPRA, then the University's own policy suggests that Plaintiffs likely would be able to study them. A favorable judicial decision is therefore likely to redress Plaintiffs' alleged injuries. Plaintiffs have alleged sufficient facts to establish Article III standing to maintain this lawsuit.

The University relies on *Glanton v. AdvancePCS Inc.*, 465 F.3d 1123, 1125 (9th Cir. 2006), but *Glanton* is

distinguishable.  The plaintiffs in *Glanton* claimed that the defendant had charged the employee welfare benefit plans too much for drugs, which caused the plans to demand higher co-payments and contributions from participants.  Therefore, the plaintiffs contended their suit, if successful, would ultimately decrease the plans' co-payment or contribution requirements.  We held that this assertion of redressability was too speculative because the plan was not bound to change its co-payment or contribution policy and there was no indication that it would do so.  In contrast, here, the University does not possess unfettered discretion as to the La Jolla remains because the University's handling of remains is subject to the "Human Remains and Cultural Items" policy.

III

The next question we must decide is whether NAGPRA abrogates the sovereign immunity of the Indian tribes.  The district court properly concluded that it does not.  Indian tribes are entitled to immunity from suit, particularly on matters integral to sovereignty and self-governance.  *See Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 55–58 (1978) (citing *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515 (1832)).  Congress has plenary authority, however, to "limit, modify or eliminate the powers of local self-government which the tribes otherwise possess."  *Id.* at 56.  Suits against Indian tribes are therefore barred absent congressional abrogation or a clear waiver from the tribe itself.  *Okla. Tax Comm'n v. Citizen Band of Potowatomi Indian Tribe of Okla.*, 498 U.S. 505, 509 (1991).  "[T]o abrogate such immunity, Congress must 'unequivocally' express that purpose." *Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2031 (2014) (quoting *Santa Clara Pueblo*, 436 U.S. at 58) (second modification and second internal quotation marks omitted).  Indeed, when

Congress intends to abrogate tribes' sovereign immunity, that intent cannot be implied, but must be "unequivocally expressed" in "explicit legislation." *Krystal Energy Co. v. Navajo Nation*, 357 F.3d 1055, 1056 (9th Cir. 2004) (internal quotation marks omitted).

NAGPRA, by its terms, does not explicitly abrogate tribal sovereign immunity. Thus, the Act does not contain an "unequivocal expression" of abrogation.

Plaintiffs argue that NAGPRA's enforcement clause does so. It confers on district courts the "jurisdiction over any action brought by any person alleging a violation of this [Act]." 25 U.S.C. § 3013. However, that section does not contain any language expressly abrogating tribal sovereign immunity. A similar argument was rejected by the Supreme Court in *Santa Clara Pueblo*. In that case, the Court held that a statutory provision providing federal courts with "jurisdiction of any civil action authorized by law to be commenced by any person" did not abrogate tribal sovereign immunity. 436 U.S. at 53 & n.4, 59.

The Scientists also argue that because NAGPRA waives sovereign immunity on the part of the United States, NAGPRA must also have abrogated tribal sovereign immunity because immunities of the two sovereigns are "coextensive." Plaintiffs misperceive the nature of tribal sovereign immunity. "Indian tribes are " domestic dependent nations" that exercise "inherent sovereign authority." *Bay Mills Indian Cmty*, 134 S. Ct. at 2030 (quoting *Okla. Tax Comm'n*, 498 U.S. at 509. "The tribes' status as distinct, independent political communities qualified to exercise powers of self-government arises from their original tribal sovereignty over their members rather than from any

constitutional source." *Montana v. Gilham*, 133 F.3d 1133, 1137 (9th Cir. 1998). Thus, "tribes retain whatever inherent sovereignty they had as the original inhabitants of this continent to the extent that sovereignty has not been removed by Congress." *Id.* Therefore, the sovereignty of the United States and the Indian tribes are not "coextensive" in the sense that the waiver of one by Congress necessarily constitutes the waiver of the other. Nothing in a Congressional waiver of sovereign immunity on behalf of the United States alters the rule that abrogation of tribal sovereign immunity by Congress must be "unequivocally expressed" in "explicit legislation." *Krystal Energy Co.*, 357 F.3d at 1056.

Further, suits concerning the United States under NAGPRA are not authorized by any specific portion of that statute, but rather under the Administrative Procedure Act ("APA"), which contains an express limited sovereign immunity waiver for suits seeking non-monetary relief against the United States. 5 U.S.C. § 702. No court has held that the sovereign immunity waiver in the APA by the United States also serves as a general abrogation of tribal sovereign immunity.

Plaintiffs also make the policy argument that permitting tribes to invoke sovereign immunity would frustrate the purpose of NAGPRA, highlighting the district court's statement expressing that concern. However, when properly asserted, sovereign immunity applies regardless of the merit of the action or overarching policy considerations. Indeed, the Supreme Court recently rejected such a holistic statutory argument in *Bay Mills Indian Community*. 134 S. Ct. at 2033–34. And, as the Supreme Court observed, "it is fundamentally Congress's job, not ours, to determine whether or how to limit tribal immunity." *Id.* at 2037. Moreover, as

the University points out, the United States retains the right to bring an action against a tribe, *see United States v. Yakima Tribal Court*, 806 F.2d 853, 861 (9th Cir. 1986), so that it could act to litigate issues under NAGPRA if necessary.

For all these reasons, we conclude that the district court properly determined that NAGPRA does not abrogate tribal sovereign immunity.

IV

A

The district court also properly concluded that the Repatriation Committee was entitled to tribal sovereign immunity as an "arm of the tribe." Tribal sovereign immunity not only protects tribes themselves, but also extends to arms of the tribe acting on behalf of the tribe. *Miller v. Wright*, 705 F.3d 919, 923-24 (9th Cir. 2013), *cert. denied*, 133 S. Ct. 2829 (2013); *Cook v. AVI Casino Enters., Inc.*, 548 F.3d 718, 725 (9th Cir. 2008); *see also Bay Mills Indian Cmty*, 134 S. Ct. at 2031 (describing the rule that tribal sovereign immunity extends to suits arising from a tribe's commercial activities, even when they take place off Indian lands).

In determining whether an entity is entitled to sovereign immunity as an "arm of the tribe," we examine several factors including: "(1) the method of creation of the economic entities; (2) their purpose; (3) their structure, ownership, and management, including the amount of control the tribe has over the entities; (4) the tribe's intent with respect to the sharing of its sovereign immunity; and (5) the financial relationship between the tribe and the entities."

*Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino and Resort*, 629 F.3d 1173, 1187 (10th Cir. 2010).

As the district court found, the Repatriation Committee was created by resolution of each of the Tribes, with its power derived directly from the Tribes' sovereign authority. The Repatriation Committee is comprised solely of tribal members, who act on its behalf. KCRC tribal representatives are appointed by each tribe. The process by which the Repatriation Committee designates the particular tribe to receive remains under NAGPRA is defined and accepted by the Tribes. The Repatriation Committee is funded exclusively by the Tribes. As the district court noted, the whole purpose of the Repatriation Committee, to recover remains and educate the public, is "core to the notion of sovereignty." Indeed, "preservation of tribal cultural autonomy [and] preservation of tribal self-determination," are some of the central policies underlying the doctrine of tribal sovereign immunity. *Breakthrough Mgmt. Grp., Inc.*, 629 F.3d at 1188 (quoting *Dixon v. Picopa Const. Co.*, 772 P.2d 1104, 1111 (Ariz. 1989)).

Given these undisputed facts, the district court properly concluded that the Repatriation Committee was an "arm of the tribe" for sovereign immunity purposes and, given only speculative arguments, did not abuse its discretion in denying the Plaintiffs further discovery on the question.

B

The district court also properly concluded that the Repatriation Committee did not waive its sovereign immunity by filing suit against the University in the Southern District of California or by incorporating under California law. A

voluntary waiver by a tribe must be "unequivocally expressed." *Pit River Home & Agric. Coop. Ass'n v. United States*, 30 F.3d 1088, 1100 (9th Cir. 1994) (citing *California ex rel. Cal. Dep't of Fish & Game v. Quechan Tribe of Indians*, 595 F.2d 1153, 1155 (9th Cir. 1979)). Waiving immunity as to one particular issue does not operate as a general waiver. Thus, when a tribe files suit, it submits to jurisdiction only for purposes of adjudicating its claims, but not other matters, even if related. *Okla. Tax Comm'n*, 498 U.S. at 509.

We have previously rejected the Plaintiffs' alternative argument that a tribe's decision to incorporate waives its sovereign immunity. *Am. Vantage Cos., Inc. v. Table Mountain Rancheria*, 292 F.3d 1091, 1099 (9th Cir. 2002).

The district court did not err in concluding that the Repatriation Committee had not waived its sovereign immunity.

V

Given that NAGPRA did not abrogate tribal sovereign immunity, and that tribal immunity extends to the Repatriation Committee, the question is whether the Tribes and the Repatriation Committee were necessary parties under Federal Rule of Civil Procedure 19(a)(1) and, if so, whether under Rule 19(b) the party is indispensable such that in equity and good conscience the suit should be dismissed. We conclude that the district court properly dismissed the action pursuant to Rule 19.

A

Rule 19(a) provides a two-pronged inquiry for determining whether a party is "necessary." *Confederated Tribes of Chehalis Indian Reservation v. Lujan*, 928 F.2d 1496, 1498 (9th Cir. 1991).[7] First, the court must determine whether complete relief can be afforded if the action is limited to the existing parties. *Id.*; Fed. R. Civ. P. 19(a)(1)(A). Second, the court must determine whether the absent party has a "legally protected interest" in the subject of the action and, if so, whether the party's absence will "impair or impede" the party's ability to protect that interest or will leave an existing party subject to multiple, inconsistent legal obligations with respect to that interest. *Id.* If the answer to either of those questions is affirmative, then the party is necessary and "must be joined." Fed. R. Civ. P. 19(a)(1). The inquiry under Rule 19(a) "is a practical one and

---

[7] FRCP 19(a) provides, in full,

A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined if:

(A) in that person's absence, the court cannot accord complete relief among existing parties; or

(B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:

(i) as a practical matter impair or impede the person's ability to protect the interest; or

(ii) leave an existing party subject to substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

fact specific." *Makah Indian Tribe v. Verity*, 910 F.2d 555, 558 (9th Cir. 1990) (citing *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 118–19 (1968)).

There is no doubt that the Tribes and the Repatriation Committee have a legally protected interest within the meaning of Rule 19.  Indeed, the language of the rule contemplates that a party need only have a "claim" to an interest.  Fed. R. Civ. P. 19(a)(2).  Rule 19 is designed to protect "a party's right to be heard and to participate in adjudication of a claimed interest, even if the dispute is ultimately resolved to the detriment of that party." *Shermoen v. United States*, 982 F.2d 1312, 1317 (9th Cir. 1992).

Here, the Repatriation Committee has made formal claims to the La Jolla remains on behalf of the Kumeyaay Tribes. The Heritage Commission, the California state agency charged with making the determination, identified the Repatriation Committee as the "most likely descendant" for the La Jolla remains.  The University has filed a Notice of Inventory Completion with the Department of the Interior indicating that the Tribes are the designated recipients.  The Tribes and the Repatriation Committee unquestionably have a sufficient claim to a legally protected interest to satisfy Rule 19.  Indeed, their claim is at the heart of the dispute.

The Scientists argue that the Tribes and the Repatriation Committee do not have a "legally protected interest" because the La Jolla remains have not been established to be "Native American" within the meaning of NAGPRA and, in fact, are not.  However, that argument misses the point of the Rule 19(a) inquiry.  The question is whether the Tribes and the Repatriation Committee have a *claim* that is not "patently frivolous." *Shermoen*, 982 F.2d at 1318.

The interest of the Tribes and the Repatriation Committee would also unquestionably be "impaired or impeded" if the suit were allowed to proceed without the Tribes or the Repatriation Committee as parties. If the Scientists prevail in their claim that the La Jolla remains are not "Native American" within the meaning of NAGPRA and succeed in their efforts to enjoin transfer of the remains to the La Posta Band, then the claims of the Tribes and the Repatriation Committee will be extinguished without the opportunity for them to be heard.

Contrary to the Plaintiffs' assertions, the University cannot sufficiently represent the interests of the Tribes or Repatriation Committee. At present, their interests are aligned. There is some reason to believe that they will not necessarily remain aligned. However, as the district court pointed out, the University "has a broad obligation to serve the interests of the people of California, rather than any particular subset, such as the people of the Kumeyaay tribes." Thus, the different motivations of the two parties could lead to a later divergence of interests. For example, if a court were to determine that the La Jolla remains should not be transferred to the Kumeyaay under NAGPRA, it is questionable whether–perhaps even unlikely that–the University and the Kumeyaay would pursue the same next course of action.

Thus, the district court properly concluded that the Tribes and the Repatriation Committee were necessary parties within the meaning of Rule 19(a).

B

The district court also properly determined that the Tribes and the Repatriation Committee were indispensable parties under Fed. R. Civ. P. 19(b). There are four factors for determining whether a party is indispensable:

> (1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;
>
> (2) the extent to which any prejudice could be lessened or avoided by:
>
>> (A) protective provisions in the judgment;
>>
>> (B) shaping the relief; or
>>
>> (C) other measures;
>
> (3) whether a judgment rendered in the person's absence would be adequate; and
>
> (4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

Fed. R. Civ. P. 19(b).

Obviously, a judgment in favor of the Scientists would prejudice the Tribes and the Repatriation Committee. It would declare that they had no rights to the La Jolla remains and prevent transfer of the remains to the La Posta band. Because the Tribes and the Repatriation Committee seek

custody, there is no provision that could be included in such a judgment that would protect their interests or serve to lessen the effect. The Plaintiffs claim that the University can protect the interest of the Tribes and the Repatriation Committee; however, as we have discussed, their interests are distinct and, although they are aligned at present, their interests could quickly diverge. A judgment rendered in the absence of the Tribes and the Repatriation Committee would be inadequate because, as the district court noted, the necessary parties would not be included and an injunction would not be effective against absent parties. The fourth factor strongly favors the plaintiffs, who would be prevented from obtaining redress for their claims.

Although Rule 19(b) contemplates balancing the factors, "when the necessary party is immune from suit, there may be 'very little need for balancing Rule 19(b) factors because immunity itself may be viewed as the compelling factor.'" *Quileute Indian Tribe v. Babbitt*, 18 F.3d 1456, 1460 (9th Cir. 1994) (quoting *Confederated Tribes*, 928 F.2d at 1499). As the district court correctly noted, "virtually all the cases to consider the question appear to dismiss under Rule 19, regardless of whether a remedy is available, if the absent parties are Indian tribes invested with sovereign immunity." (citing *Am. Greyhound Racing, Inc. v. Hull*, 305 F.3d 1015 (9th Cir. 2002); *Dawavendewa v. Salt River Project Agric. Improvement & Power Dist.*, 276 F.3d 1150 (9th Cir. 2002); *Manybeads v. United States*, 209 F.3d 1164 (9th Cir. 2000); *Clinton v. Babbit*, 180 F.3d 1081 (9th Cir. 1999); *Kescoli v. Babbit*, 101 F.3d 1304 (9th Cir. 1996); *McClendon v. United States*, 885 F.2d 627 (9th Cir. 1989).)

Given this wall of circuit authority, the district court properly concluded that the Tribes and the Repatriation Committee were indispensable parties under Rule 19(b).

## C

The district court correctly concluded that the "public rights" exception to Rule 19 did not apply. The Supreme Court has explained that "[i]n a proceeding . . . narrowly restricted to the protection and enforcement of public rights, there is little scope or need for the traditional rules governing the joinder of parties in litigation determining private rights." *Nat'l Licorice Co. v. Nat'l Labor Relations Board*, 309 U.S. 350, 363 (1940). In order for the public rights exception to apply, (1) "the litigation must transcend the private interests of the litigants and seek to vindicate a public right" and (2) "although the litigation may adversely affect the absent parties' interests, the litigation must not destroy the legal entitlements of the absent parties." *Kescoli v Babbitt*, 101 F.3d 1304, 1311 (9th Cir. 1996) (internal quotation marks omitted). As the district court properly observed, the public rights exception cannot apply here because the rights of the Tribes and the Repatriation Committee will be extinguished if the Plaintiffs prevail in their claims.

## VI

In sum, as qualified scientists, the Plaintiffs have standing to assert the claims. The district court properly concluded that NAGPRA did not abrogate the Tribes' sovereign immunity; that, as an arm of the Tribes, the Repatriation Committee was entitled to sovereign immunity, and had not waived it by filing a separate lawsuit or by incorporating in California; that the Tribes and the Repatriation Committee

were necessary and indispensable parties under Fed.R.Civ. P. 19; and that the public interest exception to Rule 19 did not apply. Therefore, the district court did not err by dismissing the action.

**AFFIRMED.**

MURGUIA, Circuit Judge, dissenting:

I agree with the majority that Plaintiffs' complaint contains sufficient factual allegations, which we must accept as true, to establish that a favorable judicial decision is likely to redress their alleged injuries. Plaintiffs therefore have Article III standing to bring this lawsuit. I also agree that the Native American Graves Protection and Repatriation Act (NAGPRA) does not abrogate the sovereign immunity of the Indian tribes, and that the district court properly exercised its discretion when it denied Plaintiffs' request to conduct additional discovery on the question whether the Kumeyaay Cultural Repatriation Committee (KCRC) could properly be considered an "arm" of the Kumeyaay tribes. And, I agree that the district court properly concluded that the KCRC did not waive its immunity when it sued the University in the Southern District of California or when it incorporated under California state law.

The majority and I part ways, however, on the question whether the KCRC is a necessary and indispensable party under Federal Rule of Civil Procedure 19. Our precedents require us to resolve that question in light of the nature and scope of the parties' dispute—which, as I see it, is whether the University properly determined that the La Jolla remains

are "Native American" within the meaning of NAGPRA and therefore whether, as a threshold matter, NAGPRA applies here at all.  Because I read those precedents to compel the conclusion that the KCRC is neither necessary nor indispensable to the resolution of that particular question, I respectfully dissent.

Plaintiffs petitioned for a writ of administrative mandamus under California state law directing the University "to make a formal determination whether or not the La Jolla Skeletons are 'Native American' within the meaning of NAGPRA."  In the alternative, Plaintiffs sought declaratory and injunctive relief, likewise requesting that the court "declar[e] . . . that the La Jolla Skeletons are not 'Native American.' "  The parties' dispute is therefore limited to the correctness of the University's administrative determination—it is not, as it was framed in the district court, a "property dispute, in which the parties assert conflicting ownership interests" in the La Jolla remains.  In other words, this case is not about whether NAGPRA compels repatriation; instead, it is about whether NAGPRA, which concerns only Native American remains, applies in the first place.

Rule 19(a)(1)(B)(i) makes an absent party "necessary" if the party "claims an interest relating to the subject of the action and is so situated that disposing of the action in the [party's] absence may . . . as a practical matter impair or impede the [party's] ability to protect the interest."  Fed. R. Civ. P. 19(a)(1)(B)(i).  Although the party's claimed interest must be more than speculative, *Dawavendewa v. Salt River Project Agric. Improvement & Power Dist.*, 276 F.3d 1150, 1155 n.5 (9th Cir. 2002), it need merely be a "claim"—that is, "[j]ust adjudication of claims requires that courts protect a party's right to be heard and to participate in adjudication of

a claimed interest, even if the dispute is ultimately resolved to the detriment of that party." *Shermoen v. United States*, 982 F.2d 1312, 1317 (9th Cir. 1992).

In this case, Defendants characterize the tribes as "paradigms of 'necessary parties' " because the KCRC and the tribes have a nonfrivolous claim to—and therefore a "legally protected interest" in—the La Jolla remains. Defendants contend that the tribes' interest would be impaired or impeded if the lawsuit were to proceed in their absence because the tribes' "claim to the ownership and control of the Remains lies at the very core of" the parties' dispute. What is more, they allege, the University cannot adequately represent the tribes' interest in this action because of the University's "broad obligation to serve the interests of the people of California, rather than any particular subset, such as the people of the Kumeyaay tribes."

As I see it, Defendants' argument fails first on its premise. Contrary to the way in which the tribes frame it, this is not a property dispute over the La Jolla remains—indeed, the University has already found that the remains are culturally unidentifiable because there is "[s]imply . . . not a preponderance of evidence to support an affirmation of cultural identification or affiliation with any modern group." Neither party suggests any problem with respect to the University's procedural or substantive determination surrounding cultural affiliation, nor does either party take issue with the Department of the Interior's 2010 regulations requiring culturally unidentifiable human remains to be transferred to the tribe or tribes "recognized as aboriginal to the area from which the human remains were removed." *See* 43 C.F.R. § 10.11. Thus, this action will not resolve whether, under NAGPRA, the Kumeyaay tribes are entitled to

"ownership or control" of the La Jolla remains—assuming NAGPRA applies, that question has already been resolved.[1]

Plaintiffs instead take issue with the procedures underlying the University's determination that the remains are "Native American" as that term is defined under NAGPRA. As the tribes readily concede, "NAGPRA is only concerned with Native American remains." So, to the extent that Plaintiffs' claims are limited to that single administrative determination, any "interest" the tribes have in this litigation is identical to the interest of any other party: all parties "have an equal interest in an administrative process that is lawful." *Makah Indian Tribe*, 910 F.2d at 559.[2] The KCRC's interest is no different from the generalized, nonspecific interest of any other "presently existing tribe, people, or culture." *Bonnichsen v. United States*, 367 F.3d 864, 875 (9th Cir. 2004).

To be sure, as the majority correctly notes, for the purposes of Rule 19, the tribes need only assert a "claim" to an interest, not an actual or vested one. *See* Fed. R. Civ. P. 19(a) (defining a "required" party as one who "*claims* an interest relating to the subject of the action" (emphasis added)). Here, the tribes would be entitled to compel repatriation of the La Jolla remains if they are in fact "Native

---

[1] The majority similarly misstates the relief that Plaintiffs seek. According to the majority, a judgment in Plaintiffs' favor would "declare that [the tribes] had no right to the La Jolla remains and prevent transfer of the La Jolla remains to the La Posta Band." That is not so. A judgment in Plaintiffs' favor would merely declare that NAGPRA does not compel repatriation.

[2] Generally, there is no legally protected interest in an agency's procedures. *See Makah Indian Tribe*, 910 F.2d at 558.

American."   Thus, the tribes have, at the very least, a nonfrivolous "claim" to an interest in the subject matter of this dispute.

But the nature of Plaintiffs' claim is not such that, "as a practical matter," proceeding with this litigation in the tribes' absence would "impair or impede the [tribes'] ability to protect" that interest.   Fed. R. Civ. P. 19(a)(1)(B)(i).   We have previously held that the level of impairment resulting from a party's absence "may be minimized if the absent party is adequately represented in the suit."   *Makah Indian Tribe*, 910 F.2d at 558.   Because the KCRC's interest in the process leading to the University's administrative determination that the La Jolla remains are "Native American" is no different from any other party's, *see id.* at 559, the University, as an existing party, is in a position to adequately protect the interest of the KCRC and the tribes.

In determining whether an existing party can adequately represent the interests of an absent party, we are to consider three factors: (1) whether the interests of the existing party "are such that it will undoubtedly make all of the absent party's arguments," (2) whether the existing party "is capable of and willing to make such arguments," and (3) "whether the absent party would offer any necessary element to the proceedings that the present party would neglect."   *Shermoen*, 982 F.2d at 1318 (stating the factors that courts consider under Rule 24(a) in the context of determining adequacy under Rule 19(a)).

The University's interest in this litigation is almost identical to that of the tribes: the interest in properly and lawfully determining the "Native American" status of the La Jolla remains.   Because that is so, it is difficult to imagine any

argument the KCRC might make that the University has not already made and will not ultimately make if the action proceeds. Either the University's determination that the remains are "Native American" was arbitrary and capricious or it was not—in any event, the evidence on which that determination was based was evidence that the KCRC itself provided. In that sense, practically every argument the KCRC could make is an argument that the University will likewise offer to defend its determination. The first factor of the *Shermoen* adequacy test therefore suggests that the tribes will adequately be represented by the University.

The second and third *Shermoen* factors likewise favor a finding that the tribes will adequately be represented. With respect to the second, there is no suggestion in the record that the University is incapable of making or unwilling to make the arguments that the KCRC would likely make. And as to the third, no party identifies a "necessary element" of this lawsuit that the tribes could offer but that the University would neglect. Applying *Shermoen*, I would accordingly conclude that the KCRC is not "so situated that disposing of the action in [its] absence may . . . as a practical matter impair or impede [its] ability to protect" its claimed interest in this litigation. Fed. R. Civ. P. 19(a)(1)(B)(i).

Nor is the KCRC an indispensable party. If an absent party is necessary and cannot be joined,[3] then the court must

---

[3] I agree with the majority that, because NAGPRA does not abrogate the sovereign immunity of the Indian tribes, the KCRC and the tribes are immune from suit and therefore "cannot be joined" for the purposes of Rule 19(b). *See Confederated Tribes of Chehalis Indian Reservation v. Lujan*, 928 F.2d 1496, 1499 (9th Cir. 1991). Thus, because the district court concluded that the KCRC was a necessary party under Rule 19(a), it properly reached the "indispensability" inquiry under Rule 19(b).

determine whether "in equity and good conscience, the action should proceed among the existing parties or should be dismissed." Fed. R. Civ. P. 19(b). That determination requires a four-part inquiry, which is set forth under the Rule:

> **When Joinder Is Not Feasible.** If a person who is required to be joined if feasible cannot be joined, the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed. The factors for the court to consider include:
>
> (1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;
>
> (2) the extent to which any prejudice could be lessened or avoided by:
>
>> (A) protective provisions in the judgment;
>>
>> (B) shaping the relief; or
>>
>> (C) other measures;
>
> (3) whether a judgment rendered in the person's absence would be adequate; and

(4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

Fed. R. Civ. P. 19(b).[4]

The first factor, prejudice, is essentially the same as the "necessary" inquiry under Rule 19(a). *Confederated Tribes*, 928 F.2d at 1499. As I explained above, because the tribes' interests in this litigation are no different than the interests of any other party, and because those interests can adequately be represented by the University, I would conclude that the first factor favors proceeding with the litigation in the tribes' absence.

The remaining factors similarly favor proceeding with the litigation. On the second, the extent to which prejudice could be lessened or avoided, I see no partial or compromise remedy that would lessen potential prejudice, but because of my conclusion on the first factor, I would conclude that the second factor likewise favors proceeding. *See* Fed. R. Civ. P. 19(b)(2). On the third, whether a judgment in the KCRC's absence would be adequate, again, the inquiry in this case is limited to the correctness of the University's determination

---

[4] The majority suggests that there may be "little need for balancing Rule 19(b) factors" in cases in which the absent party is entitled to immunity from suit. Indeed, a few of our sister circuits have concluded as much. *See, e.g.*, *Kickapoo Tribe of Indians v. Babbitt*, 43 F.3d 1491, 1496 (D.C. Cir. 1995); *Fluent v. Salamanca Indian Lease Auth.*, 928 F.2d 542, 549 (2d Cir. 1991); *Enterprise Mgmt. Consultants, Inc. v. United States*, 883 F.2d 890 (10th Cir. 1988). "Cognizant of these out-of-circuit decisions, the Ninth Circuit has, nonetheless, consistently applied the four part balancing test [under Rule 19(b)] to determine whether Indian tribes are indispensable parties." *Dawavendewa*, 276 F.3d at 1162.

that the La Jolla remains are "Native American"—a determination in which the KCRC has no specific, legally protected interest. Thus, nothing suggests that a judgment rendered in KCRC's absence would be inadequate. *See* Fed. R. Civ. P. 19(b)(3); *Philippines v. Pimentel*, 553 U.S. 851, 870 (2008) ("[A]dequacy refers to the 'public stake in settling disputes, whenever possible.' "). And finally, on the fourth factor, it seems clear, in light of the sovereign immunity of the Indian tribes, that Plaintiffs have no adequate remedy if this lawsuit is dismissed. *See* Fed. R. Civ. P. 19(b)(4). Because, on balance, the factors we generally consider under Rule 19(b) disfavor dismissal, I would conclude that the KCRC is not an indispensable party in whose absence this lawsuit could not proceed.

Although the majority suggests otherwise, my conclusion in this respect is not inconsistent with a "wall of circuit authority." In each of the cases the majority and the district court cite to support that assertion, the absent tribe was a party or signatory to a contract sought to be enforced. *See Am. Greyhound Racing, Inc. v. Hull*, 305 F.3d 1015 (9th Cir. 2002) (lawsuit seeking termination of gaming compacts to which the tribe was a party and that would otherwise automatically renew); *Dawavendewa*, 276 F.3d 1150 (9th Cir. 2002) (lawsuit challenging a provision of a lease agreement to which the tribe was a signatory); *Manybeads v. United States*, 209 F.3d 1164 (9th Cir. 2002) (lawsuit challenging settlement agreement to which the tribe was a party); *Clinton v. Babbitt*, 180 F.3d 1081 (9th Cir. 1999) (same); *Kescoli v. Babbitt*, 101 F.3d 1304 (9th Cir. 1996) (same); *McClendon v. United States*, 885 F.2d 627 (9th Cir. 1989) (lawsuit seeking to enforce a lease agreement to which the tribe was a party). As we have observed, "[N]o procedural principle is more deeply imbedded in the common law than that, in an action to

set aside a lease or a contract, all parties who may be affected by the determination of the action are indispensable." *Dawavendewa*, 276 F.3d at 1156. This is not such a case, however; I therefore disagree that the reasoning or outcomes of those cases compel the same conclusion here.

Plaintiffs' complaint takes issue with a specific, threshold question: whether the University properly determined that the La Jolla remains are "Native American" within the meaning of NAGPRA and therefore whether, as a threshold matter, NAGPRA applies at all. I would conclude that the KCRC is neither necessary nor indispensable to the resolution of that question and that this lawsuit may therefore proceed in its absence. I would not reach the question whether the public rights exception to Rule 19 applies in this case, and I would instead reverse the district court's judgment and remand this case for further proceedings.